IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

POWER MOBILITY COALITION )
919 18th Street, N.W., Suite 550 )
Washington, D.C. 20006, )
               *Plaintiff*, )
)
v. ) Civil Action No. _____
)
MICHAEL O. LEAVITT, Secretary, )
United States Department of Health and )
Human Services, )
200 Independence Avenue, S.W. )
Washington, D.C. 20201; )
)
    and )
)
MARK B. McCLELLAN, Administrator, )
Centers for Medicare and Medicaid Services, )
7500 Security Blvd. )
Baltimore, MD 21244, )
)
               *Defendants*. )

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

INTRODUCTION

1.     Plaintiff, the Power Mobility Coalition, on its own behalf and on behalf of its members, asks this Court to declare that regulations promulgated by defendants in their Interim Final Rule, *Conditions for Payment of Power Mobility Devices, Including Power Wheelchairs and Power-Operated Vehicles*, 70 Fed. Reg. 50,940 (Aug. 26, 2005), are arbitrary, capricious, and not in accordance with law in violation of the Administrative Procedure Act, 5 U.S.C. §§ 553, 706, and the Medicare Act, 42 U.S.C.

§§ 1395hh(b), 1395m(j)(2), and to vacate and enjoin enforcement of those regulations. The challenged regulations, which are to be codified at 42 C.F.R. § 410.38(c), are scheduled to take effect on October 25, 2005.

## JURISDICTION AND VENUE

2.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and 2201-2202, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

3.  Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (e), because a substantial part of the events or omissions giving rise to the claim occurred in, or a substantial part of property that is the subject of the action is situated in, this district. Venue also properly lies in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (e), because the defendants reside in this district.

## PARTIES

4.  Plaintiff the Power Mobility Coalition ("Coalition") is a national, non-profit association whose membership includes manufacturers and suppliers of motorized scooters and power wheelchairs. These devices are collectively known as power mobility devices, or "PMDs."

5.  Formed in 2000, the Coalition provides a voice for its members on issues that affect the ability of persons with limited and compromised mobility to obtain access to products and services, including PMDs. The Coalition's goal is to ensure that all Americans who need power mobility equipment to live fuller, more independent, and active lives, have access to such equipment.

6.  Defendant Michael O. Leavitt is the Secretary of the United States Department of Health and Human Services ("HHS"), an agency of the United States

government, with its headquarters at 200 Independence Avenue, S.W., Washington, D.C 20201. Defendant Leavitt is named as defendant in this action in his official capacity as Secretary of HHS.

7. Defendant Mark B. McClellan is the Administrator of the Centers for Medicare and Medicaid Services ("CMS"), an agency of the United States government within HHS, with its headquarters at 7500 Security Boulevard, Baltimore, MD 21244. Defendant McClellan is named as defendant in this action in his official capacity as Administrator of CMS.

## FACTS

### Power Mobility Devices

8. PMDs allow persons who have limited mobility or no mobility – through illness, old age, or otherwise – to care for themselves better at home and to be more active and productive members of their community. Hundreds of thousands of Americans rely on PMDs in order to accomplish such basic life tasks.

9. Power wheelchairs usually have six wheels and are steered using a "joystick." These devices offer excellent maneuverability and are relatively compact. They are particularly well-suited for use indoors. The average cost of a power wheelchair is approximately $5,000.

10. Medical electric scooters have either three or four wheels and steer much like a bicycle, using handlebars. The average cost of an electric scooter is approximately $2,000.

11. Since the late 1990s, a number of factors have contributed to an increase in demand for PMDs.

3

12. Technological advances – including improvements that have made PMDs more stable, maneuverable, and comfortable, easier to operate and maintain, and able to navigate rougher terrain – have permitted a greater proportion of persons who require assistance with mobility to use a PMD successfully.

13. PMD suppliers also have made large expenditures to inform consumers and medical professionals about the mobility options afforded by the new PMDs.

