**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| POWER MOBILITY COALITION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. _____ |
| | ) |
| MICHAEL O. LEAVITT, Secretary, United States | ) |
| Department of Health and Human Services, and | ) |
| MARK B. McCLELLAN, Administrator, Centers | ) |
| for Medicare and Medicaid Services, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFF'S MOTION FOR**
**PRELIMINARY INJUNCTIVE RELIEF**

Plaintiff, the Power Mobility Coalition ("Coalition"), hereby moves for a

preliminary injunction enjoining the enforcement of regulations promulgated by the

Department of Health and Human Services ("HHS") on August 26, 2005. *See* Interim

Final Rule, *Conditions for Payment of Power Mobility Devices, Including Power*

*Wheelchairs and Power-Operated Vehicles*, 70 Fed. Reg. 50,940 (Aug. 26, 2005) (to be

codified at 42 C.F.R. § 410.38(c)) (Exh. 1). Those regulations, which were issued

without notice and comment, would radically change the procedures for obtaining

reimbursement for motorized wheelchairs and scooters under the Medicare program. The

new regulations are scheduled to take effect on October 25, 2005.

Under current Medicare procedures, which reflect specific congressional

direction, claimants submit to HHS a standardized from that contains information tailored

to demonstrating whether a Medicare beneficiary's motorized wheelchair or scooter is reimbursable under the program. The new regulations would eliminate that standardized approach and establish a highly discretionary, and much more costly, system in which claimants must collect and review patients' medical records in an effort to determine whether the records will establish eligibility to HHS's satisfaction.

If permitted to take effect pending judicial review, the regulations would cause severe and irreversible economic injury to members of the Coalition and harm Medicare beneficiaries by interrupting their access to necessary medical devices. An injunction, by contrast, would not cause significant harm to the Medicare program. In fact, the administrative processes of the Medicare system will not conform to the challenged regulations until April 2006, even though the regulations will impose severe hardships on equipment suppliers, physicians, and patients beginning on October 25.

This challenge to the new rules has a substantial likelihood of success on the merits. Promulgation of the contested legislative regulations without notice and comment violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, and the Medicare Act, 42 U.S.C. § 1395hh(b)(1). In addition, the regulations are arbitrary, capricious, and contrary to law under 5 U.S.C. § 706 because, among other things, they are inconsistent with the requirements of the Medicare statute and the agency failed to consider reasonable alternatives.

An oral hearing is requested, and a proposed order is attached.[1]

---

[1] Since promulgation of the new regulations last August, the Coalition and its members have engaged in discussions with HHS about alternatives to this litigation. Those discussions have been unsuccessful thus far.

## STATEMENT OF THE CASE

### 1.    Power Mobility Devices

Hundreds of thousands of elderly, disabled, or otherwise infirm Americans rely upon a motorized wheelchair or scooter to accomplish basic life tasks. *See* Zipp Decl. ¶ 4 (Exh. 7). These medical devices are known as power mobility devices, or "PMDs." In the last several years, PMDs have become more comfortable, easier to operate, and safer. *Id.* ¶ 5. Most new power wheelchairs have a tight turning radius, allowing their use in homes that older models could not navigate. *See id.*; 70 Fed. Reg. at 50,941. These improvements, together with the emergence of efficient new suppliers of PMDs (including members of the Coalition) and increased consumer awareness of the devices, drove a significant increase in demand for PMDs during recent years. Zipp Decl. ¶¶ 5-6. Demand for PMDs is expected to grow further as the average age of the American population increases. *Id.* ¶ 7.

PMDs are sophisticated and expensive items of medical equipment. Scooters cost approximately $2,000 at retail, while motorized wheelchairs cost approximately $5,000. *See* 70 Fed. Reg. at 50,945. The vast majority of PMD users could not afford to purchase or rent a device outside the Medicare program. Zipp Decl. ¶ 15; Sidak & Singer Decl. ¶¶ 17, 30 (Exh. 8).

### 2.    The Medicare Act and Certificates of Medical Necessity

The Medicare Act, 42 U.S.C. §§ 1395-1395ggg, establishes a system of federal funding for certain medical care provided to eligible aged and disabled beneficiaries. The Medicare Act consists of several parts. Part B, *see id.* §§ 1395j–1395w-4, covers certain medically necessary equipment that is used primarily in the home, such as PMDs. Like

3

the rest of the Medicare program, Part B is administered by HHS's Centers for Medicare and Medicaid Services ("CMS").  CMS was formerly known as the Health Care Finance Administration, or "HCFA."

Under the Medicare statute and existing CMS regulations and guidelines, a beneficiary with a medical need for a PMD can obtain one through Medicare by following an established process that utilizes a Certificate of Medical Necessity ("CMN").  *See* 42 U.S.C. § 1395m(j)(2) (Exh. 2); 42 C.F.R. § 410.38 (2004) (Exh. 3). The CMN is a form that HCFA designed for use in obtaining reimbursement for "durable medical equipment" such as hospital-style beds, oxygen-therapy equipment, ventilators, and wheelchairs.  *See* HCFA Form 843 (May 1997) (Exh. 4); 42 C.F.R. § 410.38(a). Congress has defined the CMN as a "form or other document containing information required . . . to be submitted to show that an item is reasonable and necessary for the . . . treatment of illness or injury or to improve the functioning of a malformed body member."  42 U.S.C. § 1395m(j)(2)(B).  The CMN enables the "efficient adjudication of claims by automating the submission of certain information needed to make medical necessity determinations."  70 Fed. Reg. at 50,944.

Under a process specifically authorized by statute, suppliers of PMDs provide physicians with CMN forms that can be used to establish whether Medicare reimbursement is available for a patient's use of the supplier's equipment.  *See* 42 U.S.C. § 1395m(j)(2)(A)(i).  If a physician determines that the patient has a medical need for a PMD, the physician fills out a CMN for particular equipment.  The doctor or the patient then provides the CMN to the supplier of the equipment.  *See* Zipp Decl. ¶ 10-12; DiLernia Decl. ¶ 6 (Exh. 9).

The patient ordinarily assigns his or her right to Medicare reimbursement for the PMD to the supplier, and is responsible for only a co-payment of 20% of the Medicare-allowable cost. The co-payment, moreover, is often covered by Medicaid or private insurance, provided that Medicare finds the claim to be reimbursable. *See* Zipp Decl. ¶ 11; DiLernia Decl. ¶ 3; Sidak & Singer Decl. ¶ 18. The supplier thus takes responsibility for submitting the claim for reimbursement and assumes the financial risk that the reimbursement claim will be denied. Zipp Decl. ¶ 13; Sidak & Singer Decl. ¶ 19.

Under the Medicare Act, the initial determination whether to provide reimbursement is made by one of a number of private firms known as Durable Medical Equipment Regional Carriers, or simply "carriers." Carriers are under contract with HHS to perform a variety of functions under the Medicare statute, including making coverage determinations, conducting audits, and determining reimbursement rates. *See* 42 U.S.C. § 1395u; 42 C.F.R. § 421.210. Carriers process CMNs and determine whether to provide the requested reimbursement.

