# EXHIBIT 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE POWER MOBILITY COALITION     )
                                 )
            v.                   )        Civil Action No. _____
                                 )
MICHAEL O. LEAVITT,              )
Secretary, United States         )
Department of Health and         )
Human Services, and              )
MARK B. McCLELLAN,               )
Administrator, Centers for       )
Medicare and Medicaid            )
Services                         )


DECLARATION OF J. GREGORY SIDAK AND HAL J. SINGER


Qualifications

Introduction

I. Given Its Margins, The SCOOTER Store Could Not Withstand a Significant Increase in the Fraction of Power Mobility Devices That Are Not Reimbursed

II. Because the Interim Final Rule Would Significantly Increase the Fraction of Power Mobility Devices That Are Not Reimbursed, The SCOOTER Store Would Cease Operations

III. The SCOOTER Store Could Not Break Even If It Were Forced to Sell Its Power Mobility Devices Directly to Self-Insured or Privately Insured Patients

Conclusion

## QUALIFICATIONS

1.  My name is J. Gregory Sidak. I am Visiting Professor of Law at the Georgetown University Law Center; the founder of Criterion Economics, L.L.C., an economic consulting firm in Washington, D.C.; and one of the two founding editors of the *Journal of Competition Law & Economics*, published by the Oxford University Press. My teaching and research concern antitrust, regulation, and industrial organization.

2.  I served as Deputy General Counsel of the Federal Communications Commission from 1987 to 1989, and as Senior Counsel and Economist to the Council of Economic Advisers in the Executive Office of the President from 1986 to 1987. As an attorney in private practice with Covington & Burling in Washington, D.C., I worked on numerous antitrust cases and federal administrative, legislative, and appellate matters concerning telecommunications and other regulated industries. From 1993 to 1999, I was a Senior Lecturer at the Yale School of Management, where I taught a course on telecommunications regulation with Professor Paul W. MacAvoy. From 1992 through 2005, I was a resident scholar at the American Enterprise Institute for Public Policy Research (AEI). I directed AEI's Studies in Telecommunications Deregulation and held the F.K. Weyerhaeuser Chair in Law and Economics.

3.  I have written six books on competition and regulation in network industries. With Dan Maldoom, Richard Marsden, and Hal J. Singer, I am the co-author of *Broadband in Europe: How Can Brussels Wire the Information Society?* (Springer 2005). I am the author of *Foreign Investment in American Telecommunications* (University of Chicago Press 1997). With Daniel F. Spulber, I am co-author of *Deregulatory Takings and the Regulatory Contract: The Competitive Transformation of Network Industries in the United States* (Cambridge University Press 1997) and *Protecting Competition from the Postal Monopoly* (AEI Press 1996). With William J. Baumol, I am the co-author of *Toward Competition in Local Telephony* (MIT Press

1994) and *Transmission Pricing and Stranded Costs in the Electric Power Industry* (AEI Press 1995). With Jerry A. Hausman, I am completing a seventh book, *The Failure of Good Intentions: Is Regulation or Competition the Future of American Telecommunications?* (forthcoming Cambridge University Press 2006). I am the co-editor of *Competition and Regulation in Telecommunications: Examining Germany and America* (Kluwer Academic Press 2000), and I am the editor of *Is the Telecommunications Act of 1996 Broken? If So, How Can We Fix It?* (AEI Press 1999).

4.  I have published approximately sixty scholarly articles in journals including the *American Economic Association Papers and Proceedings*, *Antitrust Law Journal*, *Columbia Law Review*, *Journal of Competition Law & Economics*, *Journal of Political Economy*, *New York University Law Review*, *Review of Industrial Organization*, *Stanford Law Review*, *Supreme Court Economic Review*, *University of Chicago Law Review*, *Yale Law Journal*, and *Yale Journal on Regulation*, as well as opinion essays in the *New York Times*, *Wall Street Journal*, and other business periodicals. One of my early articles concerned the standards for issuing a preliminary injunction in a hostile tender offer.

