# EXHIBIT 9

IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


| | |
|---|---|
| POWER MOBILITY COALITION | ) |
| | ) |
| v. | ) Civil Action No. _____ |
| | ) |
| MICHAEL O. LEAVITT, | ) |
| Secretary, United States | ) |
| Department of Health and | ) |
| Human Services, and | ) |
| MARK B. McCLELLAN, | ) |
| Administrator, Centers for | ) |
| Medicare and Medicaid | ) |
| Services | ) |


DECLARATION OF PHILIP DiLERNIA

I, Philip DiLernia, do hereby declare under penalty of perjury as follows:

1.   I am President of Cornell Healthcare Corporation d/b/a Mr. Mobility, a supplier of power mobility equipment headquartered at 15 Minneakonig Road, Suite 309, in Flemington, New Jersey.  I founded Cornell Healthcare Corporation in 1992.  The company is a member of the Power Mobility Coalition.

2.   Mr. Mobility sells wheelchairs, power wheelchairs, and electric scooters to persons with a medical need for mobility equipment.  Most of the company's revenues are derived from the sale of power wheelchairs. In 2004, Mr. Mobility was the 17th largest supplier of power wheelchairs in the United States.  Mr. Mobility serves customers in the New York City and Philadelphia metropolitan areas and other parts of New Jersey and Pennsylvania.  Our company has 11 employees.

3.   Over 90% of Mr. Mobility's sales of power wheelchairs and scooters are to Medicare beneficiaries. More than 75% of the company's gross revenue is received directly from Medicare reimbursement.  Most of the company's remaining revenue comes from Medicaid or private

insurers such as Blue Cross/Blue Shield, and represents reimbursement for Medicare beneficiaries' co-payment obligations.  These co-payment reimbursements are paid to Mr. Mobility only after Medicare has approved reimbursement for the device.  Mr. Mobility therefore depends for its survival on timely reimbursement from Medicare for medically necessary mobility equipment that we sell to Medicare beneficiaries.

4.    Mr. Mobility does business in strict compliance with CMS's rules and reimbursement guidelines. Nevertheless, CMS and its contractors have audited approximately 150 reimbursement claims submitted by Mr. Mobility.  Although I understand that Mr. Mobility has been more successful than most other equipment suppliers in defending its reimbursement claims when they are audited, nevertheless the audit process has been very expensive and difficult for Mr. Mobility.

5.    Mr. Mobility has survived under the current rules for Medicare reimbursement because we scrupulously adhere to Medicare program rules, and because the certificate of medical necessity (CMN) has provided a way of focusing and documenting doctors' determinations of medical necessity. In my declaration I will explain why the CMN is critical to Mr. Mobility's operations and the effect that eliminating the CMN, as contemplated under CMS's recently released Interim Final Rule, would have on Mr. Mobility.

6.    The CMN form requires the doctor to answer specific questions bearing on medical necessity that may not be addressed in other parts of the patient's medical record – such as whether the patient would be capable of operating a manual wheelchair.  A Durable Medical Equipment Supplier is not required to hire licensed doctors and/or nurses on staff.  Although Mr. Mobility's clerical employees lack medical training, they are able to determine by looking at the doctor's answers on the CMN whether these basic determinations relating to medical necessity have been made, and whether the determinations reflected on the form support a finding of medical necessity for a particular device such as a power wheelchair.  The CMN provides an objective way for Mr. Mobility to gain assurance (even if not absolute certainty) that its claims will be approved by Medicare.

7.    Absent the CMN, it would not be possible to obtain similar assurance of reimbursement based on the patient's medical records.  First, there are no standards governing how Medicare carriers review reimbursement requests, or what documentation suffices to demonstrate that a claim is adequate.  There is no "checklist" that the treating physician and supplier can use in assembling documentation to support a contested claim, or that the Medicare carrier could use in reviewing documentation.