14. Finally, the population most likely to benefit from PMDs is expanding. The number of Americans aged 65 and older increased from 34.6 million in 1999 to 35.9 million in 2003, and is expected to continue to rise to as many as 86 million seniors in 2050. *See* http://www.census.gov/popest/archives/1990s/nat-agesex.txt; http://www.census.gov/Press-Release/www/releases/CB04-36TABLE3.pdf; http://www.census.gov/ipc/www/usinterimproj/natprojtab02a.pdf.

**The Medicare Act and Reimbursement for PMDs**

15. The Medicare Act, 42 U.S.C. §§ 1395-1395ggg, pays for certain medical care provided to eligible beneficiaries. The Act is administered by CMS, which formerly was known as the Health Care Financing Administration ("HCFA").

16. Part B of the Medicare Act authorizes supplementary medical insurance for covered medical services and equipment, including PMDs. *See id.* §§ 1395j–1395w-4; 42 C.F.R. § 410.38. An individual who is a Medicare beneficiary and who has a medical need for a PMD can obtain one that is paid for in large part by Medicare. *See* 42 C.F.R. § 410.38(c)(1).

17. The vast majority of PMD users are Medicare beneficiaries. These individuals generally could not afford to buy or rent a PMD without assistance from Medicare.

18. Reimbursement is obtained from Medicare through a process that relies centrally on a Certificate of Medical Necessity – Motorized Wheelchairs ("CMN"), which is a standardized form that documents the physician's determination of a physical condition that makes a specific type of PMD medically necessary. Congress has defined the CMN as the "form or other document containing information required . . . to be submitted to show that an item is reasonable and necessary for the . . . treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395m(j)(2)(B).

19. The current applicable versions of the CMN – CMS Forms 843 and 850 – were designed by CMS's predecessor agency with input from Medicare contractors, their medical directors, PMD suppliers, and professional organizations including the American Medical Association, the American Society of Internal Medicine, and the Practicing Physicians Advisory Council. The current versions of the CMN have been in use since May 1997 and April 1996, respectively.

20. During the course of developing and obtaining Administration approval for the CMN form in 1996, HCFA offered the following justification for the CMN:

> CMNs are used by Medicare and its contractors to verify that items and services provided are reasonable and necessary as required by [the Medicare Act]. In this way, CMNs are indispensable to the Medicare program. Without the use of these forms, the government would not be able to monitor utilization of certain items that are subject to frequent abuse, nor would the government be able to ensure that only appropriate payments are made. If the government did not use and evaluate the information provided in these forms, it would be very difficult to prevent

5

inappropriate payments, and the Medicare Trust Fund would be vulnerable to abuse.

HCFA, *Supporting Statement for Paperwork Reduction Act Submissions [to the Office of Management and Budget] (Version 2)* at 4 (Nov. 5, 1996). Similarly, in a submission to OMB, HCFA emphasized that "CMNs are a standardized . . . way of communicating information needed to determine the medical necessity of the claim." HCFA, *Paperwork Reduction Act Submission: Durable Medical Equipment Regional Carriers, Certificates of Medical Necessity*, OMB Control No. 093800679, at 3 (Nov. 6, 1996). That standardized approach, explained HCFA, "presents less of a burden than requiring submission of individual medical records (which are non-standardized)." *Id.*

21. The Medicare Act entitles suppliers of PMDs to distribute to physicians or Medicare beneficiaries a CMN that a treating physician may use to document that the supplier's device is medically necessary for a particular patient. *See* 42 U.S.C. § 1395m(j)(2)(A)(i). Congress has specified information that suppliers may, and in some cases must, fill out on the CMNs they distribute. The Medicare Act also establishes civil monetary penalties for violations of those requirements. *See id.* § 1395m(j)(2)(A)(iii).

22. The initial determination whether to provide reimbursement under Medicare is made by one of a number of private firms known as Durable Medical Equipment Regional Carriers ("DMERCs" or "carriers"). These carriers contract with the Secretary of HHS to perform a variety of functions under the Medicare Act, including making coverage determinations, conducting audits, and determining reimbursement rates for durable medical equipment. *See* 42 U.S.C. §§ 1395m(a)(12), 1395u; 42 C.F.R. § 421.210. Durable medical equipment includes wheelchairs, PMDs, and other

equipment such as hospital-style beds, oxygen equipment, and ventilators. *See* 42 C.F.R. § 410.38(a).