In 1996, HCFA explained the role of the CMN during the course of developing and obtaining Administration approval for its CMN form:

> CMNs are used by Medicare and its contractors to verify that items and services provided are reasonable and necessary as required by [the Medicare Act]. In this way, CMNs are indispensable to the Medicare program. Without the use of these forms, the government would not be able to monitor utilization of certain items that are subject to frequent abuse, nor would the government be able to ensure that only appropriate payments are made. If the government did not use and evaluate the information provided in these forms, it would be very difficult to prevent inappropriate payments, and the Medicare Trust Fund would be vulnerable to abuse.

HCFA, *Supporting Statement for Paperwork Reduction Act Submissions [to the Office of Management and Budget] (Version 2)* at 7 (Nov. 5, 1996) at 4 (Exh. 5). CMNs play the same "indespensible" role today.

### 3.    The 2003 Act and CMS's Notice of Proposed Rulemaking

In 2003, as part of the Medicare Prescription Drug, Improvement, and Modernization Act ("MMA"), Pub. L. No. 108-173, 117 Stat. 2066 (2003), Congress amended Medicare Part B to include a new provision specific to PMDs. Under that provision, Medicare reimbursement may be made for PMDs if a physician, or another specified medical professional, has at some time "conducted a face-to-face examination" of the patient and written a "prescription" for the PMD. 42 U.S.C. § 1395m(a)(1)(E)(iv). Prior to the MMA, a patient could obtain reimbursement for a medical scooter only if it was "ordered in writing" by a physician who was a "specialist." 42 C.F.R. § 410.38(c)(3). In this respect, the MMA made it easier for eligible Medicare recipients to obtain medical scooters.

Congress also directed the Secretary of Health and Human Services to "establish standards for clinical conditions for payment for" PMDs and other durable medical equipment. 42 U.S.C. § 1395m(a)(1)(E)(i). Congress further directed the Secretary, in promulgating those regulations, to "first establish standards" for types of equipment as to which "the Secretary determines there has been a proliferation of use, consistent findings of charges for [equipment] that [is] not delivered, or consistent findings of falsification of documentation to provide for payment of such [equipment]." *Id.* § 1395(m)(a)(1)(E)(iii).

These provisions of the MMA took effect on December 8, 2003. On December 22, 2003, the "Unified Agenda" published in the Federal Register indicated that CMS had

opened a rulemaking docket (RIN 0938-AM74), to "make the requirements to purchase [scooters] less stringent." Unified Agenda, 68 Fed. Reg. 72,904, 72,910 (Dec. 22, 2003). CMS, however, did not issue any substantive documents in that PMD rulemaking docket until the Interim Final Rule that is the subject of this case.

In August 2004, CMS issued a notice of proposed rulemaking in another docket (RIN 0938-AM90). The proposed rule in that docket addressed PMDs as one part of a comprehensive revision to CMS's payment policies under Medicare's physician fee schedule. *See* Proposed Rule, *Revisions to Payment Policies Under the Physician Fee Schedule for Calendar Year 2005*, 69 Fed. Reg. 47,488, 47,575-76 (Aug. 5, 2004). Among the various changes proposed were some that would have implemented, for all durable medical equipment, the face-to-face examination and written-prescription requirements that the MMA established specifically for PMDs. In particular, the proposed rule would have provided that the physician's or prescribing practitioner's order must be dated and signed within 30 days after a face-to-face examination, and the physician or prescribing practitioner must document in the beneficiary's medical record the need for the durable medical equipment being ordered. *See id.* (proposed new 42 C.F.R. § 410.38(g)(4)-(5)). The proposed regulation also would have allowed CMS to establish additional payment criteria through instructions to Medicare carriers. *See id.* (proposed new 42 C.F.R. § 410.38(g)(6)).[2]

---

[2] In September 2003, CMS and the Office of the Inspector General had announced an initiative to address the explosive growth of Medicare payments for PMDs. CMS, *New Efforts Aimed at Stopping the Abuse of the Power Wheelchair Benefit in the Medicare Program* (Sept. 9, 2003), *available at* http://www.cms.hhs.gov/media/press/release.asp?Counter=843. After that announcement, Medicare carriers announced so-called "clarifications" of their policies concerning the review of documentation supporting reimbursement requests. The "clarifications," however, were never approved by the Office of Management and Budget and were withdrawn following enactment of the MMA. *See* HomeCare, *CMS Retracts Controversial Power Wheelchair Clarification* (Apr. 1, 2004), *available at* http://bg.homecaremag.com/ar/medical_cms_retracts_controversial.

Members of the Coalition and other interested parties filed Comments on the proposed rule. *See* Zipp Decl. ¶ 16. CMS issued a final rule in November 2004, but that rule did not implement any of the proposed changes to 42 C.F.R. § 410.38(g) with regard to PMDs and other durable medical equipment. Instead, CMS stated that, "[d]ue to the timeframe and the extensive number of public comments received," it would promulgate regulations implementing the face-to-face examination and written-prescription requirements in the MMA "at a later date" and would "address all public comments in a future Federal Register document." Final Rule, *Revisions to Payment Policies Under the Physician Fee Schedule for Calendar Year 2005*, 69 Fed. Reg. 66,236, 66,336 (Nov. 15, 2004).

### 4.    The Challenged Rule

On August 26, 2005, CMS took action to implement those provisions of the MMA and otherwise modify its reimbursement requirements for PMDs. But CMS did not follow the approach suggested in its proposed rulemaking, or even issue its new regulations in the same docket in which it had filed the notice of proposed rulemaking. Nor did CMS address the "extensive" public comments that had been submitted with respect to the rules the agency had proposed.

Instead, CMS returned to the previously inactive docket that it had opened on December 22, 2003, to ease the requirements for obtaining reimbursement for scooters. In that docket, CMS issued, without first filing a notice of proposed rulemaking, what it termed an "Interim Final Rule" addressing all PMDs. *See* 70 Fed. Reg. at 50,940. The Rule is scheduled to take effect on October 25, 2005. It is to remain in effect indefinitely

– until CMS completes a new notice-and-comment rulemaking that it initiated (also on

August 26, 2005) to promulgate a Final Rule. *See id.*

 In promulgating the new Rule, CMS asserted that notice and comment was

unnecessary because the Rule, in part, implemented the face-to-face examination and

prescription requirements of the MMA. *See id.* at 50,943. Yet the Rule adopts a host of

new requirements that must be satisfied before a supplier (or a Medicare beneficiary)

may obtain reimbursement for a PMD. Unlike the proposed rule put out for public

comment in 2004, the Rule does away with the CMN as a standardized form for

supporting a Medicare claim. Instead of the CMN, the Rule requires the PMD supplier

(or the Medicare beneficiary) to support its claim for reimbursement by providing a

prescription and "supporting documentation," including "pertinent parts" of the patient's

medical records. *Id.* at 50,946. We refer to these changes, collectively, as the

"Documentation Requirements."

 By the terms of the Rule, a qualifying prescription is not a slip of paper from a

doctor's standard prescription pad. Instead, CMS defined "prescription" as a "written

order" that includes the beneficiary's name, the physician's name and signature, the date

of the examination, "the diagnoses and conditions that the PMD is expected to modify, a

description of the [PMD] (for example, a narrative description of the specific type of

PMD)," and the "length of need." *Id.* at 50,941.