5.  I have testified before committees of the U.S. Senate and House of Representatives on regulatory and constitutional law matters. My writings on antitrust, regulation, and constitutional law have been cited by the Supreme Court, the lower federal and state supreme courts, state and federal regulatory commissions, and the European Commission.

6.  From Stanford University, I earned A.B. (1977) and A.M. (1981) degrees in economics and a J.D. (1981). I was a member of the *Stanford Law Review*. Following law school, I clerked for Judge Richard A. Posner during his first term on the U.S. Court of Appeals for the Seventh Circuit.

7. The views expressed here are mine and Dr. Singer's and not those of the Georgetown University Law Center, which does not take institutional positions on specific legislative, regulatory, adjudicatory, or executive matters.

8. My name is Hal J. Singer. I am President of Criterion Economics. My areas of expertise are antitrust, industrial organization, auction design and strategy, damages, environmental economics, insurance, spectrum policy, telecommunications and the Internet, and transportation.

9. I am the co-author of the book *Broadband in Europe: How Brussels Can Wire the Information Society* (Springer 2005), with Dan Maldoom, Richard Marsden, and J. Gregory Sidak. I also have written several book chapters, including chapters in *Access Pricing: Theory, Practice and Empirical Evidence* (Justus Haucap and Ralf Dewenter eds., Elsevier Press 2005) and in *Handbook of Research in Trans-Atlantic Antitrust* (Philip Marsden, ed. Edward Elgar Publishing 2006).

10. I have published scholarly articles in several economics and legal journals, including the *American Economic Review Papers and Proceedings, Berkeley Technology Law Review, Canadian Journal of Law and Technology, Hastings Law Journal, Federal Communications Law Journal, Journal of Business and Finance, Journal of Industrial Economics, Journal of Insurance Regulation, Journal of Network Industries, Journal of Regulatory Economics, Regulation, Topics in Economics Analysis and Policy,* and *Yale Journal on Regulation.*

11. In regulatory proceedings, I have presented economic testimony to the Federal Communications Commission, the Federal Trade Commission, and the Antitrust Division of the Department of Justice. I have served as a testifying expert in several litigation matters. I prepared

an expert report that was submitted by Allegheny Communications as part of a petition for review of an agency action in the United States Court of Appeals for the District of Columbia Circuit. I also prepared an expert report on behalf of a parcel delivery company that was submitted in the United States District Court for the Southern District of New York. I prepared an expert report on behalf of an Indian tribe that estimated the external costs imposed by a major railroad on the reservation that was submitted in the United States District Court of Montana.

12.     I have written several white papers for corporate clients, including 1-800 CONTACTS, BellSouth, Coventry First, Harvest Partners, Qwest, SBC, and Verizon.

13.     Before joining Criterion, I worked at an internationally recognized consulting firm. In addition, I have worked as an economist for the Securities and Exchange Commission and the Army Corps of Engineers, and I have taught microeconomics and international trade at the undergraduate level.

14.     I earned M.A. and Ph.D. degrees in economics from the Johns Hopkins University and a B.S. *magna cum laude* in economics from Tulane University.

## INTRODUCTION

15.     We have been asked by The SCOOTER Store to assess the economic impact of the Interim Final Rule for Conditions for Payment of Power Mobility Devices (Interim Final Rule) promulgated by the Centers for Medicare and Medicaid Services (CMS) within the Department of Health and Human Services.[1] The rule is scheduled to take effect on October 25, 2005. We conclude that the CMS's Interim Final Rule would irreparably harm The SCOOTER

---

1. Centers for Medicare and Medicaid Services, Medicare Program; Conditions for Payment of Power Mobility Devices, Including Power Wheelchairs and Power-Operated Vehicles; Interim Final Rule, 70 Fed. Reg. 50,940 (2005) [hereinafter *Interim Final Rule*].

Store and any other supplier of power mobility devices (PMDs) with the same or greater costs as The SCOOTER Store. We also conclude that the Interim Final Rule would irreparably harm all consumers of PMDs, including those consumers who purchase through the Medicare channel and those who are fully privately insured.