8.    In my experience with audits of reimbursement claims, moreover, Medicare carriers do not seek to form an opinion whether the doctor's determination of medical necessity was reasonable.  Medicare carriers instead look for perceived inadequacies in the written record that the supplier has provided to support the doctor's determination, and base their decision on whether such inadequacies of written documentation exist.  In auditing our company's claims, for instance, Medicare carriers have never contacted a treating physician to obtain clarification of written medical records or a further explanation of the physician's determination of medical necessity.

9.    This method of review makes it difficult to be sure based on a doctor's determination of medical necessity, or even the full medical record, what conclusion the Medicare carrier will reach on any given claim, because the correctness of the doctor's ultimate determination of medical necessity has minimal importance.  Medicare carriers are focused on trees (defects in particular documents), not the forest (satisfaction of the fundamental standard for reimbursement).

10.    Another problem that faces suppliers when they must rely on general medical records is that physicians ordinarily do not maintain medical records for the purpose of justifying the need for certain medical equipment.  In particular, doctors commonly do not record the considerations that led them to reject equipment options other than the one they chose.

11.    For example, a medical record might reflect that the patient has diabetes, pain in his legs, and trouble walking even with a walker, but, in prescribing a power wheelchair, the doctor might fail to record that the patient lacks sufficient upper-body strength to use a

manual wheelchair.  Such information is not recorded
because it generally lacks prospective significance to
medical treatment.

12.  It is not realistic to expect equipment suppliers
to educate medical professionals about Medicare's
expectations for supporting documentation.  Each year, Mr.
Mobility receives orders for mobility equipment from
approximately 400 different doctors.  Because our company's
patients are different from year to year, their personal
physicians are different from year to year as well.  Mr.
Mobility cannot identify in advance the doctors with whom
we are likely to deal in the future, nor could we afford to
train those hundreds or thousands of doctors if we could
identify them.

13.  An additional problem with relying on medical
records to prove the validity of a Medicare claim is that
suppliers almost invariably do not employ medical
professionals and lack any doctor/patient relationship with
Medicare beneficiaries.  Suppliers must rely on physicians
to cooperate in preparing and presenting documentation that
is sufficient in their medical judgment.

14.  On a number of occasions, physicians have
initially refused to assist Mr. Mobility in defending
against Medicare audits.  It has been difficult and time-
consuming to win even their partial cooperation in
connection with a reimbursement process that provides no
direct benefit to the physician.  When Mr. Mobility does
succeed in obtaining doctors' cooperation, we must depend
on their medical judgment about what constitutes sufficient
proof of medical necessity, even though their judgment may
be different from the judgment made by Medicare carriers
when they review claims.

15.  The new reimbursement rules announced by CMS on
August 26, 2005, which are due to take effect on October
25, 2005, would eliminate the CMN as a mechanism for
guiding doctors' documentation of medical necessity.
Without the CMN, suppliers would have to rely solely on the
underlying medical records, which have all the limitations
that I have discussed.

16.  The new rules create other practical problems as
well.  One is that it will take a substantial period of
time (up to several months, based on my experience with

Medicare audits) to obtain from doctors the supporting information that will be necessary to submit a valid reimbursement claim.  Claims that cannot be submitted by October 24, 2005, most likely will not be ready for submission to Medicare until January 2006, at the soonest. There will be a gap in Medicare reimbursements lasting from approximately late November 2005 (when reimbursements under the old rules are paid out) to February 2006 (when a trickle of reimbursements would begin under the new rules). It is uncertain whether Mr. Mobility could continue to operate during such a period of little or no revenue.

17.  For these reasons, I have concluded that the new rules, and especially elimination of the CMN process, will increase the costs of preparing and defending Medicare claims and decrease Mr. Mobility's recovery from Medicare despite our best efforts to comply with all requirements. It is unlikely that Mr. Mobility could operate profitably under the new rules.

18.  If the new rules take effect as planned by CMS, I anticipate that Mr. Mobility will wind-down its operations and stop doing business as a supplier of mobility equipment in early 2006.  I expect that Mr. Mobility will be able to continue its operations if, instead, the existing reimbursement rules remain in effect.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
Philip DiLernia

Dated October ___, 2005