23. Medicare beneficiaries ordinarily must make a co-payment of 20 percent of the Medicare-allowable cost of their PMD, and that co-payment may be covered by private insurance. Beneficiaries who need a PMD typically assign their right to Medicare reimbursement to the supplier of the device, and the supplier submits the CMN to a DMERC. Through this process, Medicare beneficiaries receive the needed PMD at little or no expense, while the PMD supplier takes responsibility for submitting a claim for Medicare reimbursement and assumes the financial risk that reimbursement will be delayed or denied.

24. Providing PMDs to Medicare beneficiaries in advance of Medicare reimbursement is consistent with the way in which other medically necessary products and services (including doctors' visits and drugs, for example) are provided under Medicare and private health insurance programs. And it is a practical necessity. Patients and their doctors demand timely access to mobility devices that have been deemed medically necessary. Yet it customarily takes 2-3 weeks after a claim is submitted to receive reimbursement from Medicare, assuming that the claim is approved without being contested. If the claim is disputed, reimbursement can be delayed by as much as another 2-3 years, assuming it is forthcoming at all. There is no process by which the beneficiary or the supplier can obtain quick confirmation in advance that a particular device will be covered by Medicare for a particular patient.

25.     Once the supplier furnishes a PMD to a patient, the patient's dependence on the device and the low value of used PMDs usually make it unreasonable for the supplier to attempt to recover the PMD.

26.     The economic viability of the current procedure for supplying PMDs to Medicare beneficiaries thus depends on suppliers' certainty that Medicare reimbursement will be forthcoming. Such certainty generally can be obtained under the current rules because the CMN provides standardized and readily verifiable documentation of the physician's determination of medical necessity, on which the supplier can rely as the basis for its reimbursement claim.

**The 2003 Amendments to the Medicare Act and HHS's Proposals to Implement Them Through a Notice-and-Comment Rulemaking**

27.     In 2003, as part of the Medicare Prescription Drug, Improvement, and Modernization Act ("MMA"), Pub. L. No. 108-173, 117 Stat. 2066 (2003), Congress amended Medicare Part B to include new provisions addressing PMDs and other durable medical equipment. *See* 42 U.S.C. § 1395m(a).

28.     Among other requirements, Congress directed the Secretary of HHS to "establish standards for clinical conditions for payment for" all reimbursable durable medical equipment, including PMDs. 42 U.S.C. § 1395m(a)(1)(E)(i). Congress further directed the Secretary, in promulgating those regulations, to "first establish standards" for types of equipment as to which "the Secretary determines there has been a proliferation of use, consistent findings of charges for [equipment] that [is] not delivered, or consistent findings of falsification of documentation to provide for payment of such [equipment]." *Id.* § 1395(m)(a)(1)(E)(iii).

29. CMS regulations state that a patient may obtain reimbursement for a "power-operated vehicle that may be appropriately used as a wheelchair" only if it is "ordered in writing" by a physician who was also a "specialist." 42 C.F.R. § 410.38(c)(3)-(4). In the MMA, however, Congress provided that "payment may not be made" for a PMD unless a physician, or another qualifying medical professional who is not a physician, has "conducted a face-to-face examination" of the patient and has written a "prescription" for the PMD. 42 U.S.C. § 1395m(a)(1)(E)(iv). In practice, this provision of the MMA expanded the availability of medical scooters to patients with medical need by eliminating the limitation that only physicians who are specialists could determine medical necessity.