 In addition to the prescription, the physician must provide the supplier with

"pertinent parts of the medical record" that "clearly support the medical necessity for the

PMD in the beneficiary's home." *Id.* at 50,942. According to CMS, "pertinent parts"

"may include the [patient's medical] history," as well as details on the physician's

"physical examination, diagnostic tests, summary of findings, diagnoses, and treatment plans." *Id.* CMS envisions that these portions of the record would include "subjective" and "objective" components. The subjective component might summarize matters such as the patient's history, treatment, and request for a PMD. *See id.* The objective component might record circumstances like the patient's appearance and physical condition, including the functionality of the patient's extremities and the patient's ability to perform functions in his or her home environment. *See id.*

The Documentation Requirements also include procedural and record-keeping obligations. In order for a supplier to receive reimbursement for a PMD, it must receive from the doctor or treating practitioner, within 30 days of the face-to-face examination, the prescription and documentation that supports the determination of medical necessity. *See id.* at 50,946-47 (new 47 C.F.R. § 410.38(c)(2), (4)). Moreover, suppliers are required to "maintain the prescription and the supporting documentation" and must make those documents available "to CMS and its agents upon request." *Id.* at 50,947 (new 47 C.F.R. § 410.38(c)(5)(i)). If a Medicare carrier is not satisfied with the content of the prescription and medical records, it may require the supplier to obtain and present "additional documentation" from the medical professional. *Id.* at 50,943, 50,947 (new 47 C.F.R. § 410.38(c)(5)(ii)).

Although the effective date of the Rule is October 25, 2005, Medicare carriers will not be capable of processing the documents required by the Rule until April 2006. Between October 25, 2005, and April 2006, CMS will require suppliers to file an unsigned CMN form that the carriers are able to process, although that form will not carry any weight as proof of medical necessity and suppliers will have to comply with the

10

new Documentation Requirements.  *See* HHS, *CMS Manual System, Pub. 100-08*

*Medicare Program Integrity*, Transmittal 124 (Sept. 23, 2005), *available at*

http://www.cms.hhs.gov/manuals/pm_trans/R124PI.pdf.

## DISCUSSION

A preliminary injunction against enforcement of the Rule is warranted because:

(1) there is a likelihood (indeed, a strong likelihood) that the Coalition's challenge to the

Rule will succeed on its merits; (2) members of the Coalition would suffer irreparable

injury if the injunction is not granted; (3) the requested injunction would not substantially

injure other interested parties; and (4) the public interest would be furthered by the

injunction. *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

The Coalition need not demonstrate that all of the relevant considerations tilt in favor of

relief.  It is enough that the overall "balance[]" of these factors favors relief.  *Id.*; *see Lee*

*v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 26 (D.D.C. 2001) (preliminary

injunction factors "interrelate on a sliding scale and must be balanced against each

other") (internal quotation marks omitted).  Nevertheless, as we demonstrate below, *all* of

the relevant factors support issuing a preliminary injunction in this case.  *Cf. World Duty*

*Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61 (D.D.C. 2000) (preliminarily

enjoining implementation of temporary regulation that was promulgated without notice

and comment).

## I.    THE COALITION IS LIKELY TO SUCCEED ON ITS PROCEDURAL AND SUBSTANTIVE CHALLENGES TO THE RULE

The first relevant factor, whether the Coalition has shown a likelihood of success

on the merits, tips the balance of all the factors strongly in favor of an injunction, because

the Coalition is very likely to prevail on both its procedural challenge and its substantive

challenge to the Rule. *See generally Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843-45 (D.C. Cir. 1977) (discussing interrelationship of the four factors).

### A.    The Secretary Unlawfully Failed To Follow Notice-and-Comment Procedures

The APA, 5 U.S.C. § 553, generally requires that an agency wishing to change its substantive rules must do so through notice-and-comment rulemaking procedures. The Medicare Act likewise requires the use of notice-and-comment procedures in promulgating such rules. *See* 42 U.S.C. § 1395hh(b)(1). Under these procedures, a "notice of proposed rule making shall be published in the Federal Register," 5 U.S.C. § 553(b), and then "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation," *id.* § 553(c).

Notice-and-comment procedures represent Congress's compromise between the competing interests of agency efficiency and agency accountability. *See New Jersey Dep't of Envtl. Prot. v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980). Accordingly, although Congress established a handful of exceptions to the notice-and-comment requirement, it "expected, and the courts have held, that the various exceptions . . . will be narrowly construed and only reluctantly countenanced." *Id.*; *see Tennessee Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1144 (D.C. Cir. 1992) (same); *Analysas Corp. v. Bowles*, 827 F. Supp. 20, 23 (D.D.C. 1993) ("Courts in this circuit take a dim view of rule-making which has not been preceded by notice and comment.").

The Secretary of HHS conceded that he did not follow notice-and-comment procedures in promulgating the Rule. *See* 70 Fed. Reg. at 50,943. That undisputed failure renders the Rule unlawful.

### 1.    The Documentation Requirements Are an Act of Agency Discretion, Not Statutory Interpretation or Ministerial Implementation

In promulgating the Rule, the Secretary attempted to justify his failure to follow notice-and-comment procedures in part on the basis that the Rule "conforms [CMS] regulations to section 1834(a)(1)(E)(iv) of the [MMA]." 70 Fed. Reg. at 50,943. That justification potentially invokes two exceptions to notice-and-comment requirements: the exceptions for "interpretive rules," 5 U.S.C. § 553(b)(3)(A), and for rules as to which "the agency for good cause finds . . . that notice and public procedure thereon are . . . unnecessary," *id.* § 553(b)(3)(B). *See* 42 U.S.C. § 1395hh(b)(2)(C) (incorporating exceptions to section 553). The interpretive-rule exception excuses notice-and-comment procedures when, instead of establishing any new legal requirements, a rule merely "advise[s] the public of the agency's construction of the statutes and rules which it administers." *American Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993) (internal quotation marks omitted). Similarly, the "good cause" exception for rules as to which notice and comment would be "unnecessary" includes "nondiscretionary ministerial action[s]" that the agency is required to take by virtue of a statutory command or some other requirement. *Metzenbaum v. FERC*, 675 F.2d 1282, 1284, 1291 (D.C. Cir. 1982) (per curiam). Neither exception applies here.

Section 1834(a)(1)(E)(iv) of the MMA, which the Rule implements in part, *see* 70 Fed. Reg. at 50,943, provides in full:

Standards for power wheelchairs

Effective on the date of the enactment of this subparagraph, in the case of a covered item consisting of a motorized or power wheelchair for an individual, payment may not be made for such covered item unless a physician (as defined in section 1395x(r)(1)), a physician assistant, nurse practitioner, or a clinical nurse specialist (as those terms are defined in section 1395x(aa)(5)) has conducted a face-to-face examination of the individual and written a prescription for the item.