16.  To an economist, a change in the regulatory environment that prevents incumbent suppliers from earning sufficient revenues to cover their incremental costs will cause irreparable harm. The harm cannot be repaired because the supplier ceases to exist. Under the CMS's proposed reimbursement policy, The SCOOTER Store's expected revenue per unit would be less than its average variable cost of production, because an increasing fraction of claims would not be reimbursed by Medicare. This "exit condition" would cause The SCOOTER Store to cease operations,[2] and it would thereby cause The SCOOTER Store to suffer irreparable harm. The final section of our declaration analyzes whether The SCOOTER Store could continue to operate profitably by raising the price of its PMDs and selling directly to high-income seniors only. Although such an outcome is theoretically possible, it would destroy the current benefits of enhanced mobility enjoyed by thousands of seniors who are not wealthy or fully privately insured. This destruction in consumer welfare also represents an irreparable harm that would be caused by the Interim Final Rule.

### I. GIVEN ITS MARGINS, THE SCOOTER STORE COULD NOT WITHSTAND A SIGNIFICANT INCREASE IN THE FRACTION OF POWER MOBILITY DEVICES THAT ARE NOT REIMBURSED

17.  The SCOOTER Store provides power wheelchairs (the "Powerchair") and power-operated vehicles (the "Scooter"), both of which would be affected by the CMS's Interim Final

---

2. For a concise explanation of the "shut down" rule in economics, see WILLIAM J. BAUMOL & ALAN S. BLINDER, ECONOMICS: PRINCIPLES AND POLICY 228-29 (6th ed. Dryden Press 1994) ("The firm will produce nothing unless price lies above the minimum point on the AVC [average variable cost] curve.").

Rule.[3] For ease of exposition, we assume that all of The SCOOTER Store's claims are submitted to Medicare, when in fact 6 percent of The SCOOTER Store's claims are submitted to private insurers. In Part III, we demonstrate that this assumption does not affect our results.

18.     When fully reimbursed by Medicare, The SCOOTER Store earns net revenues per unit of [[____]] for the Powerchair and [[____]] for the Scooter, which includes adjustments for hardship, sales tax, and bad debt. Medicare pays 80 percent of the price, while the patient, either directly or indirectly through private insurance, pays the remaining 20 percent. For each incremental unit produced, The SCOOTER Store incurs an average variable cost of [[____]] for the Powerchair and [[____]] for the Scooter, which includes cost of goods, commissions, delivery costs, selling costs, customer acquisition costs, Medicare compliance costs, and billing costs. When fully reimbursed by Medicare, The SCOOTER Store earns margins of [[____]] for the Powerchair and [[____]] for the Scooter. The SCOOTER Store projects that, for the fourth quarter 2005, roughly 80 percent of its sales will be Powerchairs. The CMS expects that a 2005 Congressional decision to allow a broader range of physicians and treating practitioners to prescribe scooters will shift the product mix in 2006 toward scooters.[4] Assuming that decision shifts the product mix by ten percentage points, on a going-forward basis, The SCOOTER Store's weighted-average margin per unit sold when its claim is fully reimbursed by Medicare is [[____]].

19.     In the vast majority of cases in which Medicare declines to reimburse, The SCOOTER Store is not legally authorized to collect the 20 percent coinsurance from the end

---

3. *Interim Final Rule*, 70 Fed. Reg. at 50,940 ("This rule defines the term power mobility devices (PMDs) as power wheelchairs and power operated vehicles (POVs or scooters).").
4. *Id.* at 50,945 ("However, we believe that the Congressional decision to allow a broader range of physicians and treating practitioners to prescribe POVs will lead to an increased number of POV prescriptions. This shift could well be 10 percent or greater.").

user.[5] Moreover, The SCOOTER Store will not retrieve a PMD that has been delivered to a patient due to client goodwill; even if it did, the historical resale value of used PMDs is less than the cost of liquidation (effectively near zero) and would require The SCOOTER Store to incur additional costs of liquidation. Hence, whenever the claim is not reimbursed by Medicare, the revenue for each type of device is equal to zero, and thus the margin for The SCOOTER Store in this scenario is [[____]] for the Powerchair and [[____]] for the Scooter (equal to $0 less the average variable cost). Because roughly [[____]] percent of its sales will be Powerchairs on a going-forward basis, The SCOOTER Store's weighted-average margin per unit sold when its claim is not reimbursed by Medicare is [[____]].