30. These provisions of the MMA took effect on December 8, 2003.

31. On December 22, 2003, CMS opened a rulemaking docket (RIN 0938-AM74) in order to promulgate rules that would "make the requirements to purchase power operated vehicles, functioning as wheelchairs, less stringent," as the MMA had required. Unified Agenda, 68 Fed. Reg. 72,904, 72,910 (Dec. 22, 2003). CMS established a target date of February 2004 for promulgating a final rule after notice and comment. *Id.*

32. On August 5, 2004, however, CMS issued a notice of proposed rulemaking in a different docket (RIN 0938-AM90), in which CMS proposed comprehensively to revise its payment policies for numerous types of services covered by Medicare, including reimbursement for durable medical equipment. *See* Proposed Rule, *Revisions to Payment Policies Under the Physician Fee Schedule for Calendar Year 2005*, 69 Fed. Reg. 47,488, 47,575-76 (Aug. 5, 2004). Included in that lengthy document

9

were proposed rules that would have "established standards for clinical conditions" necessary to obtain payment for all durable medical equipment. 42 U.S.C. § 1395m(a)(1)(E)(i).

33. The proposed rule would have required a face-to-face examination and a written prescription as conditions for Medicare reimbursement for *all* durable medical equipment, whereas Congress had required a face-to-face examination and written prescription only for PMDs. *See* 42 U.S.C. § 1395m(a)(1)(E)(iv); 69 Fed. Reg. at 47,545. The proposed rule also would have established the following new obligations on medical practitioners who prescribe the use of a PMD or other durable medical equipment:

   a. The prescription for durable medical equipment must be dated and signed within 30 days after the face-to-face examination, *see* 69 Fed. Reg. at 47,576 (proposed new 42 C.F.R. § 410.38(g)(4));

   b. The physician or prescribing practitioner must document in the beneficiary's medical record the need for the durable medical equipment being ordered, *see id.* (proposed new 42 C.F.R. § 410.38(g)(5)); and

   c. CMS may determine other additional payment criteria, such as prescription renewal requirements, repairs, minor revisions and replacement, through contractor instructions, *see id.* (proposed new 42 C.F.R. § 410.38(g)(6)).

34. Members of the Coalition and other interested parties filed comments on the proposed reimbursement rule for durable medical equipment. In letters to CMS dated September 24, 2004, and October 4, 2004, for example, the Coalition identified several problematic aspects of the proposed regulation for durable medical equipment, including the poorly defined record-keeping requirements and the burdens that complying with the

10

regulations would place on physicians and suppliers of PMDs. The Coalition proposed that CMS establish an advisory committee made up of physicians, Medicare beneficiaries, and manufacturers and suppliers of PMDs to assist in considering modifications to the reimbursement guidelines for PMDs. Those letters were placed in the administrative record of Docket No. RIN 0938-AM90.

35.     On November 15, 2004, CMS issued a Final Rule in Docket No. RIN 0938-AM90 pursuant to its proposed comprehensive rule. *See* Final Rule, *Revisions to Payment Policies Under the Physician Fee Schedule for Calendar Year 2005*, 69 Fed. Reg. 66,236 (Nov. 15, 2004). The Final Rule that CMS promulgated, however, did not implement the proposed changes (or any other changes) to 42 C.F.R. § 410.38(g) with regard to durable medical equipment.

36.     Instead, CMS stated that, "[d]ue to the timeframe and the extensive number of public comments received" on that issue, it would promulgate regulations implementing the face-to-face examination and written-prescription requirements in the MMA "at a later date" and would "address all public comments in a future Federal Register document." 69 Fed. Reg. at 66,336.

**The Interim Final Rule**

37.     On August 26, 2005, CMS promulgated an Interim Final Rule addressing PMDs. *See* 70 Fed. Reg. at 50,940. The Interim Final Rule was promulgated in Docket No. RIN 0938-AM74 – the docket that CMS had opened on December 22, 2003, to *ease* requirements for buying a PMD under Medicare, and that had been inactive since it was opened.

38.     Despite its consideration of similar issues in a notice-and-comment rulemaking proceeding in Docket No. RIN 0938-AM90, CMS did not file a notice of proposed rulemaking in Docket No. RIN 0938-AM74 before promulgating its Interim Final Rule. *See* 70 Fed. Reg. at 50,940. Moreover, the preamble to the Interim Final Rule does not mention either the notice of proposed rulemaking in which CMS had proposed standards for clinical conditions for all durable medical equipment, or the public comments filed on that issue in Docket No. RIN 0938-AM90.