42 U.S.C. § 1395m(a)(1)(E)(iv).

The regulations at issue in this case plainly do more than implement the examination and prescription requirements of section 1834(a)(1)(E)(iv). The Secretary explained in promulgating the Rule that the Documentation Requirements are "*[i]n addition to* the prescription" required by Congress. 70 Fed. Reg. at 50,942 (emphasis added). And the "prescription" that the regulations require is itself more detailed than a normal prescription used in the medical profession, requiring the physician to include "the diagnoses and conditions that the PMD is expected to modify [and] a description of the item (for example, a narrative description of the specific type of PMD)." *Id.* at 50,941. As for the Secretary's elimination of CMNs, that action is not even *permissible* under the Medicare Act, 42 U.S.C. § 1395m(j)(2)(A)(i), much less *required. See generally Maximum Comfort, Inc. v. Thompson*, 323 F. Supp. 2d 1060, 1067-68 (E.D. Cal. 2004), *appeal pending*, No. 05-15832 (9th Cir. docketed May 4, 2004). The Rule promulgated by the Secretary therefore was not a discretionless, ministerial action that Congress required him to undertake.

Nor does the Rule satisfy the D.C. Circuit's criteria for an interpretive rule that is exempt from notice-and-comment requirements under section 553(b)(3)(A). *Cf. Komjathy v. NTSB*, 832 F.2d 1294, 1296 (D.C. Cir. 1987) (per curiam) (notice and

comment not required where regulation "merely reiterates the statutory language"). As a threshold matter, the Secretary cannot now rely on the interpretive-rule exception because he did not invoke that exception when adopting the Rule, and "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983).

In any event, the new requirements have all the indicia of a legislative rule that generally must be subject to public comment. *See generally General Elec. Co. v. EPA*, 290 F.3d 377, 382-83 (D.C. Cir. 2002) (identifying characteristics of legislative rules); *Truckers United for Safety v. Federal Highway Admin.*, 139 F.3d 934, 938-39 (D.C. Cir. 1998) (same). The Documentation Requirements impose new, binding obligations on the Coalition's members and other suppliers of PMDs. The Secretary recognized that the Rule would have "substantial" effects on members of the public, 70 Fed. Reg. at 50,945, and was "economically significant" and a "major rule under the Congressional Review Act," *id. See generally* Sidak & Singer Decl. ¶ 31. The Secretary invoked his legislative rulemaking authority when imposing the Rule. 70 Fed. Reg. at 50,946 (citing 42 U.S.C. § 1302 as legal authority for the Rule). The requirements cabin CMS's own discretion in implementing the Medicare program with respect to PMDs. And they are to be published in the Code of Federal Regulations as amendments to prior Medicare rules. *See id.* (new 42 C.F.R. § 410.38(c)(2)(iii)).

As in *World Duty Free*, notice and an opportunity for public comment were required here because the new regulations go "beyond a mere recitation of the statutory language to . . . impose obligations and potential penalties." 94 F. Supp. 2d at 65

15

2.    *There Was No Other "Good Cause" for Bypassing Notice-and-Comment
      Procedures*

The Secretary further posits that there was "good cause" under 5 U.S.C.

§ 553(b)(3)(B) for failing to undertake notice-and-comment procedures because

"fraudulent billing practices for PMDs have been a substantial problem" and "it would be

contrary to the public interest to delay a regulation intended to stem the abusive billing

practices." 70 Fed. Reg. at 50,943. That statement amounts to little more than an

assertion that a rulemaking is warranted. It is not even clear whether the Secretary meant

to suggest that notice and comment was "impracticable," or "unnecessary," or "contrary

to the public interest" under section 553(b)(3)(B). But it is of no matter which element of

the test the Secretary meant to invoke, because the fraud justification fails under each

one.

First, the Secretary cannot claim (and did not claim in the preamble to the Rule)

that there was insufficient time to undertake notice and comment on the question of how

fraud in the PMD program can best be addressed. CMS publicly announced its intent to

consider reforms to the Medicare PMD program as early as September 2003. *See* note 2,

*supra.* In December 2003, CMS opened a rulemaking on PMD reimbursement. In

August 2004, CMS solicited comments on a proposed rule that contained provisions

similar to some of the provisions of the instant Rule. Coalition members and other

members of the public commented on the proposed rule. Then, in November 2004, CMS

deferred considering comments on that proposed rule until a later date. *See* pp. 7-8,

*supra.* CMS has been working toward its new Rule for at least two years. *See World

Duty Free*, 94 F. Supp. 2d at 65 (lack of a congressional deadline for action and agency's

two-year delay in promulgating regulations to implement a statutory change

"substantially undercut[]" agency's argument that "notice and publication was 'impracticable' and 'contrary to the public interest'").

The preamble to the Rule suggests no reason why the public could not have been included in CMS's lengthy deliberations. Indeed, there is every appearance that Secretary decided to proceed without notice and comment precisely so that he would not have to address the sort of record evidence developed on similar issues after the August 2004 notice of proposed rulemaking. The narrow exceptions in section 553 do not authorize that sort of "surprise switcheroo on regulated entities." *Environmental Integrity Project v. EPA*, Nos. 04-1083, 04-1243, 2005 U.S. App. LEXIS 21683, at *13 (D.C. Cir. Oct. 7, 2005) (under "logical outgrowth" rule, agency violated APA in adopting, without notice and comment, an interpretation of statutory language that was different than the interpretation in a proposed interim rule).

Second, although an agency may abandon notice and comment in "emergency situations" or when "delay could result in serious harm," *Jifry v. FAA*, 370 F.3d 1174, 1179-80 (D.C. Cir. 2004), neither circumstance is present here. Again, CMS's false-starts toward promulgating regulations through notice and comment belie any suggestion that an emergency precludes those procedures. The Secretary himself does not describe CMS's policy concerns or the Rule in those terms. *See* 70 Fed. Reg. at 50,941, 50,943-46; *see also Utility Solid Waste Activities Group v. EPA*, 236 F.3d 749, 754-55 (D.C. Cir. 2001) (relying on EPA's failure to establish "any threat to the environment or human health or that some sort of emergency had arisen").

Protecting program funds – through appropriate requirements that take account of all the relevant considerations – is indisputably a legitimate goal of CMS, but it lacks the

extreme urgency that has led courts to find good cause for bypassing notice and comment. *Cf. Jifry*, 370 F.3d at 1179 (upholding FAA regulations promulgated without notice and comment after the September 11, 2001, terrorist attacks to address an "imminent hazard" of further attacks) (internal quotation marks omitted). Indeed, because every agency rulemaking presumably is intended to serve the public interest, the good-cause exception would swallow the general rule of section 553 if an agency could avoid notice and comment merely by asserting that its rules will have some benefit. *See Utility Solid Waste Activities Group*, 236 F.3d at 754 (good-cause exception is not an "escape clause" and its use "should be limited to emergency situations") (internal quotation marks omitted).[3]

Third, this is not a "'a situation in which the interest of the public would be defeated by any requirement of advance notice,' as when announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent." *Utility Solid Waste Activities Group*, 236 F.3d at 755 (quoting U.S. Dep't of Justice, *Attorney General's Manual on the Administrative Procedure Act* at 31 (1947)). The Secretary has made no representation that notice and an opportunity to comment would have enabled evasion of the Rule. Nor could the Secretary press that argument, inasmuch as he made the new Rule effective two months after its promulgation. *See* 70 Fed. Reg. at 50,940.