20.  By focusing on the public insurance channel only, The SCOOTER Store's expected margin can be expressed simply as the weighted average of its margin when its claim is reimbursed by Medicare and when the claim is not reimbursed. Under the current compliance standard, Medicare ultimately reimburses 94 percent of all PMDs submitted for payment by The SCOOTER Store, including those PMDs that are resubmitted under appeal. Hence, The SCOOTER Store's expected margin per unit sold is [[____]].

21.  It is a straightforward exercise to solve for the fraction of claims that must be reimbursed by Medicare such that The SCOOTER Store's expected margin across both products is zero. According to our calculations, the "critical share" of claims that must be reimbursed is equal to 77 percent. In other words, for a reimbursement rate greater than or equal to 77 percent, The SCOOTER Store earns a positive margin on average, while reimbursement rates less than 77

---

5. DMERC Supplier Manual (Region C) Chapter 10: Claim Payment ("You may not hold a beneficiary financially responsible for any adjustments identified with group code CO (contractual obligation). CO is always used to identify excess amounts for which the law prohibits Medicare payment and absolves the beneficiary of any financial liability, such as participation agreement violations amounts, late filing penalties, or amounts for services not considered reasonable or necessary.")

percent generate losses on average.[6] This estimate is extremely conservative because, at a 77 percent reimbursement rate, the SCOOTER Store's margins would not make *any* contribution toward its fixed costs. In reality, the SCOOTER Store might exit well before the economic textbook "shut down" criterion. In the following section, we analyze whether the CMS's Interim Final Rule would decrease the share of The SCOOTER Store's claims that are reimbursed by Medicare below the critical share.

### II. BECAUSE THE INTERIM FINAL RULE WOULD SIGNIFICANTLY INCREASE THE FRACTION OF POWER MOBILITY DEVICES THAT ARE NOT REIMBURSED, THE SCOOTER STORE WOULD CEASE OPERATIONS

22. Under the current compliance standard, a physician provides a Certificate of Medical Necessity (CMN) to the device supplier, who delivers the PMD to the patient and then submits the CMN and a claim to Medicare for reimbursement.[7] The CMS acknowledges that the CMN allows for the "efficient adjudication of claims by automating the submission of certain information needed to make medical necessity determinations."[8] The CMS claims that the publication of the national coverage determination on Mobility Assistive Equipment in May 2005 made the CMN superfluous because physicians "better know how to properly evaluate and document a beneficiary's medical condition and appropriately prescribe PMDs."[9] An alternative and more likely explanation is that, due to their "efficient adjudication of claims," the CMNs did not provide a sufficient basis for the CMS to reject all claims by a PMD supplier that the CMS believed should be rejected, and thus the CMNs did not allow the CMS to curb increasing expenditure by Medicare on these highly popular medical devices.

---

6. Even if customer acquisition costs exclude advertising and marketing costs, which The SCOOTER Store considers as variable costs for internal margin analysis, the critical share of reimbursement rate is 49 percent.
7. *Interim Final Rule*, 70 Fed. Reg. at 50,944.
8. *Id.*
9. *Id.*

23. Under the proposed compliance standard, the supplier would no longer be required to obtain a CMN from the prescribing physician as a condition for reimbursement from Medicare. In its place, the CMS proposes that, before delivering the PMD to the patient, the supplier obtains from the physician, among other items, a PMD prescription, which "must include the beneficiary's name, the date of the face-to-face examination, the diagnoses and conditions that the PMD is expected to modify, a description of the item (for example, a narrative description of the specific type of PMD), the length of need, the physician or treating practitioner's signature and the date the prescription is written."[10] The CMS also proposes that suppliers obtain the following information from physicians:

> In addition to the prescription for the PMD, the physician or treating practitioner must provide to the supplier supporting documentation which will include pertinent parts of the medical record that clearly support the medical necessity for the PMD in the beneficiary's home. Pertinent parts from the documentation of the beneficiary's PMD evaluation may include the history, physical examination, diagnostic tests, summary of findings, diagnoses, and treatment plans. The physician or treating practitioner should select only those parts of the medical record that clearly demonstrate medical necessity for the PMD. The parts of the medical record selected should be sufficient to delineate the history of events that led to the request for the PMD; identify the mobility deficits to be corrected by the PMD; and document that other treatments do not obviate the need for the PMD, that the beneficiary lives in an environment that supports the use of the PMD and that the beneficiary or caregiver is capable of operating the PMD. In most cases, the information recorded at the face-to-face examination will be sufficient. However, there may be some cases where the physician or treating practitioner has treated a patient for an extended period of time and the information recorded at the face-to-face examination refers to previous notes in the medical record. In this instance, those previous notes would also be needed.[11]

The CMS goes on to provide two model reports that should be acquired by the PMD supplier, both of which contain a "Subjective section of the physician's progress note" and "Objective findings."[12] By definition, the subjective section will inject subjectivity into the compliance process. The first model report contains an essay of 362 words, and the second model report

---

10. *Id.* at 50,941.
11. *Id.*
12. *Id.* It therefore seems inconsistent that the CMS criticizes the CMN as being "subjective and interpreted differently by clinicians." *Id.* at 50,944.

contains an essay of 580 words. It is not reasonable to expect most physicians to draft 362 to 580 word essays for a single patient who needs a PMD.

24. Clearly, such requirements would impose a large burden on the prescribing physician. The CMS previously estimated that the burden associated with the completion and collection of the CMNs for PMDs was approximately twelve minutes per CMN.[13] In its Interim Final Rule, the CMS claims that the costs imposed on the prescribing physician under the new evidentiary standard "is similar to the burden we previously estimated for a CMN."[14] We strongly disagree. The higher evidentiary standard, including an obligatory essay with subjective sections, will result in significantly greater time pressures on doctors, which will imply that a larger fraction of doctors will no longer prescribe a PMD. To be as conservative as possible, however, we assume that all doctors conform to the new standard. To the extent that this assumption is relaxed, The SCOOTER Store would cease operations at a higher reimbursement rate.

25. The CMS has long pursued policies that would decrease the utilization by senior citizens of PMDs in general and scooters in particular. In 1992, ostensibly due to a concern for a patient's safety,[15] the CMS determined that only specific types of doctor (such as a neurologist) could prescribe a scooter.[16] In December 2003, the CMS restricted the coverage criteria for PMDs, which meant that patients had to be more disabled than the extant (bed or chair confined) condition to obtain a PMD.[17] Under the "Clarification" coverage criteria, a power wheelchair

---

13. *Id.*
14. *Id.*
15. *Id.* at 50,941 ("When POVs were first introduced, we were concerned about their stability and the danger they could pose to a Medicare beneficiary.").
16. Federal Health Insurance for the Aged and Disabled, 57 Fed. Reg. 57,688 (1992) (to be codified at 42 C.F.R. pt. 405) (proposed Dec. 7, 1992).
17. Centers for Medicare and Medicaid Services, Power Wheelchair and POVs: Policy Clarification and Medical Review Strategy, Dec. 2003.

would be available to a patient only if the patient is unable (1) "to walk either without any assistance or with the assistance of an ambulatory aid" and (2) "to self-propel a manual wheelchair within their home."[18] The "Clarification" announced that the CMN was never intended to establish coverage criteria, and it announced that medical record documentation would serve as the documentation standard during a medical review. After a Congressional investigation, the CMS withdrew the "Clarification," but the agency never paid any of the claims that it denied under the "Clarification" standard.