39.     The Interim Final Rule is scheduled to take effect on October 25, 2005. It will remain in effect until CMS completes a new notice-and-comment rulemaking that it initiated (also on August 26, 2005) to promulgate a Final Rule. *See* 70 Fed. Reg. at 50,940. CMS has not set a deadline for promulgating the anticipated Final Rule.

40.     The Interim Final Rule does more than incorporate into agency regulations the face-to-face-examination and written-prescription requirements that the MMA established for PMDs. *See* 42 U.S.C. § 1395(a)(1)(E)(iv).

41.     First, the Interim Final Rule requires a "prescription" that is more detailed than the prescription normally used in the medical profession. To comply with the new Medicare regulations, a prescription must include: "the beneficiary's name, the date of the face-to-face examination, the diagnoses and conditions that the PMD is expected to modify, a description of the item (for example, a narrative description of the specific type of PMD), the length of need, and the physician or treating practitioner's signature and the date the prescription was written." 70 Fed. Reg. at 50,941, 50,946 (to be codified at 42 C.F.R § 410.38(c)(1)).

12

42. The Interim Final Rule also adopts a series of documentation requirements that are "*[i]n addition to* the prescription" requirement. 70 Fed. Reg. 50,942 (emphasis added). Under the documentation requirements, PMD suppliers may not provide a PMD that will be the subject of a claim for Medicare reimbursement unless they first obtain, within 30 days of the face-to-face examination that led to the prescription, the prescription and adequate "supporting documentation." *Id.* at 50,943, 50,946-47 (to be codified at 42 C.F.R. § 410.38(c)(4)). The "supporting documentation," in turn, must include "pertinent parts of [the patient's] medical record that clearly support the medical necessity for the PMD in the beneficiary's home." *Id.* at 50,942; *see id.* at 50,946 (to be codified at 42 C.F.R. § 410.38(c)(2)(iii)).

43. The supplier must retain the prescription and supporting documentation and provide them to CMS or a Medicare carrier upon request. *Id.* at 50,947 (to be codified at 42 C.F.R. § 410.38(c)(5)). CMS generally requires PMD suppliers to retain records that support a reimbursement request for at least seven years. *See Medicare Program Integrity Manual* § 5.21 (rev. 2004), *available at* http://www.cms.hhs.gov/manuals/108_pim/pim83c05.pdf.

44. Furthermore, at the request of CMS or its carrier, the supplier must provide "additional documentation . . . to support and/or substantiate the medical necessity for the power mobility device." 70 Fed. Reg. at 50,947 (to be codified at 42 C.F.R. § 410.38(c)(5)(ii)). This additional documentation "may include physician office records, hospital records, nursing home records, home health agency records, records from other healthcare professionals, and test reports." *Id.* at 50,943.

13

45. According to CMS, the "pertinent parts" of the medical record that the supplier must collect within 30 days of the examination and retain in all instances "may include the [patient's medical] history," as well as details on the physician's "physical examination, diagnostic tests, summary of findings, diagnoses, and treatment plans." 70 Fed. Reg. at 50,942. That documentation must contain both objective and subjective justification for the medical professional's prescription. The objective component might consist of medical records establishing (to the DMERC's satisfaction) the patient's appearance and physical condition, including the functionality of the patient's extremities, and the patient's ability to perform functions in his or her home environment. The subjective component might consist of a narrative, written by the physician or qualifying treating practitioner, that summarizes, in a fashion acceptable to the particular DMERC to which the claim is submitted, the patient's history and treatment and the rationale for the medical professional's recommendation of a PMD. *See id.*

46. Finally, in promulgating the Interim Final Rule, CMS announced that the new prescription documentation requirements would replace the CMN process, and that the CMN would be eliminated as a mechanism for documenting eligibility for Medicare reimbursement. 70 Fed. Reg. at 50,943-44.