---

[3] The preamble to the Rule also hints at impracticality in stating that the Rule was necessary to "operationalize" a National Coverage Decision ("NCD") for Mobility Assistive Equipment that CMS issued on May 5, 2005. *See* 70 Fed. Reg. at 50,943. Yet the Secretary evidently believed when he issued the NCD last May that it would be compatible with the CMN regime that was already in place; otherwise, he would have sought to modify the CMN requirements at that time. The preamble to the Rule, moreover, does not suggest that a conflict between the NCD and the CMN regime arose between May 2005 and August 2005. Instead, the Secretary suggests that the new Rule will improve compliance with the NCD. *See id.* That is an issue – concerning improvement of an existing agency program on which many members of the public depend – that notice-and-comment procedures are especially well-suited to examine.

18

The so-called "interim" status of the Rule also does not except it from the notice-and-comment requirements of section 553. Even interim regulations are subject to notice and comment, save those regulations that respond to a "rare 'emergency' situation." *American Fed'n of Gov't Employees, AFL-CIO v. Block*, 655 F.2d 1153, 1157-58 (D.C. Cir. 1981); *see also Tennessee Gas Pipeline*, 969 F.2d at 1145-46 (holding that an "interim rule" with "limited nature" was nevertheless subject to notice-and-comment requirements). As discussed above, the Secretary has not established that the Rule responds to any emergency. Furthermore, it is fatal to any "interim rule" rationale that the Secretary has not established a deadline or even a target date for promulgation of a final rule. *See Thrift Depositors of Am., Inc. v. Office of Thrift Supervision*, 862 F. Supp. 586, 593 (D.D.C. 1994) (interim status of rule did not warrant suspending notice and comment when the agency did not know when final rule would be promulgated); *Analysas Corp.*, 827 F. Supp. at 25 (same).

### B.    The Rule Is Arbitrary, Capricious, and Contrary to Law

The Coalition also is very likely to prevail on its substantive challenge to the Rule. "[N]otice-and-comment rulemaking is a primary method of assuring that an agency's decisions will be informed and responsive." *New Jersey Dep't of Envtl. Prot.*, 626 F.2d at 1045. It therefore is unsurprising that the Rule – which was never tested by that crucible – is fatally defective for lack of reasoned justification. *See Tennessee Gas Pipeline*, 969 F.2d at 1146 (deficiencies of interim rule demonstrate the "value of public participation in rulemaking" and the "wisdom of the APA's requirement that an agency have the benefit of informed comment before it issues regulations that have the force of law").

The Rule is subject to substantive judicial review under the familiar "arbitrary [and] capricious" standard of the APA. 5 U.S.C. § 706(2)(A); *see National Ass'n of Psychiatric Health Sys. v. Shalala*, 120 F. Supp. 2d 33, 41 (D.D.C. 2000) (applying arbitrary-and-capricious standard to an Interim Final Rule). To be sure, the agency's failure to permit public comment prevents this Court from reviewing CMS's decision on "the whole record" before the agency. 5 U.S.C. § 706. Nevertheless, the Documentation Requirements must be struck down if CMS failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (internal quotation marks omitted); *see Tennessee Gas Pipeline*, 969 F.2d at 1146 (applying *State Farm* standard to agency's explanation for invoking good-cause exception notwithstanding the absence of a formal record). In particular, the Secretary was required either to consider "facially reasonable" alternatives to the Rule, or else to "give some reason . . . for declining to do so." *Laclede Gas Co. v. FERC*, 873 F.2d 1494, 1498 (D.C. Cir. 1989).

According to the preamble to the Rule, the reasons for issuing the new Documentation Requirements were: (1) increased Medicare payments for PMDs, *see* 70 Fed. Reg. at 50,941, 50,943; (2) the agency's conclusion that "inflated and falsified billings" are generally "a serious problem" in Medicare's durable medical equipment program, of which PMD reimbursement is a part, *id.* at 50,941; and (3) "the belief that the CMNs do not accurately reflect the contents of the physician's medical record" underlying a determination of medical necessity, *id.* at 50,944. None of these

considerations necessarily establishes the wisdom of the specific action that the Secretary took.

*Increased Reimbursement Outlays.* The Secretary states that Medicare payments for power wheelchairs "increased approximately 350 percent from 1999 to 2003." *Id.* at 50,941. The Secretary ignores that Medicare reimbursements for PMDs have *declined* by more than 30% since 2003. *See* Zipp Decl. ¶ 9. Furthermore, the increased utilization of PMDs before 2003 would suggest on its face that this equipment was increasingly beneficial to Medicare recipients during that period, not an increasing problem. (Research in fact bears this out. *See* pp. 33-34, *infra*).

There were several good reasons for the increase in physician prescriptions for PMDs from 1999 to 2003. Improvements in power wheelchairs and scooters made these devices useful for a greater number of patients, and suppliers worked hard to inform doctors and those patients who could benefit from these devices about their availability. More Americans in need of a PMD were receiving them. In addition, the increasing number of Americans aged 65 and older has increased the overall medical need for PMDs. *See* p. 7, *supra*.

The Secretary seemingly believes that too many Medicare dollars are being spent on PMDs. If so, the Secretary may review the eligibility criteria in the Medicare statute, *see* 42 U.S.C. § 1395y(a)(1)(A) (covered service or equipment must be "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member"), and CMS's implementing regulations, and ask for a legislative solution or public comment on a proposed regulatory fix. In May 2005, the Secretary and CMS issued a National Coverage Decision that attempts to clarify

eligibility for PMDs. *See* 70 Fed. Reg. 50,943 (noting the NCD); HHS, *CMS Manual System, Pub. 100-03 Medicare National Coverage Determinations*, Transmittal 37 (June 3, 2005), *available at* http://www.cms.hhs.gov/manuals/pm_ trans/r37NCD.pdf. What the Secretary may not do is use the Documentation Requirements as a back-door way of reducing Medicare spending on PMD reimbursements that are required under the program's eligibility criteria.

    *Fraud.* The Secretary further cited findings of "fraud and abuse" by durable medical equipment suppliers. 70 Fed. Reg. at 50,941; *see id.* at 50,943-44. Specifically, the Secretary noted agency determinations of "inflated and falsified billings . . . among certain DME suppliers," *id.* at 50,941, and appeared to reference a report on Medicare fraud by the Office of the Inspector General of HHS. *See* HHS, Office of Inspector General, *Medicare Payments for Power Wheelchairs*, OEI-03-02-00600 (Apr. 2004) ("OIG Report"), *available at* http://oig.hhs.gov/oei/reports/oei-03-02-00600.pdf. The recommendations of the OIG Report, however, do not include the Documentation Requirements that the Secretary adopted.

    The OIG Report identified two categories of unnecessary reimbursement by Medicare: (i) claims paid by Medicare despite the lack of a CMN or other inadequate documentation under existing regulations, and (ii) reimbursement for PMDs supplied to patients who are either ineligible for any type of PMD, or ineligible for the particular type of PMD supplied. *See* OIG Report at 9-12. The solution to overpayments in the first category lies with improved processing of claims by CMS and its Medicare contractors. Requiring additional paperwork will not help CMS to stop making payments when required documentation is missing.