26. In August 2005, by which time the utilization rate of scooters among senior citizens had (presumably as the CMS intended) plummeted, the CMS withdrew its 1992 requirement that only specialists could prescribe a scooter.[19] However, the Interim Final Rule is another way that the CMS seeks to decrease the utilization of PMDs, and thus decrease the contribution of PMDs to expenditures in the Medicare budget.

27. With the Interim Final Rule, the CMS appears to be injecting more subjectivity into the reimbursement process and requiring a larger evidentiary record so that it might deny a greater fraction of claims for PMDs. Based on our calculations in the previous section, we estimated that The SCOOTER Store would cease operations if it expected that the fraction of reimbursed claims would be less than 77 percent. Given the nature of the Interim Final Rule, it is reasonable to infer that the fraction of reimbursed claims would be significantly less than the critical share if the rules were implemented in their current form. Our best estimate of the reimbursement rate under the Interim Final Rule is between 50 and 75 percent. Our estimate is

---

18. *Id.*
19. *Interim Final Rule*, 70 Fed. Reg. at 50,941.

derived from the historical reimbursement rate under the current Medicare appeals process.[20] When Medicare currently rejects a claim, The SCOOTER Store may appeal Medicare's decision.[21] Under the current standard, which initially relies solely on the CMN, Medicare has rejected on average 12 percent of The SCOOTER Store's claims for reimbursement between 2000 and 2005. Of those initially rejected claims, half (equal to 6 percent) have been ultimately approved under appeal. Because the CMS has proposed such a subjective standard in the Interim Final Rule, the agency would have a plausible basis for denying *every* claim submitted by The SCOOTER Store. In that contingency, the greatest reimbursement rate that The SCOOTER Store could achieve would be 50 percent (equal to 0 percent of claims that are initially accepted plus 50 percent that are ultimately approved under appeal). If Medicare initially rejected half of all claims under the new regime, then the greatest reimbursement rate that The SCOOTER Store could expect to realize would be 75 percent (equal to the 50 percent of claims that are initially accepted plus 25 percent that are ultimately accepted under appeal). Because the *maximum* percentage (75 percent) in our range of plausible estimates for reimbursement rates under the Interim Final Rule is less than the critical share (77 percent) under which The SCOOTER Store would cease operations, the implementation of that rule would likely force The SCOOTER Store to cease operations and thereby cause irreparable harm.

---

20. Another basis for our estimate is the historical disallowance rate for the Social Security Disability program, which has a claims-denial rate of about 25 to 40 percent. *See Performance Measure Review: Reliability of the Data Used to Measure the Office of Hearings and Appeals Decisional Accuracy*, Office of the Inspector General, Social Security Administration, A-12-00-10057 (April 2002). The Social Security Administration's disability and blindness determinations involves the same sort of review of personal medical records as is required when a Medicare carrier reviews the medical records submitted to support a determination of medical necessity.
21. DMERC DMEPOS Supplier Manual (Region C) Chapter 14: Appeals Process.

### III. THE SCOOTER STORE COULD NOT BREAK EVEN IF IT WERE FORCED TO SELL ITS POWER MOBILITY DEVICES DIRECTLY TO SELF-INSURED OR PRIVATELY INSURED PATIENTS

28.     Even if The SCOOTER Store could somehow manage to survive by changing its business strategy, the vast majority of its PMD customers would be irreparably harmed by the Interim Final Rule. One survival strategy that The SCOOTER Store could embrace if Medicare were to reject the majority of reimbursement claims under the Interim Final Rule would be to withhold delivery of the device to the patient until Medicare approves the claim. But such a strategy would require patients to wait months until the PMD was delivered (and years if the claim were appealed) *despite* the fact that the patient had already obtained a prescription from his or her doctor. Because the average age of The SCOOTER Store's customer is 77, it is not reasonable for The SCOOTER Store to ask its customers to wait several months before receiving the PMD—three months of delay for a senior citizen represents a significant share of his or her remaining life.[22]

29.     An alternative survival strategy for The SCOOTER Store would be to focus sales on wealthy senior citizens only and seniors with sufficient private insurance to cover 100 percent of the price of the PMD (that is, seniors who are fully privately insured). This strategy presumes that The SCOOTER Store could increase its price so that its average revenue exceeded average *total* cost (fixed plus variable cost) for sales to high-income or high-net worth patients only. Under this scenario, the consumer welfare associated with the purchase of PMDs through Medicare would be eliminated. Consumer welfare is equal to the difference between maximum willingness to pay (the consumer's valuation) and the price paid summed across all consumers.