47. Under the Interim Final Rule the CMN will serve only a temporary record-keeping function. Although the Interim Final Rule takes effect on October 25, 2005, Medicare carriers will not be capable of processing the documentation required by the Rule until April 2006. *See* HHS, *CMS Manual System, Pub. 100-08 Medicare Program Integrity*, Transmittal 124, at 1 (Sept. 23, 2005), *available at* http://www.cms.hhs.gov/manuals/pm_trans/R124PI.pdf. Between October 25, 2005 and

April 2006, CMS will require suppliers to file a "partially-completed unsigned CMN" in addition to the newly required documents. *Id.* This use of unsigned CMNs, however, is only a record-keeping device for CMS and its carriers. The unsigned CMN no longer qualifies as documentation of medical necessity, and its submission does not relieve the supplier of its obligation to comply with the new prescription and documentation requirements.

48. In promulgating the Interim Final Rule, CMS did not consider obvious alternatives to abolishing the CMN procedure. Such obvious alternatives would include requiring treating medical professionals to provide additional information supporting their determination of medical necessity in the standardized format of a CMN.

49. Starting on October 25, 2005, suppliers would be subject to civil monetary penalties and exclusion from future participation in Medicare if they submit a claim for a PMD that "is determined not to be medically necessary or reasonable," which would include claims that are determined not to comply with the prescription and documentation requirements of the Interim Final Rule. 42 C.F.R. §§ 402.1, 402.105, 402.107.

**The Effect of the Interim Final Rule on Coalition Members**

50. As CMS recognized in abolishing the CMN process, the "medical necessity" standard for obtaining reimbursement is inherently "subjective" and prone to different interpretation by different medical professionals. 70 Fed. Reg. at 50,944. Since 1997, the CMN process has served to "eliminate some of the subjectivity" surrounding the determinations of medical necessity that support reimbursement. *Id.* In collecting CMNs and providing them to DMERCs upon request, suppliers of PMDs act as conduits between the treating physicians who determine medical necessity and the DMERCs that

15

are authorized to review those determinations. Because suppliers can rely on a historically grounded expectation that a properly completed CMN will be sufficient evidence of medical necessity, they have been able to assume the risk associated with their intermediary role in the Medicare system. Suppliers thus can provide patients with the mobility devices they urgently need, without requiring the patients to wait until Medicare reimbursement has been approved.

51. The Interim Final Rule eliminates the certainty created by CMNs and substitutes a new reimbursement regime that disrupts suppliers' role in the Medicare system. Under the Interim Final Rule, suppliers must obtain from the patient's physician or treating practitioner a prescription and other, undefined supporting documentation that "clearly demonstrate[s] medical necessity for the PMD." 70 Fed. Reg. at 50,942. Whereas the CMN process relied on physicians to make determinations of medical necessity for their patients (subject to potential review by the DMERCs in extraordinary cases), the Interim Final Rule relies on suppliers to assess the adequacy of each justification of medical necessity that is prepared by a treating professional.

52. Suppliers generally do not currently employ the trained personnel who would be needed to oversee the work of physicians and treating practitioners. Suppliers also would be required under the Interim Final Rule to create and maintain extensive new files that may support their assessment that the medical professional made a sufficiently strong case of medical necessity. If the supplier's assessment of the medical professional's justification is incorrect, and the supplier is unable to obtain additional documentation that persuades the DMERC of medical necessity, the DMERC may deny payment on the claim.

53. Members of the Coalition will be irreparably harmed by the newly promulgated regulations. The record-keeping and other out-of-pocket costs imposed by the Interim Final Rule and the uncertainty surrounding Medicare reimbursement under the Interim Final Rule will cause some Coalition members that are suppliers of PMDs to cease selling those devices, and therefore to withdraw from the Medicare program. Non-compliance with the regulations, to test their validity, is not a viable alternative for these Coalition members because it would not provide a timely determination of the regulations' validity and non-compliance would subject a supplier to severe penalties, including fines and exclusion from future participation in Medicare. *See* 31 U.S.C. § 3729; 42 U.S.C. § 1320a-7(a); 42 C.F.R. §§ 402.1, 402.105, 402.107. As such, the Coalition's supplier members have no practical means of obtaining relief through an administrative process.