As for PMDs furnished to ineligible patients, the OIG Report indicates that the main reason for such errors was physicians' lack of information about Medicare guidelines and the different types of mobility devices. *See id.* at 16-17. The Secretary has taken other actions to address those problems, including the issuance of an NCD in May 2005. The Secretary has failed to explain, particularly in light of those recent actions, how changing long-established reimbursement procedures reduces uncertainty, much less why the new procedures are the most appropriate way of correcting information shortfalls on the part of doctors and other treating professionals.

*Documentation Gaps.* Finally, CMS expressed the views that "CMNs do not accurately reflect the contents of the physician's medical record" and their "practical utility . . . is questionable," and, accordingly, that CMNs should be abandoned for PMD reimbursements. 70 Fed. Reg. at 50,944. This also is not sufficient justification for the Rule.

As an initial matter, the Eastern District of California has held that 42 U.S.C. § 1395m(j), which addresses the use and contents of CMNs, establishes Congress's intent "that whatever information may be required by carriers from suppliers to show the medical necessity and reasonableness of [durable medical equipment] must be contained in a CMN." *Maximum Comfort*, 323 F. Supp. 2d at 1068. For the reasons given in that case, *see id.* at 1067-75, the Rule is unlawful inasmuch as it replaces the CMN with a vague requirement of documenting medical necessity through medical records and allows carriers to require additional documentation beyond that expressly required by the Rule.

The Rule is also substantively deficient because the Secretary failed to consider other obvious approaches to gathering fuller information on medical-necessity determinations. In the Regulatory Impact Statement accompanying the Rule, the Secretary stated, without any explanation, that "[w]e do not believe that any reasonable alternatives [to the Rule} exist." 70 Fed. Reg. at 50,945. Yet public comments on the August 2004 proposed rule, which the Secretary has yet to address, discussed such alternatives. *See* Zipp Decl. ¶ 16. Furthermore, as recently as November 2004, CMS was considering one particularly obvious option – revising the CMN form to include additional information supplied by the medical practitioner. *See id.* ¶ 23. The Secretary utterly failed to explain why such "facially reasonable" alternatives to the Rule would not address his concerns. *Laclede Gas*, 873 F.2d at 1498.[4]

Similarly, the Secretary's adoption of the Rule appears to have been infected by grossly incorrect assumptions about its effect on suppliers of PMDs. The Secretary stated, for example, that "suppliers will face decreases in record-keeping requirements," 70 Fed. Reg. at 50,945, when in fact the Rule imposes new obligations to collect, review, and maintain supporting documentation. *See* Zipp Decl. ¶¶ 18-21; DiLernia Decl. ¶¶ 7-16. Coalition member The Scooter Store estimates that the Rule will require it to spend an additional $150,000 each year on document storage, in addition to the added expense of gathering and reviewing medical records to support reimbursement claims. Zipp Decl. ¶ 21. The Rule also is invalid due to this defective reasoning.

---

[4] In light of such concrete alternatives to the Rule, the Secretary's disregard of notice-and-comment requirements cannot be excused as harmless error. *See Utility Solid Waste Activities Group*, 236 F.3d at 755 (lack of comment period was not harmless error when a party "presented enough evidence to show that on remand they can mount a credible challenge to the amended rule and were thus prejudiced by the absence of an opportunity to do so before the amendment").

## II.   THE COALITION'S MEMBERS WILL SUFFER IRREPARABLE HARM IF ENFORCEMENT OF THE RULE IS NOT ENJOINED

A "strong showing of likely success on the merits may warrant issuance of preliminary injunctive relief even if the plaintiff makes a less compelling showing on the other three factors." *Lee*, 160 F. Supp. 2d at 26. In this case, however, the Coalition need not rely on that principle. Each of the other three factors, including the threat of irreparable injury to the Coalition's members if preliminary relief is not granted, also weighs in favor of preliminary injunctive relief.

The Rule will inflict irrecoverable, severe, and immediate economic loss upon Coalition members who depend upon timely and reliable Medicare reimbursement in their businesses. Under the CMN procedures that have been in effect since 1997, doctors record and attest to their determinations of medical necessity on the CMN form, which the supplier (or potentially the Medicare beneficiary herself) sends to the Medicare carrier to request reimbursement. Other medical information is not routinely requested by CMS or its carriers. *See* Zipp Decl. ¶ 22; DiLernia Decl. ¶ 8.

The "critical" role of the CMN in Medicare reimbursement, DiLernia Decl. ¶ 5, reflects, first, that the determination of medical necessity for a PMD is a judgment that treating physicians – not PMD suppliers or CMS – must make. In the CMS Administrator's words during his Senate confirmation process in 2004, "[t]he clinical criteria for deciding when a manual or power wheelchair is medically necessary and appropriate for a beneficiary has been and will continue to be a matter of clinical judgment by a physician," and a matter "best left to the physician's judgment." Answers for the Record to Questions from the Senate Finance Committee Hearing on the Nomination of Mark B. McClellan To Be Administrator of the Centers for Medicare &

25

Medicaid Services at 91 (Mar. 8, 2004) (response to question submitted by Sen. Kerry), *available at* http://finance.senate.gov/hearings/edmcquest.pdf.

The CMN process also meets a need to focus treating doctors on generating a written record that addresses the medical necessity of a particular device. In the ordinary course of their practices, physicians do not maintain medical records for the purpose of justifying their patients' need for particular medical equipment. For example, doctors may not record the considerations (such as upper-body weakness in a patient with no mobility below the waist) that led them to prescribe a PMD rather than other equipment such as a standard wheelchair, particularly when those considerations lack prospective significance for medical treatment. *See* DiLernia Decl. ¶¶ 10-11.

PMD suppliers are unable as a practical matter to educate all their customers' personal doctors on the need to keep such records for Medicare. DiLernia Decl. ¶ 12; *see* Zipp Decl. ¶ 19-20. Likewise, it would be infeasible for suppliers of PMDs to second-guess the records doctors generate in their practices. *See* DiLernia Decl. ¶ 13; Zipp Decl. ¶ 20. Instead, suppliers (as well as doctors) have relied on the CMN to ensure that a doctor who has prescribed a PMD has recorded findings that support that choice. *See* DiLernia Decl. ¶ 6; Zipp Decl. ¶ 22.

In a November 1996 submission to the Office of Management and Budget justifying adoption of the CMN, HCFA emphasized these factors, explaining that "CMNs are a standardized . . . way of communicating information needed to determine the medical necessity of the claim." HCFA, *Paperwork Reduction Act Submission: Durable Medical Equipment Regional Carriers, Certificates of Medical Necessity*, OMB Control No. 093800679, at 3 (Nov. 6, 1996) (Exh. 6). HCFA pointed out that this

standardized approach "presents less of a burden than requiring submission of individual

medical records (which are non-standardized)." *Id.*

The Documentation Requirements represent an abandonment of this longstanding

and workable approach that Congress incorporated into the Medicare Act. *See* 42 U.S.C.

§ 1395m(j)(2)(B). Under the new Rule, applicants for reimbursement may not rely on the

standardized and familiar information the doctor provides on a CMN, but must instead

assemble on an ad hoc basis, in addition to a prescription that meets CMS's requirements,

other medical records "that clearly demonstrate medical necessity for the PMD." 70 Fed.