---

22. As of 2003, the average life expectancy for a U.S. citizen was 77.6 years. Donna L. Hoyert, Hsianc-Ching Kung, and Betty L. Smith, Center for Disease Control, National Vital Statistics Reports, Vol. 53, No.15, Feb. 28, 2005.

According to the CMS, PMD suppliers submit 187,000 claims to Medicare each year.[23] Assuming a weighted-average price of $1,000 in co-payments per PMD (equal to 20 percent of a $5,000 allowable), annual consumer expenditure on PMDs through the Medicare channel is roughly $187 million. Because the majority of the price is absorbed by Medicare, and because a PMD is a medical necessity, it is reasonable to infer that the demand for PMDs is not sensitive to increase in price—that is, the demand is inelastic or less than one in absolute value. Assuming an elasticity of demand for PMDs equal to -1 (that is, a one-percent increase in the price for PMDs results in a one-percent decrease in demand for PMDs), the greatest price at which any consumer would purchase a PMD through a Medicare co-payment is $2,000 (equal to $1,000 − [($1,000/187,000)/-1] x 187,000). Assuming an elasticity of demand for PMDs equal to -0.33 (that is, a one-percent increase in the price for PMDs results in a 0.33 percent decrease in demand for PMDs), the greatest price at which any consumer would purchase a PMD through a Medicare co-payment is $4,030 (equal to $1,000 − [($1,000/187,000)/-0.33] x 187,000). Using that range of elasticities, the consumer welfare that would be eliminated if The SCOOTER Store and other PMD suppliers were to abandon the Medicare channel entirely ranges from $93.5 to $283.3 million per year. Figure 1 shows the loss in consumer welfare graphically.

---

23. *Interim Final Rule*, 70 Fed. Reg. at 50,944.

FIGURE 1: CONSUMER WELFARE LOSS OF PMD CUSTOMERS WHO PURCHASE THROUGH THE MEDICARE CHANNEL DUE TO THE INTERIM FINAL RULE



As Figure 1 shows, the loss in consumer welfare is equal to the area under the demand curve above the price. The consumer welfare loss depends on the slope of the demand curve; a steeper slope implies less price sensitivity, a greater willingness to pay, and a greater loss in consumer welfare (that is, a larger triangle).

30.   But even this bleak outcome is too optimistic because the private segment of the PMD market is likely too small to support The SCOOTER Store's overhead costs. Only 6 percent of The SCOOTER Store's sales are made to fully privately insured customers. If The SCOOTER Store were forced to spread its fixed costs across this significantly smaller base of customers, then it could not break even—that is, average revenue would not exceed its average total cost. Under this scenario, all PMD customers, including those patients that are fully privately insured, would forgo the consumer welfare associated with the purchase of PMDs.

## CONCLUSION

31.	By decreasing the utilization of PMDs, the CMS will limit the growth in Medicare spending. But that narrow objective fails to consider the larger goals served by the Medicare program. Those goals are to preserve the welfare of senior citizens, who have contributed to this insurance program for their entire lifetime. To preserve such welfare, the regulatory environment must encourage medical suppliers to take risks and to continue to provide their products. The Interim Final Rules would likely cause The SCOOTER Store to cease operations over a reasonably short time horizon and thereby cause irreparable harm. Moreover, seniors who are not fully privately insured would no longer be able to enjoy the consumer welfare of mobility made possible by PMDs. Their loss in welfare is another form of irreparable harm caused by the Interim Final Rules.

* * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 12, 2005.

_____
J. Gregory Sidak

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 12, 2005.

_____
Hal J. Singer