## FIRST CAUSE OF ACTION

(For violation of the Administrative Procedure Act, 5 U.S.C. §§ 553, 706, and the Medicare Act, 42 U.S.C. § 1395hh(b))

54. Plaintiff incorporates by reference paragraphs 1 through 53, as though fully set forth herein.

55. The Administrative Procedure Act, 5 U.S.C. § 553, requires that administrative agencies promulgate legislative rules after following a notice-and-comment process. The Medicare Act, 42 U.S.C. § 1395hh(b)(1), contains an explicit notice-and-comment requirement applicable to regulations implementing the substantive provisions of the Medicare Act.

56. The Interim Final Rule was promulgated without notice and comment and does not qualify for any of the limited exceptions to the notice-and-comment requirement

in either 5 U.S.C. § 553(b) or 42 U.S.C. § 1395hh(b), and therefore violates both the Administrative Procedure Act and the Medicare Act.

## SECOND CAUSE OF ACTION

(For violation of the Medicare Act, 42 U.S.C. § 1395m(j)(2))

57. Plaintiff incorporates by reference paragraphs 1 through 56, as though fully set forth herein.

58. The Medicare Act gives suppliers, such as the Coalition, a statutory right to utilize a CMN in seeking reimbursement for PMDs provided to Medicare beneficiaries. *See* 42 U.S.C. § 1395m(j)(2)(A)(i).

59. Congress also provided that a supplier that submits a properly completed CMN cannot be required to submit additional information to substantiate a claim for reimbursement. *See* 42 U.S.C. § 1395m(j)(2)(B).

60. The Interim Final Rule eliminates the CMN as evidence of medical necessity and permits Medicare carriers to insist on additional information to substantiate claims for reimbursement. The Interim Final Rule therefore violates 42 U.S.C. § 1395m(j)(2) and 5 U.S.C. § 706.

## THIRD CAUSE OF ACTION

(For violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))

61. Plaintiff incorporates paragraphs 1 through 60, as though fully set forth herein.

62. The reimbursement requirements established in the Interim Final Rule are arbitrary, capricious, and not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

WHEREFORE, plaintiff respectfully requests that this Court:

A. Declare that the Interim Final Rule violates the Administrative Procedure Act and the Medicare Act because it was unlawfully promulgated without notice and comment;

B. Declare that the Interim Final Rule violates the Medicare Act by eliminating the CMN and permitting Medicare carriers, as a condition of reimbursement, to insist on additional information beyond that required to be submitted initially by a supplier;

C. Declare that the Interim Final Rule violates the Administrative Procedure Act because the reimbursement requirements established therein are arbitrary, capricious, and contrary to law;

D. Vacate the Interim Final Rule;

E. Enjoin defendants from administering or enforcing the Interim Final Rule;

F. Award plaintiff its costs and reasonable attorneys' fees pursuant to 28 U.S.C. § 2412 and other applicable authority; and

G. Grant such other relief as this Court may deem just and proper.

                                        Respectfully submitted,

                                        */s/ K. Chris Todd*

| | |
|---|---|
| Eric W. Sokol | K. Chris Todd |
|   D.C. Bar No.: 434592 |   D.C. Bar No.: 284455 |
| Power Mobility Coalition | David C. Frederick |
| 919 18th Street, NW |   D.C. Bar No.: 431864 |
| Suite 550 | Austin C. Schlick |
| Washington, DC 20006 |   D.C. Bar No.: 540042 |
| (202) 296-3501 | Andrew M. Hetherington |
| |   D.C. Bar No.: 490434 |
| | Kellogg, Huber, Hansen, Todd |
| |   Evans & Figel, P.L.L.C. |
| | 1615 M Street, NW |
| | Suite 400 |
| | Washington, D.C. 20036 |
| | (202) 326-7900 |

                          *Counsel for the Power Mobility Coalition*

Dated: October 13, 2005