Reg. at 50,942; *see id.* (documentation must "clearly support" medical necessity). Thus,

the Rule seemingly establishes a new burden of proof (a "clear" evidence test), and

requires suppliers to ensure that the doctor's medical records – whatever they may

include – satisfy that standard. The Rule, however, provides no criteria, beyond two

hypothetical examples of acceptable documentation that are discussed in the preamble, by

which suppliers can reliably predict whether CMS and its contractors will find any

particular documentation adequate. *See id.* at 50,492-43.

The combined consequence of (i) abolishing the CMN and (ii) failing to provide

meaningful criteria for assessing the sufficiency of various sorts of medical records, is

that suppliers – who, over time, have developed informed expectations as to how carriers

are likely to view any particular CMN – have no significant guidance at all. In many

instances, suppliers will not be able to make any educated prediction about whether they

will be reimbursed for the cost of a PMD that fills a doctor's prescription, especially

when the preamble to the Rule implies that the very purpose of the new requirements is to

reduce the number of claims that Medicare reimburses. *See id.* at 50,941, 50,943 (citing

increased program outlays and "restraining the billing for PMDs" as justifications for the

Rule); DiLernia Decl. ¶¶ 8-16; Zipp Decl. ¶¶ 24-25; Sidak & Singer Decl.¶ 25.[5]

Together with the increased record-gathering and record-keeping costs associated

with the new Rule, and related delays in obtaining reimbursement, this uncertainty about

whether claims will ever be paid is likely to put Coalition members (including small

suppliers as well as large ones) out of business. *See* DiLernia Decl. ¶¶ 16-18; Sidak &

Singer Decl. ¶¶ 22-27; Zipp Decl. ¶¶ 26-27. That extreme economic hardship constitutes

irreparable injury. *See Express One Int'l, Inc. v. U.S. Postal Serv.*, 814 F. Supp. 87, 90-

91 (D.D.C. 1992) (denial of the opportunity to service a government contract, with

ensuing "loss of revenues and profits," was irreparable injury); *Wisconsin Gas Co. v.*

*FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (loss may be irreparable, even if recoverable,

if it "threatens the very existence of the movant's business"); *McGregor Printing Corp. v.*

*Kemp*, No. 91-3255, 1992 U.S. Dist. LEXIS 6717, at *16-*17 (D.D.C. May 14, 1992)

(threat of closing down two plants with potential job loss of seven to 60 employees

constituted irreparable injury).

The losses suffered by these suppliers, moreover, are irreparable because neither

lost sales of mobility devices nor denied claims for reimbursement can be recouped from

patients. *See* Zipp Decl. ¶ 13; DiLernia Decl. ¶¶ 16-18; Sidak & Singer Decl. ¶ 19, 30.

There also is no mechanism, such as a suit for money damages, by which losses could be

recovered from CMS after the fact. *See Department of the Army v. Blue Fox, Inc.*, 525

U.S. 255, 260 (1999) ("Absent a waiver, sovereign immunity shields the Federal

---

[5] When it audits suppliers' reimbursement claims, CMS commonly looks at a sampling of claims filed during a certain period of time. Depending on the results of the audit, CMS may extrapolate from the results of the audit to disallow a percentage of all claims filed by the supplier during that period. *See* 42 U.S.C. § 1395ddd(f)(3) (Supp. 2004). The consequence of this approach is a multiplier effect: for every claim that is found deficient after an audit, the supplier must repay CMS for many more claims.

Government and its agencies from suit.") (internal quotation marks omitted).

Accordingly, because Coalition members would not be able to secure compensatory or

other relief at a later date, their economic injury is irreparable. *See Wisconsin Gas*, 758

F.2d at 674-75.

 *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20 (D.D.C. 1997), is

illustrative. There, several manufacturers challenged the FDA's regulatory treatment of

their products, where a competitor was allowed "to submit much less rigorous

information and testing results." *Id.* at 23-24. The Court determined that the plaintiffs

had shown "on-going and imminent harm" resulting from the more time-consuming and

expensive regulatory requirements, that those greater financial costs could not be

recouped, and that, although the plaintiffs' losses were purely economic, they had proved

harm sufficient to warrant injunctive relief. *Id.* at 28-29; *see Armour & Co. v. Freeman*,

304 F.2d 404, 406 (D.C. Cir. 1962) (per curiam) (irreparable injury found when

"enforcement of the [challenged] regulation" would "cause loss of profits which could

never be recaptured"). Similar findings are warranted in this case.

 Courts have found irreparable harm under circumstances involving far less

economic injury than the Rule would inflict on Coalition members. In *World Duty Free*,

for example, the Court concluded that an interim rule that affected one-third of

company's business constituted irreparable harm. 94 F. Supp. 2d at 67; *see also National

Ctr. on Missing & Exploited Children v. Horner*, 699 F. Supp. 333, 337 (D.D.C. 1988)

(potential loss of $166,000 in contributions to a charitable organization constituted

"irreparable harm"); *Bracco Diagnostics*, 963 F. Supp. at 29 & n.9 ($1.5 million in

additional expenses). In this case, by comparison, the Rule could wipe out supplier

businesses of all sizes and imperil Medicare-reimbursed sales of PMDs that total

approximately $864 million annually for the industry. *See* 70 Fed. Reg. at 50,945

(providing FY 2004 sales figures).[6]

Coalition members also have been unlawfully deprived of their opportunity to

participate, through the public-comment process, in CMS's decisionmaking on the Rule.

Coalition members have participated in other rulemaking proceedings concerning CMS's

reimbursement regulations for PMDs, and they would have participated in a notice-and-

comment proceeding to consider whether the Documentation Requirements are lawful

and sound policy. *See* Zipp Decl. ¶ 17. That denial of an opportunity to participate in the

agency's administrative processes constitutes irreparable harm, independent of the

economic effect of the Rule. *See Community Nutrition Inst. v. Butz*, 420 F. Supp. 751,

757 (D.D.C. 1976) ("[T]he harm suffered by those who would otherwise participate in

agency rulemaking under the APA is to be considered irreparable when the agency fails

to afford them their rights to such participation.").

## III.    A PRELIMINARY INJUNCTION WOULD NOT CAUSE THE SECRETARY OR INTERESTED PARTIES SERIOUS HARDSHIP

In marked contrast to the irreparable harm that Coalition members will suffer

absent the issuance of a preliminary injunction, the Secretary has only a minimal interest

in enforcing the Rule as of October 25, 2005.

---

[6] Because the Documentation Requirements are likely to cause Coalition members to close their businesses and withdraw entirely from the Medicare program, and because remaining suppliers will face severe penalties if they fail to comply with the Rule, Coalition members have no practical means of obtaining relief through the administrative process. *See* DiLernia Decl. ¶ ¶17-18; Zipp Decl. ¶¶ 26-27; Sidak & Singer Decl. ¶¶ 16, 27, 30. In this situation, access to the courts is available under 42 U.S.C. § 405(h) because denying access would "mean no review at all." *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 19 (2000). *See American Lithotripsy Soc'y v. Thompson*, 215 F. Supp. 2d 23, 28-29 (D.D.C. 2002); *National Ass'n of Psychiatric Health Sys.*, 120 F. Supp. 2d at 38-39.

CMS's two-year delay in promulgating a Rule, and its continuing failure to take any relevant regulatory action pursuant to the August 2004 notice of proposed rulemaking, cast serious doubt on any claim of imminent harm if the Documentation Requirements do not take effect on October 25. CMS's asserted interests in enforcing the Rule also must be discounted insofar as they include illegitimate considerations (such as reducing Medicare expenditures for PMDs that are reimbursable under the applicable eligibility criteria), or could be addressed as effectively, or more effectively, in some other way (such as by improving the CMN form).

A preliminary injunction would not disrupt CMS's regulatory program because the Documentation Requirements have not taken effect. This is not a circumstance in which entering a preliminary injunction would disrupt a current regulatory regime, *cf. EMILY's List v. Federal Election Comm'n*, 362 F. Supp. 2d 43, 58-59 (D.D.C. 2005) (preliminary injunction would throw the "present system of regulations into disarray"), but rather one in which the injunction would preserve the status quo pending adjudication of the merits, *see Graphic Scis., Inc. v. International Mogul Mines Ltd.*, 397 F. Supp. 112, 117 (D.D.C. 1974) ("[T]he primary use of temporary relief is to preserve the status quo until more deliberate investigation can better determine the rights of the parties.").

Furthermore, Medicare carriers do not have in place the systems necessary to process reimbursement claims under the new documentation guidelines, and they will not have such systems in place before April 2006 – more than five months from now. *See* pp. 10-11, *supra*. Thus, whatever benefits the Documentation Requirements might ultimately have will be realized only incompletely (and perhaps not at all) until April 2006 at the earliest. During that same period, however, the Documentation Requirements

31

will cause Coalition members to suffer immediate and certain economic loss. For all these reasons, the balance of these hardships tilts decidedly in favor of granting the Coalition's motion for preliminary injunctive relief.

## IV.    THE PUBLIC INTEREST LIES IN ISSUING A PRELIMINARY INJUNCTION

The final factor pertinent to this motion for preliminary relief is the public interest. This factor also weighs heavily on the side of granting relief.

There is a substantial public interest in ensuring that Medicare beneficiaries are not denied access to medically appropriate mobility devices. *See International Long Term Care, Inc. v. Shalala*, 947 F. Supp. 15, 20 (D.D.C. 1996) (the public interest in serving the needs of the "elderly and infirm" warranted preliminary injunction preventing termination of a nursing home from Medicare); *Libbie Rehab. Ctr., Inc. v. Shalala*, 26 F. Supp. 2d 128, 132 (D.D.C. 1998) ("The interest of the Government in administering the Medicare . . . program[] is to ensure that the recipients of benefits are receiving adequate treatment and care.").

In Fiscal Year 2004, medical professionals prepared 187,000 certifications of medical necessity for PMDs, which were submitted for Medicare reimbursement. *See* 70 Fed. Reg. at 50,944-45. Each of those CMNs represents an opportunity for an American to live a safer, richer, and more independent life. Yet, as physicians and suppliers withdraw from or reduce their participation in the Medicare program in response to the Rule, patients in need of PMDs will lose important sources of information about these devices and will have more difficulty obtaining them. Thus, the Documentation Requirements will reduce the public's access to medically necessary mobility devices beginning on October 25, 2005. That outcome is contrary to the public interest. *See FTC*

*v. Freeman Hosp.*, No. 95-5015-CV-SW-1, 1995 U.S. Dist. LEXIS 4020, at *11 (W.D.

Mo. Feb. 28, 1995) (identifying public interest in access to "effective medical care"); *St.*

*Jude Med., Inc. v. Intermedics, Inc.*, 623 F. Supp. 1289, 1293 (D. Minn. 1984) (public

interest favored granting preliminary junction in order to ensure patient access to heart

valves).

HHS's desire to reduce Medicare spending comes nowhere close to outweighing

this public interest in providing medically necessary mobility equipment. *Cf. Cordis*

*Corp. v. Medtronic, Inc.*, No. 4-86-820, 1986 U.S. Dist. LEXIS 17091, at *42-*43 (D.

Minn. Dec. 1, 1986) (public interest in ensuring sufficient public access to life-saving

devices outweighs possible costs to integrity of the patent system). As already explained,

the growth in Medicare reimbursements for PMDs between 1999-2003 has stopped, and

reflected several factors that have nothing to do with fraud or unjustified payments. *See*

p. 21, *supra*. Nor can it be assumed that eliminating the CMN in favor of more

subjective and cumbersome documentation requirements is a sound way of enforcing

Medicare's eligibility requirements. *See* pp. 21-22, *supra*.

What *can* be expected that the Rule will deny qualified patients access to

medically necessary mobility devices. That is an issue of human safety and wellness, not

just money. Expressed in economic terms, however, the Rule may result in a net loss of

consumer welfare (which is the total difference between the value of PMDs to consumers

and their cost) in the range of $93 to $283 million per year. Sidak & Singer Decl. ¶ 29.

Furthermore, research indicates that the provision of PMDs under Medicare *saves*

program funds. PMDs make patients more independent, better able to care for

themselves, and less prone to falls and other accidents, and thus reduces Medicare

expenditures for home healthcare and inpatient care at hospitals and skilled nursing facilities. *See* Clifford L. Fry, Ph.D., *et al.*, *Powered Vehicles for the Mobility Impaired: The Net Benefits to Medicare* (2005), *available at* http://www.cms.hhs.gov/ mcd/publiccomment_popup.asp?comment_id=227 (concluding that the provision of a PMD to an eligible Medicare recipient saves the program more than $5,300 over three years – after deducting the cost of the PMD). Erecting artificial obstacles to reimbursement for eligible PMDs therefore is not even a rational way of curbing Medicare spending.

Finally, courts have recognized a weighty public interest in enforcing the requirements of the APA. *See Bracco Diagnostics*, 963 F. Supp. at 30. Here, the public – including physicians, suppliers, and Medicare beneficiaries and their families – has a substantial interest in ensuring CMS's compliance with the deliberative requirements of the APA, before the agency significantly overhauls an important component of the Medicare program.[7]

## CONCLUSION

A preliminary injunction enjoining defendants from enforcing the challenged Rule (new 42 C.F.R. § 410.38(c)) should be entered.

---

[7] For the same reasons that the balance of harms and the public interest support entering a preliminary injunction in this case, the appropriate permanent relief will be vacatur of the Rule and a remand to the agency. *See, e.g.*, *CropLife Am. v. EPA*, 329 F.3d 876, 884-85 (D.C. Cir. 2003); *Sprint Corp. v. FCC*, 315 F.3d 369, 377 (D.C. Cir. 2003); *see also American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (remedy for a violation of the APA "normally will be a vacatur of the agency's order").

Respectfully submitted,


Eric W. Sokol
  D.C. Bar No.: 434592
Power Mobility Coalition
919 18th Street, N.W.
Suite 550
Washington, D.C. 20006
(202) 296-3501

K. Chris Todd
  D.C. Bar No.: 284455
David C. Frederick
  D.C. Bar No.: 431864
Austin C. Schlick
  D.C. Bar No.: 540042
Andrew M. Hetherington
  D.C. Bar No.: 490434
Kellogg, Huber, Hansen, Todd
  Evans & Figel, P.L.L.C.
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
(202) 326-7900

*Counsel for the Power Mobility Coalition*


Dated:  October 13, 2005