# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| POWER MOBILITY COALITION<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL O. LEAVITT,<br>Secretary of the Department of<br>Health and Human Services, *et al.*<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 1:05-cv-02027-RBW |

---

## DEFENDANTS' MEMORANDUM IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

Plaintiff asks this Court to grant it the extraordinary emergency remedy of a preliminary injunction preventing Defendants Michael O. Leavitt ("the Secretary"), Secretary of the Department of Health and Human Services ("HHS") and Mark B. McClellan ("the Administrator"), Administrator of the Center for Medicare and Medicaid Services ("CMS"), from enforcing a new rule designed to effect the will of Congress and reduce fraud and abuse in Medicare claims for power mobility devices ("PMDs"), i.e., power wheelchairs and scooters. Plaintiff's motion falls far short of the high bar for entry of such pre-enforcement, emergency relief; it should be denied.

Plaintiff seeks to portray the Secretary as a miser who wishes for himself (and would exercise) the power to deny all proper claims for PMD on no basis at all.  Meanwhile, Plaintiff

believes the Medicare Trust Fund should be required to reimburse PMD suppliers for very

expensive pieces of equipment based solely on a one-page, standard form, although PMD claims

have been beset by rampant fraud. In fact, the Secretary seeks merely to limit Medicare

payments to those claims that are medically reasonable and necessary and, of course, that can be

substantiated by patient medical records – not merely a single page form. This is perfectly

appropriate, as Congress has for 40 years entrusted the Secretary with the final decision as to

what is medically necessary under the Medicare Act and, therefore, what claims can be paid. The

new PMD payment rule that Plaintiff asks the Court to enjoin is a reasonable response to PMD

fraud and abuse; moreover, it conforms agency regulations to recent statutory changes and the

Congressional command that the Secretary prioritize regulatory changes that will address

fraudulent claims.

Atmospherics aside, Plaintiff's motion fails under the law. The paltry (albeit lengthy)

declarations Plaintiff supplies to establish its claim of imminent, certain and irreparable harm add

up to rank speculation. The declaration testimony suffers from a number of evidentiary flaws

and adds up to only a murky claim of remote and redressable injury based on flawed

assumptions. Nor has Plaintiff established a likelihood of success on the merits of its underlying

claims; indeed, because its claims are barred by statute, Plaintiff cannot even meet its burden to

show those claims are properly before this Court. Even if this Court had jurisdiction to entertain

them, however, Plaintiff's substantive and procedural challenges to the PMD payment rule under

the Administrative Procedure Act ("APA") would fail. The new rule is not defective because it

has been first issued as an interim final rule with comment period rather than as a notice of

proposed rulemaking; it is exempt from the notice and comment requirements of the APA

because portions of it merely conform agency regulations to Congressional commands, and the Secretary properly found that good cause justified issuing the balance, which is needed to combat fraud and protect the integrity of the Medicare program.  Plaintiff's claim that the rule is arbitrary and capricious is also meritless: the rule is entirely consistent with the Medicare Act.

Accordingly, the Court should deny Plaintiff's motion for a preliminary injunction.

## BACKGROUND

### I.    Statutory and Regulatory Background

### A.    The Medicare Program

The Medicare Act, established under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh, pays for covered medical care provided to eligible aged and disabled persons. The statute consists of three main parts: Part A, which generally authorizes payment for covered inpatient hospital care and related services, 42 U.S.C. §§ 1395c to 1395i-5, 42 C.F.R. Part 409; Part B, which provides supplementary medical insurance for covered medical services, such as doctors' visits, diagnostic testing, or covered medical supplies, such as DME, prosthetics and orthotics, 42 U.S.C. §§ 1395j to 1395w-4, 42 C.F.R. Part 410; and Part C, which authorizes beneficiaries to obtain services through HMOs and other "managed care" arrangements, 42 U.S.C. §§ 1395w-21 to 1395w-28, 42 C.F.R. Part 422.[1]  This case involves Part B, as Plaintiff purports to be an association of DME "suppliers."  42 U.S.C. § 1395x(d), 42 C.F.R. § 400.202.

---

[1]    Medicare Part D will provide coverage for prescription medication once it takes effect on January 1, 2006.  42 U.S.C. §§ 1395w-101, et seq; 42 C.F.R. Part 423.

**B.     Medicare Carriers**

In administering Part B, CMS acts through private fiscal agents called "carriers."  42 U.S.C. § 1395u; 42 C.F.R. Part 421, Subparts A and C, and 42 C.F.R. § 421.5(b).  Carriers are private entities, generally insurance companies, that, under contract with the Secretary of Health and Human Services ("the Secretary"), perform a variety of functions, such as making coverage determinations in accordance with the Medicare Act, applicable regulations, the Medicare Part B Supplier Manual, the publicly available Program Integrity Manual ("PIM"), regional Durable Medical Equipment Regional Carriers ("DMERCs," "DMER carriers," or "carriers") manual, and other guidance, determining reimbursement rates and allowable payments, conducting audits of the claims submitted for payment, and adjusting payments and payment requests.  Upon receipt of a claim for services rendered, the carrier pays the Medicare beneficiary on the basis of an itemized bill, and pays the Medicare supplier on the basis of an assignment of benefits executed by the beneficiary.  42 U.S.C. § 1395u(b)(3)(B).  These carrier functions are prescribed by regulation.  42 C.F.R. § 421.200.

Pursuant to 42 U.S.C. §§ 1395m and 1395u, and the regulations at 42 C.F.R. § 421.210, DMER carriers process claims for DME (including PMDs), prosthetics, and orthotics within designated regions of the country.  Carriers have the authority to issue bulletins to medical providers and suppliers, detailing coverage requirements, limitations of coverage definitions, medical necessity definitions, and other pertinent matters.  Metromed Laboratories, Inc. v. Health Care Service, Case No. 1:98cv01885, 1999 WL 58558 (N.D. Ill. Feb. 3, 1999); U.S. v. Arrow Medical Equipment Company, Civ. No. 90-5701, 1991 WL 129830 (E.D. Pa. July 8, 1991).

Such issuances are promulgated via newsletters and bulletins that are routinely transmitted to suppliers.  See U.S. v. Krizek, 859 F. Supp. 5 (D.D.C. 1994).

### C.     Payment of Medicare Suppliers and Recovery of Medicare Overpayments

For reasons of administrative efficiency, initial payment for services under Medicare is ordinarily made as long as the claim does not contain glaring irregularities on its face.  See Heckler v. Ringer, 466 U.S. 602, 627 (1984) (noting Medicare processes literally hundreds of millions of claims every year); Warren Decl. ¶ 19 (Medicare is now processing over 1 billion individual claims each year).  Carriers then conduct post-payment audits in a small percentage of cases to ensure that payments are made in accordance with applicable Medicare payment criteria.  When payment is made erroneously, an "overpayment" is assessed and "recouped" from subsequent payments otherwise due the supplier.[2]  42 C.F.R. § 421.200(a)(2).  See also 42 U.S.C. §§ 1395l(j), 1395gg(b)(1); 42 C.F.R. §§ 405.370, 405.371(a)(1) and (a)(2), 405.350.[3]

### D.     The Medicare Appeals Process

A Medicare supplier dissatisfied with the resolution of a claim must present its grievance through the designated administrative appeals process and exhaust the administrative remedies available to it.  42 U.S.C. § 1395u(b)(3)(C); 42 U.S.C. § 1395ff(b) (incorporating by reference 42 U.S.C. § 405(b)); see also 42 C.F.R. §§ 405.801 et seq., 405.901 et seq (describing the

---

[2]     Recoupment is "[t]he recovery by Medicare of any outstanding Medicare debt by reducing the present or future Medicare payments and applying the amount withheld to the indebtedness."  42 C.F.R. § 405.370.

[3]     The Act provides for a waiver of supplier liability when the supplier "did not know, and could not reasonably have been expected to know, that payment would not be made for such services."  42 U.S.C. § 1395pp(a).  The Act also provides for waiver of recovery of an overpayment whenever it is determined that the supplier is "without fault" in incurring the overpayment.  42 U.S.C. § 1395gg(b)(1).

administrative appeals process for Part B).  The Medicare Act's review scheme is established

through four statutory provisions: 42 U.S.C. § 405(b), 42 U.S.C. § 405(g), 42 U.S.C. § 405(h),

and 42 U.S.C. § 1395cc(h).[4]  Section 405(b) provides that any individual dissatisfied with a

determination of the Secretary is entitled to "notice and opportunity for a hearing with respect to"

the determination.  42 U.S.C. § 405(b).  Once this administrative process is exhausted, judicial

review of the Secretary's "final decision" is available as provided in 42 U.S.C. § 405(g)

(incorporated by reference in 42 U.S.C. § 1395ff(b)(1)(a)), which provides that anyone

dissatisfied with a "final decision . . . made after a hearing to which he was a party may obtain . .

. review of such decision by" filing an action in federal district court.  42 U.S.C. § 405(g).

Section 405(h) renders the administrative and judicial review procedures under Section 405(b)

and (g) exclusive.  It states:

> No findings of fact or decision of the [Secretary] shall be reviewed by any person,
> tribunal, or governmental agency *except as herein provided*.  No action against the
> United States, the [Secretary], or any officer or employee thereof shall be brought
> under section 1331 [authorizing federal jurisdiction over federal questions] or
> 1346 [authorizing federal jurisdiction over claims against the United States as
> defendant] of title 28, United States Code, to recover on any claim *arising under*
> [the Medicare Act].

42 U.S.C. § 405(h) (emphasis added).  See also Lifestar Ambulance Serv. v. United States, 365

F.3d 1293, 1295 (11th Cir. 2004) ("The Medicare Act establishes a comprehensive remedial

scheme, providing both administrative hearing rights for aggrieved providers . . . and judicial

review of the Secretary's final decisions" under 42 U.S.C. § 405(g)) (citing Ringer, 466 U.S. at

605-06 & n.1 (quoting 42 U.S.C. § 405(g)).).

_____

[4]        42 U.S.C. § 405(h) is specifically made part of the Medicare Act by 42 U.S.C.
§ 1395ii.

### E.    Medicare Coverage of Power-Operated Wheelchairs and Documentation Requirements Under Prior Rules

Medicare Part B resembles "a private medical insurance program that is subsidized in major part by the federal government."[5]  Schweiker v. McClure, 456 U.S. 188, 190 (1982).  As with private medical insurance programs, the statute and its implementing regulations set forth conditions and limitations on the coverage of services and items (42 U.S.C. §§ 1395k, 1395l, 1395x(s),) exclude certain services and items from coverage, and otherwise specify various limitations.  See also 42 U.S.C. § 1395y(a)(2)-(16); 42 C.F.R. § 411.15(a)-(k).

Part B coverage extends to DME.  42 U.S.C. §§ 1395k, 1395x(s).  DME coverage includes wheelchairs used in the patient's "home," including institutions other than hospitals or skilled nursing facilities.  42 U.S.C. § 1395x(n), 42 C.F.R. § 410.38(a)-(c).  Customized wheelchairs are covered as long as they are "uniquely constructed or substantially modified for a specific beneficiary according to the description and orders of a physician."  42 C.F.R. § 414.224(a).  In all cases, however, Medicare coverage is limited to services that are medically "reasonable and necessary" for the diagnosis or treatment of illness.  42 U.S.C. § 1395y(a)(1)(A), 42 C.F.R. § 411.15(k)(1).

To obtain payment for certain items of DME under prior law, the Secretary had, through the regional Medicare DMER carriers, required suppliers to submit a form known as a Certificate of Medical Necessity ("CMN").  See 42 U.S.C. § 1395m(j)(2)(B) (defining CMN).  In addition, the Secretary has always required (and, under the new rule, continues to require) suppliers to

---

[5]    Part B participants pay monthly premiums, which are deposited along with federal appropriations in the Federal Supplementary Medical Insurance Trust Fund which finances Part B.  See 42 U.S.C. §§ 1395j, r, s, t, & w.

furnish information sufficient to support payments under Medicare Part B, 42 U.S.C. § 1395*l*(e).

Consistent with these mandates, the Secretary – through the regional carriers – issued several

directives advising suppliers that they were required in some instances to provide medical

documentation in addition to the CMNs in order to substantiate compliance with the "reasonable

and necessary" requirement of the Act.[6]  See, e.g., Warren Decl. Exh. A (DMERC instructions to

carriers).

The CMN itself is a limited, standard document, that requests (1) identifying information

about the supplier and the beneficiary, (2) a description of the DME supplied, and (3) other

administrative information "other than information relating to the beneficiary's medical

condition," which could be provided by the supplier, and limited medical information required to

be completed by a physician.  42 U.S.C. § 1395m(j)(2)(A).  A valid certification by a physician

may be a CMN, where permitted, or a prescription or a physician order for an item of DME.

Absent a physician certification, however, Medicare lacks statutory authority to pay the claim.

See 42 U.S.C. § 1395n(a)(2)(B) ("payment for services . . . may be made . . . only if . . . a

physician certifies . . . that . . . such services are or were medically required."); see also 42 U.S.C.

§ 1395y(a)(1)("no payment may be made . . . for any expenses incurred for items or services . . .

---

[6]        A Medicare supplier is presumed to know that an item was not "reasonable and
necessary" on the basis of relevant "CMS notices, including manual issuances, bulletins or other
written guides or directives" from the Medicare carrier.  42 C.F.R. § 411.406(e)(1); see also
Tsoutsouris v. Shalala, 977 F. Supp. 899, 904, 908 (N.D. Ind., 1997), citing 42 C.F.R.
§ 411.406(e)(1); U.S. v. Medica-Rents Co., 285 F.2d 742, 747-48 (N.D. Tex. 2003) (supplier has
the duty to comply with Medicare statutes, regulations, and supplier guidelines).  Courts have
acknowledged that providers and suppliers must follow the billing and documentation
requirements set forth in such carrier issuances pursuant to statute and regulation, because courts
must "defer to [the Secretary's] interpretation if it is not inconsistent with the statute and
regulations, and is a reasonable interpretation thereof." Community Hospital of the Monterey
Peninsula v. Thompson, 323 F.3d 782, 792 (9th Cir. 2003).

which are not reasonable and necessary for the diagnosis or treatment of illness or injury"). However, physician certification, while necessary, is not alone sufficient to establish that an item or service is covered by Medicare.  In 42 U.S.C. § 1395*l*(e), Congress prohibited the Secretary from making Medicare payments unless the Secretary has been furnished the information he may require to substantiate medical necessity.  The statute provides that

> no payment shall be made to any provider of services or other persons under this part unless there has been furnished such information as may be necessary in order to determine the amounts due . . . under this part.

42 U.S.C. § 1395*l*(e).  In addition, 42 U.S.C.§ 1395u(p)(4) specifies that a carrier may request a supplier to obtain additional information about a claim from a physician, and requires that the physician provide that information.

PMDs are a distinct, and expensive, form of DME.  Only a small sub-set of Medicare beneficiaries who are eligible for payment for a wheelchair of some sort are eligible for reimbursement of a power operated wheelchair.  The relevant guidance manuals to suppliers specify the criteria which must be met in order for power operated wheelchairs to be covered under Medicare Part B.  The DMERCs have long informed suppliers that for a power-operated wheelchair to be covered by Medicare, the patient's medical record must contain documentation substantiating findings on the CMN.  See Warren Decl. ¶¶ 11, 29; Warren Decl. Exh. A.

### F.    Fraud in PMD Claims and The Medicare Modernization Act

In 2003, Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. 108-173, 117 Stat. 2066 ("Medicare Modernization Act" or "MMA").  Title III of that Act, "Combatting Waste, Fraud, and Abuse," seeks to address and ameliorate fraud in, inter alia, Medicare claims for PMDs.  See id. § 302(a)(2); H.R. Conf. Rep.

-9-

108-391 at 575, reprinted in 2003 U.S.C.C.A.N. 1808, 1944 (discussing "those covered items for

which there has been a proliferation of use, consistent findings of charges for covered items that

are not delivered, or consistent findings of *falsification of documentation* to provide for payment

of such covered items." (emphasis added)).  In pertinent part, the Act provides:

> (i) IN GENERAL.--The Secretary shall establish standards for clinical conditions for
> payment for covered items under this subsection. . . .
> (iii) PRIORITY OF ESTABLISHMENT OF STANDARDS.--In establishing the
> standards under this subparagraph, the Secretary shall first establish standards for those
> covered items for which the Secretary determines there has been a proliferation of use,
> consistent findings of charges for covered items that are not delivered, or consistent
> findings of falsification of documentation to provide for payment of such covered items
> under this part.
> (iv) STANDARDS FOR POWER WHEELCHAIRS.--Effective on the date of the
> enactment of this subparagraph, in the case of a covered item consisting of a motorized or
> power wheelchair for an individual, payment may not be made for such covered item
> unless a physician (as defined in section 1861(r)(1)), a physician assistant, nurse
> practitioner, or a clinical nurse specialist (as those terms are defined in section
> 1861(aa)(5)) has conducted a face-to- face examination of the individual and written a
> prescription for the item.
> (v) LIMITATION ON PAYMENT FOR COVERED ITEMS.--Payment may not be made
> for a covered item under this subsection unless the item meets any standards established
> under this subparagraph for clinical condition of coverage.".

Pub. L. 108-173 § 302(a)(2), codified at 42 U.S.C. § 1395m(a)(1)(E).

The Act followed, and responded to, a proliferation of fraud and abuse in the PMD

market.  Indeed, "DMERCs and the [HHS] Office of the Inspector General (OIG) have identified

fraud cases involving power wheelchairs that were not supplied, not medically necessary, or

both."  HHS OIG, MEDICARE PAYMENTS FOR POWER WHEELCHAIRS (April 2004), OEI-03-02-

00600, at ii, available at http://oig.hhs.gov/oei/reports/oei-03-02-00600.pdf.  The Inspector

General reviewed a statistically significant sample of PMD claims, including claims for the

more-expensive power wheelchairs and the still expensive, but less so, power scooters.  *A*

*majority of the reviewed claims for power wheelchairs did not meet Medicare criteria.* Id. iii.

Approximately *one-third* of the claims did not qualify for *any* type of wheelchair; 45% did not

meet power wheelchair criteria, but may or may not have been eligible for a less-expensive

scooter or manual wheelchair that was not the subject of a claim. Id.; see also id. at 3

("Information submitted to the DMERC by the supplier must be substantiated by documentation

in the patient's medical records."). This level of abuse was cause for serious concern, as PMDs

cost Medicare and its beneficiaries $538 million in 2001 (95% for the more-expensive power

wheelchairs). Id. at 3. Claims and payments for power wheelchairs were increasing dramatically

at that time, id., and continued their climb: by 2003, the cost reached $1.2 billion. See Testimony

of Herb Kuhn, Director, Center for Medicare Management, CMS, on Power Operated

Wheelchairs Before the Senate Finance Committee (April 28, 2004), available at

http://www.cms.hhs.gov/media/press/testimony.asp?Counter=1025.

Ongoing efforts by CMS to target fraud and abuse have helped improve the profile of

PMD claims. See generally id. Payments decreased to approximately $820 million in 2004, and

appear set to rise again to approximately $900 million in 2005. See Warren Decl. ¶ 19.

### G. The Interim Final Rule and Continuing Efforts to Mitigate Fraud and Abuse in Power Mobility Device Medicare Reimbursement Claims

On August 26, 2005, CMS published an Interim Final Rule, Conditions for Payment of

Power Mobility Devices, Including Power Wheelchairs and Power-Operated Vehicles, 70 Fed.

Reg. 50940 (Aug. 26, 2005) ("PMD payment rule"). The 90 day comment period for the PMD

payment rule, currently ongoing, will end at 5 p.m. on November 25, 2005. Id. The rule

conforms CMS regulations to § 302(a)(1)(E)(iv) of the MMA, Pub. L. 108-173, codified at 42

U.S.C. § 1395m(a)(1)(E), which provides that 1) a face-to-face examination of the individual be conducted by a physician, a physician assistant, a nurse practitioner or a clinical nurse specialist; and 2) payment may not be made for a power wheelchair unless the physician or treating practitioner has written a prescription for the item.  By permitting treating practitioners to conduct the face-to-face examination, MMA effectively removed CMS' regulatory requirement that a beneficiary must be seen by a specialist in physical medicine, orthopedic surgery, neurology, or rheumatology in order to receive a power-operated vehicle, also known as a scooter.  See Warren Decl. ¶ 28.  Accordingly, the PMD payment rule both requires a fact-to-face examination be conducted by appropriate medical personnel prior to making a claim for PMD, and eliminates the prior specialist requirement, to conform CMS regulations with the dictates of the MMA, making it easier for beneficiaries to access a medical provider who is authorized to prescribe a PMD.

In addition, the PMD payment rule commits to regulation CMS's longstanding requirement that, as part of a medical review, a supplier is required to produce documentation from the beneficiary's medical record that demonstrates the medical necessity of an item or service.  At the same time, the rule eliminates the requirement of a CMN but nonetheless requires a written prescription, and requires a supplier have the supporting documentation before submitting a claim.  Under the new system envisioned by the PMD payment rule, physicians and treating practitioners will be compensated for the required face-to-face examination, and for the additional work necessary to complete a written prescription and prepare pertinent parts of the medical record.  70 Fed. Reg. 50941.  The PMD payment rule does nothing, however, to alter the

administrative review procedures described <u>supra</u> that are available to a supplier dissatisfied with

a claim denial or other decision of the Secretary.

## ARGUMENT

## II.    Standard of Review

A request for emergency injunctive relief is an extraordinary remedy, and the power to

issue such an injunction "should be sparingly exercised."  <u>Dorfmann v. Boozer</u>, 414 F.2d 1168,

1173 (D.C. Cir. 1969) (quotation marks omitted).  For a plaintiff to prevail in its motion for a

preliminary injunction, it "must demonstrate: 1) a substantial likelihood of success on the merits,

2) that it would suffer irreparable injury if the injunction is not granted, 3) that an injunction

would not substantially injure other interested parties, and 4) that the public interest would be

furthered by the injunction."  <u>CityFed Fin. Corp. v. Office of Thrift Supervision</u>, 58 F.3d 738,

746 (D.C. Cir. 1995); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Washington Metropolitan Area Transit Comm'n v. Holiday</u>

<u>Tours</u>, 559 F.2d 841, 842 (D.C. Cir. 1977); <u>Virginia Petroleum Jobbers Ass'n v. FTC</u>, 259 F.2d

921, 925 (D.C. Cir. 1958).  While courts may balance weakness in one or more prongs against

strong showings in others, <u>CityFed Financial Corp.</u>, 58 F.3d at 747, two prongs of the familiar

four-part inquiry – the likelihood of success on the merits and irreparable harm –  must be

established.  <u>See</u> <u>District 50, United Mine Workers of Am. v. International Union, United Mine</u>

<u>Workers of Am.</u>, 412 F.2d 165, 167 (D.C. Cir. 1969).[7]

---

[7]    In addition, when a movant seeks mandatory injunctive relief, <u>i.e.</u>, an injunction that "would alter, rather than preserve, the status quo . . . the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction."  <u>Columbia Hosp.</u> <u>for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.</u>, 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (<u>quoting</u> <u>Phillip v. Fairfield Univ.</u>, 118 F.3d 131, 133 (2d Cir. 1997)), <u>aff'd</u>, 159 F.3d 636 (D.C.

(continued...)

**III.    The Court Should Deny Plaintiff's Motion for Preliminary Injunction Because Plaintiff Has Not Established Imminent, Certain, and Irreparable Injury**

"[I]rreparable harm to the moving party is 'the basis of injunctive relief in the federal courts'." Almurbati v. Bush, 366 F.Supp.2d 72, 77-8 (D.D.C. 2005) (Walton, J.), citing CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995) (quoting Sampson v. Murray, 415 U.S. 61, 88 (1974)).  Accordingly, a plaintiff's failure to meet its burden of establishing irreparable harm is sufficient, in itself, to deny emergency relief.  CityFed Fin. Corp., 58 F.3d 738, 747.  Moreover, "[t]o obtain injunctive relief, the petitioners must show that the threatened injury is not merely 'remote and speculative'." Almurbati, 366 F.Supp.2d 72, 78, quoting Milk Indus. Found. v. Glickman, 949 F.Supp. 882, 897 (D.D.C. 1996).  Thus, proving "irreparable" injury is a considerable burden, requiring proof that the movant's injury is *certain, great and actual* - not theoretical - and *imminent*, creating a clear and present need for extraordinary equitable relief to prevent harm.  Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985); Varicon Int'l v. OPM, 934 F. Supp. 440, 447 (D.D.C. 1996).  "Even more important, the plaintiffs must show that the injury will be impossible to correct or redress after it occurs[.]" Foundation Health Fed. Servs. v. United States, 1993 WL 738426, *2 (D.D.C. Sept. 23, 1993).  And economic loss, in and of itself, generally does not constitute irreparable harm. Wisconsin Gas Co., 758 F.2d at 674; Varicon, 934 F. Supp. at 447.  Rather, only economic loss that threatens the survival of a movant's business constitutes irreparable harm.  Wisconsin Gas Co., 758 F.2d at 674; Holiday Tours, Inc., 559 F.2d at 843 n.3).  But, again, such harm must be

_____

[7](...continued)
Cir 1998).  "A district court should not issue a mandatory preliminary injunction unless the facts and the law clearly favor the moving party." Nat'l Conference on Ministry to Armed Forces v. James, 278 F. Supp. 2d 37, 43 (D.D.C. 2003) (internal quotations omitted).

certain to occur in the near future as a direct result of the threatened action. <u>Wisconsin Gas Co.</u>, 758 F.2d at 674; <u>Varicon</u>, 934 F. Supp. at 447.

Plaintiff here has fallen far short of its burden to establish that certain, great, actual and imminent harm will result if the Court denies the "extraordinary" and "unusual" emergency injunctive relief it requests. <u>Lehman</u>, 623 F. Supp. at 334; <u>Role Models America, Inc. v. White</u>, 193 F. Supp.2d 76, 80 (D.D.C. 2002). As an initial matter, much of the "evidence" Plaintiff supplies to clear its high burden of showing irreparable harm is self-serving hearsay and speculation offered without sufficient foundation. <u>See</u> <u>generally</u> Declaration of Timothy K. Zipp, Declaration of Philip DeLernia, Declaration of J. Gregory Sidak and Hal J. Singer. Further, the Sidak & Singer Decl. contains questionable opinion that is presumably offered as expert testimony, but it falls far short of the required standards. <u>See</u>, <u>e.g.</u>, Fed. R. Evid. 104, 701-704; <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999); <u>Joiner v. General Electric Co.</u>, 522 U.S. 136 (1997); <u>Daubert v. Merrill-Dow Pharmaceuticals, Inc.</u> 509 U.S. 579 (1993). Moreover, aside from the evidentiary defects in Plaintiff's argument, their central claim is not credible: they will not be imminently and certainly forced out of business if they abide by the PMD payment rule and its documentation requirements, i.e., if they must obtain prescriptions rather than a CMN and Medicare continues its longstanding policy of relying on medical record evidence.[8]

Plaintiff attempts to substantiate its irreparable harm claim almost exclusively via their hired economists' references to the purported circumstances of The Scooter Store. Sidak & Singer Decl. When the strident speculation of the economists is set aside, however (<u>see</u>, <u>e.g.</u>,

---

[8]     Though Plaintiff asks this Court to enjoin the entire PMD payment rule, <u>see</u>, <u>e.g.</u>, Plaintiff's Motion ("Pl. Br.") 1, it does not even address its irreparable harm arguments to any portions of the rule beyond those concerning documentation.

Sidak & Singer Decl. ¶ 22 (implying, without foundation, that the PMD payment rule is designed

to allow CMS to improperly reject claims[9])), their opinion boils down to an allegation that The

Scooter Store will be forced out of business if CMS rejects more than 23% of its claims.  Id.

¶ 21.  Even assuming, arguendo, that this is true – which, of course, it may not be[10] – the

economists' subsequent claim that this will occur is, on its face, pure speculation based on false

assumptions.  See, e.g., id. ¶ 27.  For example, the economists claim the PMD payment rule

injects "subjectivity" into the claims process in an effort to reject more claims.[11]  Id. ¶¶ 22-23

(quoting 70 Fed. Reg. 50941).  But Plaintiff's declarants, apparently unfamiliar with general

principles of medical prescription and review, utterly misapprehend and mischaracterize the

agency's use of the terms "subjective" and "objective."  They do not inject guesswork into claims

review; rather,

> [i]n CMS' examples of the pertinent parts of a beneficiary's medical record, reference to
> the term "subjective" portion of the physician's notes comes from the well-known (among
> physicians) S.O.A.P. acronym (subjective, objective, assessment, plan).   "Subjective"
> refers to the information provided by the patient, i.e. the patient's presenting complaint,
> history, etc.  "Objective" refers to the physician's findings, such as the blood pressure,
> heart murmur, etc.  The "Assessment" is the physician's interpretation/evaluation of the

---

[9]     In fact, as the Secretary found, the net impact of the rule will likely result not in a
decreased number of PMD prescriptions, but in a "shift in the composition of the PMDs
reimbursed by Medicare" from "cumbersome" power wheelchairs to power-operated vehicles
("POVs"), i.e., scooters.

[10]     The declarants do not explain in any detail where their underlying figures (filed
under seal) come from, so there is no indicia of reliability.  Presumably, they were offered by The
Scooter Store, not gleaned from reliable financial documents.

[11]     The PMD payment rule is an effort to reject more PMD claims only in the sense
that it seeks to ferret out *fraudulent* claims.  See Warren Decl.  Plaintiff's implication that the
government is attempting to deny legitimate claims is wholly unsubstantiated, and flies in the
face of the "presumption of regularity" afforded to government agencies.  Citizens to Preserve
Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971).

subjective and objective sections, in light of his clinical expertise.  The "Plan" describes
the tests to be ordered or prescriptions to be written.

Warren Decl. ¶ 26 (citing DEGOWIN'S DIAGNOSTIC EXAMINATION (8th ed. 2004)).

Plaintiff's declarants go on to argue that CMS is requiring "362 to 580 word essays for a
single patient" and that this "is not reasonable."  Sidak & Singer Decl. ¶ 23.  As an initial matter,
there is no foundation for their claim that such a requirement would be unreasonable.  More
important, however, *there is no such requirement*; the illustrative examples of physician's
progress notes in the Federal Register are lengthy merely so they will be understandable to a lay
reader.  Warren Decl. ¶ 25.  Claims will be denied based on the progress note only when it "does
not adequately describe the patient's need for a PMD."  Id.  Resting on their faulty assumptions,
Plaintiff's declarants then baldly state that "[c]learly, such requirements would impose a large
burden on the prescribing physician."  Sidak & Singer Decl. ¶ 24.  Regardless, such physicians
and other providers will receive additional compensation under the PMD payment rule for
increased efforts.  70 Fed. Reg. 50941.

Most fatal to Plaintiff's irreparable harm claim, however, is the rank speculation that
constitutes the economists' critical "conclusion," which falls far short of establishing certain,
great, irreparable and imminent harm.  See Wisconsin Gas Co., 758 F.2d at 674.  Plaintiff's
declarants repeat their faulty and baseless allegation that the rule "inject[s] more subjectivity into
the reimbursement process and requir[es] a larger evidentiary record so that [CMS] might deny a
greater fraction of claims."  Sidak & Singer Decl. ¶ 27; contra Citizens to Preserve Overton Park,
401 U.S. 402, 415 (presumption of regularity for agency action).  They then claim it is
"reasonable to infer" that CMS will deny *between 50 and 100 percent* of suppliers' claims.

-17-

Sidak & Singer Decl. ¶ 27.  This is based, again, on the declarants' misuse (whether out of ignorance or design) of the medical terms-of-art "subjective" and "objective."  Compare Sidak & Singer Decl. 27 ("Because the CMS has proposed such a subjective standard . . . the agency would have a plausible basis for denying *every* claim") with Warren Decl. ¶ 26 (explaining use of the term-of-art "subjective" in the PMD payment rule preamble).  In fact, there is no reason to expect PMD claim approval rates to decline under the new rule; rather, there is reason to expect an *increase* the rate of approval because unsubstantiated claims can be corrected prior to submission, and fraudulent claims precluded, under the new rule.  Warren Decl. ¶ 32.  Finally, even if there was substance to the declarants' speculation of harms, Plaintiff has not shown (indeed, has made no effort to show) that *irreparable* economic harm is *imminent*.  See Wisconsin Gas Co., 758 F.2d at 674; Varicon, 934 F. Supp. at 447.  The economists make the claim that The Scooter Store could not continue, but they do not consider whether The Scooter Store could remain viable (even under their flawed assumptions) by tapping its cash or other reserves, or changing its cash-flow or asset profile, for a very long time while litigating the merits of their claims pursuant to the usual timelines in the Federal Rules of Civil Procedure as opposed to the "extraordinary" and "unusual" emergency procedures Plaintiff seeks to invoke.  Lehman, 623 F. Supp. at 334; Role Models America, 193 F. Supp.2d at 80.  Nor do they consider the possibility that The Scooter Store could conceivably be forced out of business without regard to the new rule.[12]

---

[12]    The Scooter Store is defending itself against substantial False Claims Act charges pending in another district.  See The Scooter Store, Inc. v. Leavitt, et al., Civil Action No. SA05ca0033-RF (W.D. Tx.).  The Scooter Store's motion to dismiss those claims was denied by the presiding judge on October 18, 2005.  Id.

Moreover, one particularly puzzling aspect of Plaintiff's imminence argument is the fact that, as discussed <u>supra</u>, *virtually all claims are paid* unless they contain glaring, facial irregularities; overpayments are recouped some time later. That is hardly "imminent" harm.

Nor do Plaintiff's other declarations support the requisite showing of irreparable harm. The Zipp Declaration, also focused on The Scooter Store, makes an uncertain attempt at showing irreparable harm with the obvious statement that "[i]f . . . increased administrative costs and decreased reimbursements . . . make it unprofitable for TSS to continue to supply PMDs . . . TSS will be unable to remain in business." Zipp Decl. ¶ 26. Mr. Zipp also adopts Plaintiff's erroneous argument that the prior law required the government to pay for a $5,000 piece of medical equipment based solely, in all cases, on a one-page form CMN. <u>Compare</u> Zipp. Decl. ¶ 19 with <u>infra</u>. Mr. Zipp further complains, erroneously, that the Secretary has not provided useful guidance to physicians on the PMD payment rule. <u>See</u> Zipp. ¶ Decl. 20; <u>contra</u> October 2004 Letter from Donald G. Norris, M.D., Interim Medical Director for DMERC Region D, to physicians, <u>available at</u> http://www.cignamedicare.com/MDCorner/Documentation/PMD.pdf. The Declaration of Philip DeLernia, an executive of "Mr. Mobility," another PMD supplier, is equally infected with speculation of remote, and not demonstrably imminent, injury. <u>See</u>, <u>e.g.</u>, DeLernia Decl. ¶¶ 17-18 (alleging, without economic foundation, that "elimination of the CMN process," as misconstrued by Plaintiff, will make it "*unlikely* that Mr. Mobility could operate profitably under the new rules." (emphasis added)).[13]

---

[13]      Nor can plaintiffs supplement their inadequate declarations at this point in support of emergency relief. <u>See</u> LcvR 65.1(c) (initial application for preliminary injunction must be supported by all affidavits on which movant will rely). By the same token, Defendants have not addressed the Declaration of Dr. Mark Race because it is not properly before the Court. <u>Id.</u>

(continued...)

Plaintiff has utterly failed to establish imminent, irreparable, and certain harm.  For that reason alone, its motion for an extraordinary emergency injunction to prevent implementation of the PMD payment rule should be denied.  CityFed Fin. Corp., 58 F.3d 738, 747.

## IV. Plaintiff Has Failed to Establish it is Likely to Succeed on the Merits of its Underlying Claims

Plaintiff has also failed to meet its burden on the other essential prong of this Circuit's test for entry of emergency injunctive relief, the likelihood of eventual success on the merits of its underlying claims.  District 50, UMWA, 412 F.2d 165, 167.  First, Plaintiff has not met (and, indeed, cannot meet) its burden to establish subject matter jurisdiction because jurisdiction of its underlying claims in this Court is barred by statute.  Further, even if this Court could consider Plaintiff's underlying APA claims, Plaintiff is not likely to prevail.

### A. Subject Matter Jurisdiction Over Plaintiff's Claims is Barred by Statute

Plaintiffs virtually ignores its burden to establish this Court's subject matter jurisdiction to review Plaintiff's claims, though that is, of course, a threshhold question.  "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  The Court, of course, "always [has] jurisdiction to determine [its] jurisdiction."  Nestor v. Hershey, 425 F. 2d

---

[13](...continued)
65.1(d).  Plaintiff's motion for preliminary injunction was filed (albeit not properly served on Defendants) on October 13, but the Race Decl. was filed subsequently and without the required motion for leave of court.  Id.
     Even if the Court nonetheless considers the Race Decl., it also contains nothing to clear Plaintiff's high burden of establishing imminent, certain and irreparable harm.  See, e.g., Race Decl. ¶¶ 12-13 (making speculative claims based on hearsay and without proper foundation).

504, 511 (D.C. Cir. 1969); accord Steel Co. v. Citizens for a Better Environment, 523 U.S. 83,

93-94 (1998) (federal court may not decide merits before determining whether it has jurisdiction

over a case).

In this action, plaintiff has not (and cannot) establish subject matter jurisdiction in this

Court because it is barred by statute.  Specifically, the Medicare Act, 42 U.S.C. § 405(h), bars

subject matter jurisdiction over all claims arising under the Medicare statute absent two

requirements: presentment of a claim to the Secretary, which may not be waived, and exhaustion

of administrative remedies, which is waivable by the Secretary.  Section 405(h), which is

incorporated into the Medicare Act by 42 U.S.C. § 1395ii, provides that:

> The findings and decisions of the [Secretary] after a hearing shall be binding upon all
> individuals who were parties to such hearing. No findings of fact or decision of the
> [Secretary] shall be reviewed by any person, tribunal, or governmental agency except as
> herein provided. No action against the United States, the [Secretary], or any officer or
> employee thereof shall be brought under section 1331 or 1346 of title 28, United States
> Code, to recover on any claim arising under this title.

42 U.S.C. § 405(h).[14]

---

[14]       Section 405(h) unambiguously precludes federal question jurisdiction under
§ 1331; plaintiff's citations to the Administrative Procedure Act, 5 U.S.C. §§ 701-706, the
Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the general mandamus statute, id.
§ 1361, are similarly unavailing.  See Compl. ¶ 2.
       It is axiomatic that neither the APA nor the Declaratory Judgment Act provide an
independent grant of subject matter jurisdiction for review of agency action.  See, e.g.,  Schilling
v. Rogers, 363 U.S. 666 (1960) (Declaratory Judgment Act); Califano v. Sanders, 430 U.S. 99,
104 (1977) (APA).  Nor is there mandamus jurisdiction in this case.  "[T]he remedy of
mandamus is a drastic one, to be invoked only in extraordinary situations." Allied Chemical
Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980) (per curiam). This Court's mandamus jurisdiction,
accordingly, "is strictly confined," "available only in 'extraordinary situations'; [and] it is hardly
ever granted." In re Cheney, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc). Most importantly
here, mandamus is a remedy of last resort for a litigant who has "exhausted all other avenues of
relief." Heckler v. Ringer, 466 U.S. 602, 616 (1984). See Fornaro v. James, 416 F.3d 63, 69
(D.C. Cir. 2005) ("'It is, of course, elementary that mandamus is an extraordinary form of relief
                                                                          (continued...)

The Supreme Court's precedents make clear that these jurisdictional prerequisites to suit apply to all manner of claims that arise under the Medicare statute, make subject matter jurisdiction contingent on exhaustion of administrative remedies, and are to be broadly construed. The Court has thus characterized the § 405(h) bar to other avenues of review as "sweeping and direct," see Weinberger v. Salfi, 422 U.S. 749, 757 (1975), and explained that it applies to "all 'claim[s] arising under the' the Medicare Act." Ringer, 466 U.S. 602, 615. See also Your Home Visiting Nurse Serv., Inc. v. Shalala, 119 S. Ct. 930, 935 (1999) ("judicial review under the federal-question statute, 28 U.S.C. § 1331, is precluded by 42 U.S.C. § 405(h)"). Moreover, in its most recent, comprehensive review of this line of authority, the Court stressed that, so long as the claim arises under Medicare, the nature of the claim has no bearing on whether it must be channeled through the exhaustion and exclusive judicial review provisions of the Medicare statute:

> Those cases themselves foreclose distinctions based upon the "potential future" versus the "actual present" nature of the claim, the "general legal" versus the "fact specific" nature of the challenge, the "collateral" versus "noncollateral" nature of the issues, or the "declaratory" versus "injunctive" nature of the relief sought. Nor can we accept a distinction that limits the scope of § 405(h) to claims for monetary benefits. Claims for money, claims for other benefits, claims of program eligibility, and claims that contest a sanction or remedy may all similarly rest upon individual fact-related circumstances, may all similarly dispute agency policy determinations, or may all similarly involve the application, interpretation, or constitutionality of interrelated regulations or statutory provisions. There is no reason to distinguish among them in terms of the language or in terms of the purposes of § 405(h).

---

[14](...continued)
which lies only when no adequate alternative remedy exists"), quoting Barnhart v. Devine, 771 F.2d 1515, 1524, 1527 (D.C. Cir.1985) (finding mandamus precluded by adequate remedy under the CSRA). There is no mandamus jurisdiction here because, as discussed infra, the PMD suppliers that allegedly form the membership of plaintiff have not even attempted to avail themselves of, much less exhausted, their perfectly adequate, administrative remedies.

Illinois Council on Long Term Care, 529 U.S. 1, 14 (2000).  Plaintiff's claims "arise under" the

Medicare Act, as they admit,[15] and so it is certainly required to present its APA claims to the

Secretary and exhaust administrative remedies.  See Ringer, 466 U.S. at 610 n.7 (requiring

presentment and exhaustion for APA claims "arising under" the Act; noting that the Ringer

plaintiffs challenged the Secretary's policy on procedural and substantive APA grounds)[16];

National Kidney Patients Ass'n v. Sullivan, 958 F.2d 1127, 1129-34 (D.C. Cir. 1992) (exhaustion

required for APA notice and comment claims), cert. denied, 506 U.S. 1049 (1993).  Accordingly,

because PMD suppliers could present a challenge to the PMD payment rule to the Secretary but

have not done so, their challenge cannot stand in this Court, and they have no likelihood of

eventual success on the merits in this action.

      Presumably aware of this fatal flaw in its claims, Plaintiff argues, in passing in a footnote,

that it can avoid the clear pronouncement of § 405(h) and seek relief in the first instance in this

---

[15]     In Paragraph 1 of the Complaint, for example, Plaintiff alleges the PMD payment rule violates the Medicare Act, 42 U.S.C. §§ 1395hh(b) & 1395m(j)(2).

[16]     By requiring that claims be channeled through an administrative process, and by providing for judicial review only of the Secretary's "final decision," the Medicare Act effectively precludes pre-enforcement, or anticipatory, challenges such as Plaintiff's.  For example, in Ringer, one of the named plaintiffs (Mr. Ringer) sought to challenge an agency rule precluding reimbursement for an operation he needed.  Because Ringer could not file a claim for reimbursement (because he could not undergo the procedure without an assurance of reimbursement), he was never subject to a decision of the Secretary challengeable under Section 405(g).  Accordingly, he brought a "pre-enforcement" action in district court, asserting federal question jurisdiction, and requesting a declaratory judgment that the pertinent Medicare regulation was invalid.  See 466 U.S. at 620-22.
     The Supreme Court held that, because the Medicare Act provides the exclusive basis for obtaining jurisdiction over claims (like Ringer's) arising under it, the district court could not assume jurisdiction under 28 U.S.C. § 1331 (or any other statute).  The Court stated plainly: "The third sentence of 42 U.S.C. § 405(h), made applicable to the Medicare Act by 42 U.S.C. § 1395ii, provides that § 405(g), to the exclusion of 28 U.S.C. § 1331, is the sole avenue for judicial review for all 'claim[s] arising under' the Medicare Act."  466 U.S. at 614-15 (emphasis added).

-23-

Court because PMD suppliers "have no practical means of obtaining relief through the administrative process."  Pl. Br. 30 n.6.  Plaintiff further claims this is because the documentation requirements of the PMD payment rule are "likely" to force suppliers out of business, and that those who manage to continue will face "severe penalties."  Id.  But Plaintiff has not met its burden to establish any of this; indeed, none of it is true.

It is hardly the case that suppliers have no practical means of obtaining relief through the administrative process.  In Illinois Council, the Supreme Court required nursing homes to violate the challenged rule, suffer a penalty, and then challenge that penalty through the administrative process.  529 U.S. 1, 22.  Similarly, under the PMD payment rule a supplier whose claim for reimbursement is denied can appeal that denial, including a challenge to the underlying rule, and then (but only then) seek review in this Court.  See 42 U.S.C. § 1395u(b)(3)(C); 42 U.S.C. § 1395ff(b) (incorporating by reference 42 U.S.C. § 405(b)); see also 42 C.F.R. §§ 405.801 et seq., 405.901 et seq. (describing the administrative appeals process for Part B).  This is hardly the sort of case where "there is no conceivable set of circumstances that could . . . permit[] Plaintiffs to challenge the validity of [the rule] within the procedures provided by the agency."  Bartlett Memorial Medical Center, Inc. v. Thompson, 347 F.3d 828, 844 (10th Cir. 2003).  That is what "constitutes the 'no review at all'" that justifies federal question jurisdiction.  Id.; see also Fanning v. United States, 346 F.3d 386, 400 (3d Cir. 2003) (plaintiffs would not have to exhaust administrative remedies "if they could show that they have no way of having their claims reviewed" (emphasis added)); Walters v. Leavitt, 376 F.Supp.2d 746, 754-55 (E.D. Mich. 2005) ("a plaintiff may avoid § 405(h)'s exhaustion requirement and bring a § 1331 action only where he establishes that no administrative or judicial review is possible"); Connecticut State Dept. of

Social Services v. Thompson, 242 F.Supp.2d 127, 135 (D. Conn. 2002) (finding federal question

jurisdiction only where plaintiffs "do not receive an initial determination from which they can

seek administrative and, if necessary, judicial review").

As discussed supra, Plaintiff has failed to establish that CMS's continuing complex

medical review of approximately 0.3% of DME claims (see Warren Decl. ¶ 19) will cause PMD

suppliers to shut down.  Plaintiff alleges those who do not comply with the rule's documentation

requirements will face "severe penalties," but here, unlike even in Illinois Council, there is no

"penalty," per se, (either civil or criminal) for failing to abide by the rule.  See generally 70 Fed.

Reg. 50940.  Rather, under the PMD payment rule going forward, as has long been the case, see,

e.g., Warren Decl. ¶¶ 10, 11, 29,  if a supplier cannot provide documentation to support a claim

on review, that claim will be denied.[17]  Id.  Denial of individual claims constitutes the sort of

"cost[s] in . . . isolated, particular case[s]" that the Supreme Court held does *not* allow a party to

circumvent § 405(h).  Illinois Council, 529 U.S. 1, 22.  As this Court has held, "simply because

[a claimant] must assume some financial risk to invoke the administrative process does not

remove § 405(h)'s jurisdictional bar."  American Chiropractic Ass'n, Inc. v. Shalala, 131

F.Supp.2d 174, 178 n.5 (D.D.C. 2001), citing Illinois Council, 529 U.S. 1.

Moreover, Plaintiff's apparent reliance to the contrary on American Lithotripsy Soc'y v.

Thompson, 215 F.Supp.2d 23, 28-29 (D.D.C. 2002), and Nat'l Ass'n of Psychiatric Health Sys.

v. Shalala, 120 F.Supp.2d 33, 38-9 (D.D.C. 2000), is misplaced.  In both those cases, unlike here,

---

[17]     While additional penalties may be theoretically possible, this Court should accept
the Secretary's representations on this matter just as the Supreme Court did in Illinois Council.
529 U.S. 1, 22 ("The Council gives us no convincing reason to doubt the Secretary's description
of the agency's general practice" as to penalties for noncompliance.).

the plaintiffs faced *severe* penalties for noncompliance beyond mere noncoverage of services.  In

Psychiatric Health Sys., the Court found that plaintiffs who sought to challenge the rule would

face termination from the Medicare program and, in many cases, decertification by state and local

authorities as well.  120 F.Supp.2d 33, 38-9 & 39 n.4.  In American Lithotripsy Soc'y, the Court

found that plaintiffs faced not only termination from the Medicare program if they brought an

administrative challenge, but additional, statutory penalties of $15,000 per bill.  215 F.Supp.2d

23, 28-29.  Moreover, the American Lithotripsy Soc'y Court based its ruling on the fact that

(again unlike here) the Secretary did not contest plaintiffs' allegations of "financial ruin" and

lack of access to the administrative process.  Id. at 30.  As discussed supra, Plaintiff's allegations

of severe financial harm to The Scooter Store and other suppliers do not withstand scrutiny.

Finally, we note that channeling Medicare claims through the Act's administrative

processes, via a decision of the Secretary, makes sense.  Among other things, the Act's scheme

promotes administrative efficiency by protecting HHS and CMS from the "potential for overly

casual or premature judicial intervention" in their administrative processes.  See Ringer, 466 U.S.

at 627.  It also promotes judicial economy by allowing the agency an opportunity to "correct its

own errors, to afford the parties and the courts the benefit of its experience and expertise, and to

compile a record which is adequate for judicial review."  Salfi, 422 U.S. at 765.  Indeed,

channeling claims through the administrative process may even avert the need for judicial review

altogether.  See id. at 762.  For all of these reasons, the Court lacks jurisdiction under 28 U.S.C. §

1331 over Plaintiffs' claims.

**B.      Plaintiff Is Not Likely to Succeed on Its Claim That The PMD Payment Rule is Arbitrary & Capricious**

Plaintiff claims that the PMD payment rule is arbitrary and capricious under the APA, 5 U.S.C. § 706, "inasmuch as" it eliminates the requirement of a CMN. For this proposition, plaintiff relies on a decision of the Eastern District of California, Maximum Comfort v. Thompson, 323 F. Supp.2d 1060 (E.D. Cal. 2004), appeal docketed, No. 05-15832 (9th Cir. May 9, 2005). Maximum Comfort is, of course, of no precedential value in this Court. Northwest Forest Resource Council v. Dombeck, 107 F.3d 897, 900 (D.C. Cir. 1997) ("Stare decisis does not mandate that a district court in this circuit follow the decision of a district court in another circuit."). As set forth below, the Secretary respectfully submits that Maximum Comfort was wrongly decided, and its reasoning is not persuasive. In particular, Congress has never required use of a CMN, and the PMD payment rule's documentation requirements are fully consistent with the Medicare Act, and with the Secretary's longstanding policy that there must exist sufficient information in the medical record to support the reasonableness and necessity of a service for which Medicare coverage is claimed.

**1.      Congress has Charged the Secretary With Determining What is "Reasonable and Necessary" Under the Medicare Act, and With Broad Discretion to Make That Determination**

The Medicare Act has provided since its enactment in 1965 that:

Notwithstanding any other provision of this title, no payment may be made under Part A or Part B for any expenses incurred for items or services . . . which . . . are not *reasonable and necessary* for the diagnosis or treatment of illness. . . .

42 U.S.C. § 1395y(a)(1)(A) (emphasis added); see also 42 C.F.R. § 411.15(k)(1). Medical reasonableness and necessity therefore have always been the touchstone of reimbursement, and to

that end, the statute unambiguously vests final authority in HHS to determine what items or

services are "reasonable and necessary."  Indeed, Congress provided in the Medicare Act that,

> [t]he determination of whether an individual is entitled to benefits under part A or
> part B of this subchapter, and the determination of the amount of benefits under
> [Medicare] . . . shall be made by the Secretary in accordance with regulations
> prescribed by him.

42 U.S.C. § 1395ff(a).  In Ringer, 466 U.S. 602, the Supreme Court emphasized that the decision

as to whether a particular item or service is medically reasonable and necessary under Medicare

is left to the discretion of the Secretary:

> [t]he Secretary's decision as to whether a particular medical service is 'reasonable
> and necessary' and the means by which [he] implements [his] decision, whether
> by promulgating a generally applicable rule or by allowing individual
> adjudication, are clearly discretionary decisions.

Id. at 617.

    Plaintiff, however, would make the CMN dispositive and, thus, give physicians, rather

than the Secretary, the final word on what is "reasonable and necessary."[18]  Put another way,

_____

[18]     Plaintiff also cites out of context the Congressional testimony of the
Administrator of CMS on this subject.  Plaintiff makes much of a sentence in which Dr.
McClellan emphasized both the important role of physicians' judgment in prescribing power
wheelchairs and the use of the CMN. See Pl. Br. 25-26. But Plaintiff conveniently leaves out
other, pertinent language from the Administrator's testimony. To wit, after emphasizing to the
Committee the importance of the physician's judgment in determining whether a manual or
power wheelchair is appropriate, Dr. McClellan noted that, "[h]owever, this idea does not
abdicate the responsibility to have appropriate documentation as to the medical necessity of the
claim." Nominations of Dr. Mark B. McClellan, Brian Roseboro, Donald Korb, and Mark J.
Warshawsky, Hearing Before The Senate Committee On Finance, S. Rep. No. 108-433 at 192
(March 8, 2004). Moreover, in answer to a question about combating Medicare fraud and abuse,
Dr. McClellan emphasized that "[i]t is through the examination of claims under post- and
pre-payment review that CMS has been able to identify fraudulent suppliers." Id. at 193. Dr.
McClellan also explained how CMS identifies power wheelchair claims for such medical
reviews:

(continued...)

under Plaintiff's reasoning, HHS cannot deny a claim for a service so long as a physician has signed a CMN or, presumably, written a prescription for an item or service, and the CMN or prescription would end the claims review process rather than begin it. This cannot be: again, the Secretary, not a physician, was entrusted by Congress to determine what is reasonable and necessary under the Medicare Act. See Ringer, 466 U.S. at 627. Indeed, courts have routinely approved the Secretary's judgments that *entire categories* of care are not reasonable and necessary, regardless of what a particular physician may have found in a particular case. See, e.g., Goodman v. Sullivan, 891 F.2d 449, 451 (2d Cir. 1989) (upholding denial of coverage of MRI); Friedrich v. Secretary of Health and Human Services, 894 F. 2d 829, 831, 837 (6th Cir. 1990) (per se exclusion of atherosclerosis therapy); Wilkins v. Sullivan, 889 F. 2d 135, 139 & n.6 (7th Cir. 1989) (exclusion of bilateral carotid body resection surgery); Bosko v. Shalala, 995 F. Supp. 580, 583 (W.D. Pa. 1996) (exclusion of autologous bone marrow transplant as treatment for chronic myelogenous leukemia). As another court held in a challenge to denial of reimbursement under Medicare Part B:

> It is plain that the plaintiff's primary thesis – that physician certification

---

[18](...continued)
Since CMS simply does not have the resources available to review the billing practices of all contracted suppliers of power wheelchairs who submit claims, CMS targets its efforts based on the analytical data it collects. CMS, through the Durable Medical Equipment Regional Carriers' (DMERC) Medical Review staff, identify and target specific suppliers who display aberrant billing patterns.

Id. at 201. Thus, far from identifying the CMN as the only documentation required or hinting that a physician (as opposed to the Secretary) has the last word on medical necessity, as Plaintiff implies, Dr. McClellan described the important roles played by physicians' medical judgment, as well as the role of CMS' medical review process, in combating Medicare fraud and abuse related to power wheelchairs.

establishes a presumption of coverage under Part B or insulates providers from
bearing the risk of erroneous certifications – is fanciful. . . . The statute's language
emphasizes that physician certification is a necessary, but not sufficient, predicate
to reimbursement, and makes clear that the requirement "is a precondition for
payment, not coverage."

American Ambulance Serv. of Pennsylvania, Inc. v. Sullivan, 761 F. Supp. 1211, 1217 (E.D. Pa.

1991) (quoting Bodnar v. Secretary of Health and Human Serv., 903 F. 2d 122, 125 (2d Cir.

1990)).

Indeed, Plaintiff's argument fails on its face: there is no statutory provision where

Congress has required that HHS use the CMN.[19]  To the extent *carriers* previously used the

CMN (see 42 U.S.C. 1395m(j)(2)(B)), as discussed below, other provisions of the statute have

long authorized carriers to request medical record documentation.

>    **2.    The Medicare Act Neither Requires a CMN, Nor Limits the
>          Secretary's Claims Review to a CMN**

Plaintiff argues that "42 U.S.C. § 1395m(j), which addresses the use and contents of

CMNs, establishes Congress's intent 'that whatever information may be required by carriers from

suppliers to show the medical necessity and reasonableness of DME *must* be contained in a

CMN'."  Pl. Br. 23 (emphasis added), citing Maximum Comfort, 323 F. Supp. 2d at 1068.

Plaintiffs are wrong:  42 U.S.C. § 1395m(j) contains no such requirement.  In pertinent part, the

cited provision states:

>    *For purposes of this paragraph*, the term "certificate of medical necessity" means a form
>    or other document containing information required by the carrier to be submitted to show
>    that an item is reasonable and necessary for the diagnosis or treatment of illness or injury

---

[19]    The legislative history of the Social Security Act Amendments of 1994, Pub. L.
No. 103-432, 108 Stat. 4398 (1994), which enacted the provision upon which plaintiff relies,
42 U.S.C. § 1395m(j)(2), also includes nothing to indicate that Congress intended to mandate
that the CMN be the only means of determining what is reasonable and necessary.

or to improve the functioning of a malformed body member.

42 U.S.C. § 1395m(j)(2)(B) (emphasis added).  Thus, the cited provision is merely a definition of

the term CMN  "for purposes of this paragraph," and by that paragraph, in turn, Congress did not

even require that a carrier distribute a CMN – it merely *authorized* a carrier to do so, with certain

limitations.  See 42 U.S.C. § 1395m(j)(2)(A) ("A CMN, as distributed by a supplier of DME for

completion, *may* contain only (1) identifying information about the supplier and the beneficiary,

(2) a description of the DME supplied, and (3) other administrative information "other than

information relating to the beneficiary's medical condition." (emphasis added)) .  Thus, this

provision cannot support plaintiff's legal conclusion:  far from mandating that a DMERC can

require only a CMN and nothing more, it does not even mandate that a DMERC require the

CMN at all.

Nothing in this, or any other statutory provision plaintiff can point to, restricts the

Secretary from requesting any other documentation in place of (or in addition to) the CMN to

demonstrate that the DME for which Medicare reimbursement is sought is reasonable and

medically necessary.[20]  Furthermore, 42 U.S.C. § 1395m(j)(4) states that, if a supplier "furnishes

an item or service to a beneficiary for which payment is denied under section [1395y(a)(1) of this

title,]" any expenses incurred will be the responsibility of the supplier.  Clearly, the statute

contemplates that, as here, the supplier might provide an item or service based on an assessment

by the supplier, a physician, or even the carrier that the item or service is medically necessary and

---

[20]    The Maximum Comfort court, which baldly concluded that this language "*plainly*
specifies that Congress intended that whatever information may be required by carriers from
suppliers to show the medical necessity and reasonableness of DME *must* be contained in a
CMN*,*" 323 F. Supp.2d at 1068 (emphasis added), was therefore simply incorrect.

reasonable only to have that assessment overruled by the agency.

Simply put, the statutory provisions establishing the Secretary's authority to decide reimbursement questions do not limit the means by which he exercises that authority. In 42 U.S.C. § 405(a), Congress stated the Secretary "shall have full power and authority to make rules and regulations and to establish procedures" to carry out the provisions of the Act.[21] Moreover, as described infra, Congress has left in place other statutory provisions that for four decades have emphasized the Secretary's duty to ensure that Medicare payments are made only for reasonable and medically necessary claims while assuring his discretion in completing that mission.[22]

---

[21] The Ninth Circuit recognized the broad discretion Congress vested in the Secretary to determine what information to require as a condition of payment in Community Hospital of the Monterey Peninsula v. Thompson, 323 F.3d 782, 788 (9th Cir. 2003) (construing Medicare Part A). Community Hospital concerned the validity of the Secretary's interpretation, in a Manual instruction, of 42 U.S.C. § 1395g(a), which grants the Secretary discretion to require that Part A providers furnish specific information as a condition of payment. 323 F.3d at 785. The court held it was reasonable for the Secretary to find an information requirement implicit in the regulations and policy manuals. Id. 794. Indeed, the Ninth Circuit held:

> As we understand the teachings of the Supreme Court in Guernsey, the Secretary may enforce a requirement that is consistent with, and a reasonable implementation of, his regulations and manuals without being able to point to a regulation or manual provision that directly, or by implication, imposes an affirmative duty to comply with that requirement.

Id. at 790, n. 7. In the context of claims for reimbursement for DME, the pertinent provision of the Medicare Act is 42 U.S.C. § 1395l(e), discussed infra. The Maximum Comfort court distinguished Community Hospital based on the erroneous holding that "Congress did not leave a gap for the Secretary to fill regarding medical necessity documentation; instead, it specifically provided that whatever information is required to determine the medical necessity of DME is to be contained in a CMN." 323 F. Supp.2d at 1072. As we have seen, this is not the case.

[22] Prior to the enactment of § 1395m(j) in its present form, Congress had also restricted the use of CMNs, prohibiting suppliers from distributing CMNs that were partially completed. The legislative history underlying that prohibition further indicates Congressional understanding that the Secretary and the DMERCs could require additional documentation

(continued...)

### 3.    The Medicare Act Authorizes the Secretary's Requirement of Medical Record Documentation

To facilitate the efficient processing of DME claims, 42 U.S.C. § 1395m(j)(2)(A)(i) authorizes (*but does not require*) Medicare to distribute CMNs to physicians or Medicare beneficiaries.  In the majority of cases prior to the PMD payment rule, the Secretary relied on the CMN "to show that an item is reasonable and necessary." Id. § 1395m(j)(2)(B).[23]  But, as discussed supra, nothing in the Medicare Act makes the CMN a supplier's *exclusive* source for information regarding the reasonableness and necessity of an item of DME, as Plaintiff would have it.  Pl. Br. 23.  To the contrary, the Act mandates otherwise:  Congress explicitly directed that carriers shall have the authority to "make such audits of the records of providers of services as may be necessary to assure that proper payments are made under this part," 42 U.S.C. § 1395u(a)(1)(C), and to "assist in the application of safeguards against unnecessary utilization of services furnished by providers or services and other persons to individuals entitled to benefits," 42 U.S.C. § 1395u(a)(2)(B).

Under 42 U.S.C. § 1395u(a)(1)(C), DME regional carriers are directed to perform audits in appropriate cases to "assure proper payments are made."  These carrier audits are critical to protecting the program from fraud and abuse. Without the ability to review medical

---

[22](...continued)
beyond the CMN.  See H.R. Rep. 101-881, 1990 U.S.C.C.A.N. 2017, 2093 (discussing CMN and "any other documents that may be required by the Secretary in order to establish that the item is reasonable and necessary for a patient.").

[23] A CMN, as distributed by a supplier of DME for completion, may contain (1) identifying information about the supplier and the beneficiary, (2) a description of the DME supplied, and (3) other administrative information "other than information relating to the beneficiary's medical condition."  42 U.S.C. § 1395m(j)(2)(A).

documentation beyond the a simple form like the CMN, however, carriers would be unable to determine whether the information provided on such a form is incorrect, false or fraudulent; accordingly, they would be unable to carry out their responsibilities under § 1395u(a)(1)(C).  See also 42 C.F.R. § 424.57(c)(21) (requiring suppliers to "provide[] to CMS, upon request, *any information* required by the Medicare statute and implementing regulations." (emphasis added)). Thus, under plaintiff's proposed rule that only a CMN may be required to establish medical necessity and reasonableness, Pl. Br. 23, the audit provision would be rendered superfluous.  This Court should not accept plaintiff's invitation to "'adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law'." Kawaauhau v. Geiger, 523 U.S. 57, 62 (1998) (quoting Mackey v. Lanier Collection Agency & Service, Inc., 486 U.S. 825, 837 (1988)).

Title 42 U.S.C. § 1395*l*(e) also directs providers and suppliers to furnish "such information as may be necessary in order to determine the amounts due such providers."  The information required by § 1395*l*(e) necessarily includes documentation requested by the Secretary to ascertain whether the item or service was reasonable and necessary and thus covered by Medicare and eligible for reimbursement.  Put another way, no amount is due if the item is not medically necessary and reasonable.  Contra Maximum Comfort, 323 F. Supp.2d at 1071-72. Congress also expressly required that physicians shall provide diagnostic information to a supplier if the supplier is asked to provide such information by "the Secretary (or fiscal agent of the Secretary). . . ." 42 U.S.C. § 1395u(p)(4).  Section 1395u(p)(4), therefore, provides for review of DME claims *beyond examination of the CMN itself*, and with that provision Congress

-34-

contemplated that Medicare carriers evaluating DME claims could request information from

suppliers beyond the CMN, which the suppliers, in turn, would obtain from physicians.  Id.

### 4.    The PMD Payment Rule is Not Void Because the Preamble Does Not Discuss, In Detail, Rejected Alternatives

As discussed supra, Plaintiff's argument that the PMD payment rule is substantively

deficient, arbitrary and capricious fails in the face of the Medicare Act's requirement that the

Secretary, not a PMD supplier or even a physician, is charged with the final determination of

what is reasonable and necessary and, indeed, with deciding what documents must be reviewed

to verify medical necessity and reasonableness.  Ringer, 466 U.S. 602, 617.  Plaintiff's argument

that "the Secretary failed to consider other obvious approaches to gathering fuller information

[than in the CMN] on medical-necessity determinations," Pl. Br. 24, also fails.  Incredibly,

Plaintiff rests this contention on its allegation that the Secretary did not respond to comments

made on another, broader proposed rule that concerned payment requirements for all types of

DME.  Pl. Br. 24 (referring to 69 Fed. Reg. 66236, 66336 (November 15, 2004)).  CMS

reasonably stated that there is no adequate substitute for the availability of the appropriate

medical records, as selected by the prescribing physician.  70 Fed. Reg. 50945.  This explanation

should not "be found wanting simply because the agency failed to include every alternative

device and thought conceivable by the mind of man."  Vermont Yankee Nuclear Power Corp. v.

NRDC, 435 U.S. 519, 551 (1978) (upholding agency action under the National Environmental

Policy Act).  Nor is the rule "infected by grossly incorrect assumptions."  Pl. Br. 24.  Plaintiff

argues the rule "imposes new obligations to collect, review, and maintain supporting

documentation," id., but Plaintiff's premise is fundamentally erroneous: the PMD payment rule

documentation requirements are fully consistent with prior CMS policy.[24]  Warren Decl. ¶ 29.

### C.    The PMD Payment Rule was Promulgated as an Interim Final Rule With Comment Period in Accordance with the APA

Though Plaintiff focuses its criticisms on the documentation requirements contained in

the PMD payment rule – i.e., a portion of the rule that will directly impede unscrupulous PMD

suppliers from seeking public money for fraudulent (or otherwise unsupportable) claims – it

seeks to enjoin the entire rule because, inter alia, it was published as an interim final rule with

90-day comment period, not a notice of proposed rulemaking.  For different reasons as to

different parts of the rule, this argument is fatally flawed.

### 1.    Portions of the PMD Payment Rule Are "Interpretive"

 CMS had no obligation to issue its interpretation of the MMA, Pub. L. 108-173

§ 302(a)(2), through notice-and-comment rulemaking. Under the APA, notice-and-comment

rulemaking is not required for interpretive rules, see 5 U.S.C. § 553(b)(A), which are those rules

or statements that are "issued by an agency to advise the public of the agency's construction of

the statutes and rules which it administers." Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 99

(1995) (internal quotation marks omitted).

---

[24]    The Court should, accordingly, give no weight to Plaintiff's self-serving, exaggerated claims as to the cost of compliance.  Pl. Br. 24, citing Zipp & DeLernia Decls.  The Scooter Store's claim that it will face massive new costs to comply with the documentation requirements of the new rule, if accurate, may be related to its failure to comply with the documentation requirements of the old rules.  Cf. The Scooter Store, Inc. v. Leavitt, et al., Civil Action No. SA05ca0033-RF (W.D. Tx.) (including False Claims Act allegations against The Scooter Store).

A rule is legislative, in contrast, "only" if Congress delegated legislative power to the agency and the agency "intended" to use that power. American Postal Workers v. U.S. Postal Serv., 707 F.2d 548, 558 (D.C. Cir. 1983), cert. denied, 465 U.S. 1100 (1984); see American Mining Congress v. Mine Safety & Health Admin., 995 F.2d 1106, 1109 (D.C. Cir. 1993). The agency must have intended to bind itself, Syncor Int'l Corp. v. Shalala, 127 F.3d 90, 94 (D.C. Cir. 1997), and must have intended to create new laws, rights, or duties. Fertilizer Inst. v. EPA, 935 F.2d 1303, 1307-08 (D.C. Cir. 1991).[25]

As CMS explained in the Federal Register, portions of the PMD payment rule conform CMS regulations to changes mandated in the Medicare Act by the MMA:

> Since this change conforms our regulations to [the Medicare Act, as amended by the MMA], we believe it would be contrary to the public interest to delay implementing this beneficiary relief pending notice-and-comment procedure. The Congress has prohibited Medicare from paying for covered items consisting of motorized or power wheelchairs unless a physician (as defined in section 1861(r)(1)), a physician assistant, nurse practitioner, or a clinical nurse specialist (as those terms are defined in section 1861(aa)(5)) conducts a face-to-face examination of the beneficiary and writes a prescription for the item. We believe that the face-to-face examination and prescription requirements *are mandated by* section 302(a)(2)(E)(iv) of the MMA and *involve little exercise of agency discretion*. Therefore, we believe that notice and comment procedure are unnecessary with respect to these provisions. In addition, this rule removes a current regulatory restriction that limits POV prescribing to certain specialists. We believe that *this limitation is inconsistent with the MMA*, which expressly allows a physician, physician assistant, nurse practitioner or a clinical nurse specialist to prescribe a PMD, and we believe that removing this limitation will increase beneficiary access to the appropriate PMD for his or her medical condition.

---

[25]     This does not mean, however, that "an agency's action is legislative whenever it has the effect of creating new duties." Fertilizer Inst., 935 F.2d 1303, 1308. Rather, "regardless of the consequences of a rulemaking, a rule will be considered interpretative if it represents an agency's explanation of a statutory [or regulatory] provision." Id. Thus, the "effect" or "impact" of the rule on affected parties is not the issue. Paralyzed Veterans of Am. v. D.C. Arena L.P., 117 F.3d 579, 588 (D.C. Cir. 1997), cert. denied, 118 S. Ct. 1184 (1998) (it "is always true" that agency's interpretation of its own regulation "has real consequences").

70 Fed. Reg. 50943 (emphasis added). Thus, these portions of the rule closely track the MMA, codified at 42 U.S.C. § 1395m(a)(1)(E), and merely "advise the public of the agency's construction of the statutes and rules which it administers." See Guernsey Mem'l Hosp., 514 U.S. 87, 99; compare generally 42 U.S.C. § 1395m(a)(1)(E) (MMA) with 42 C.F.R. § 410.38(c) (PMD payment rule). They are, therefore, interpretive, and plainly exempt from the notice and comment requirement. Accordingly, Plaintiff has failed to show it will likely succeed on its claim that these interpretive rules were promulgated in breach of the APA.

      **2.**      **The PMD Payment Rule Documentation Requirements Were Promulgated as Part of an Interim Final Rule With Comment Period Pursuant to Good Cause**

The documentation requirements of the PMD payment rule were also properly issued as part of an interim final rule with comment period because, as Plaintiff recognizes, an agency is excused from providing notice and opportunity for comment on a proposed rule "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest[.]" 5 U.S.C. § 553(b)(B). Contrary to Plaintiff's assertion, however, CMS properly relied on the good cause exception to excuse notice and comment of the PMD payment rule documentation requirements. This reliance was also appropriate here because this regulation was promulgated pursuant to the MMA, which specifically contemplates the Secretary's issuance of interim final rules. See Pub. L. 108-173 § 902 ("Issuance of Regulations"), codified at 42 U.S.C. §§ 1395hh(a)(3)(A), (C) (discussing procedures for issuing interim final rules).

Courts have long relied on the Attorney General's Manual on the Administrative Procedure Act for guidance as to when the good cause exception applies.  See, e.g., Utility Solid Waste Activities Group v. EPA, 236 F.3d 749, 754-55 (D.C. Cir. 2001); San Diego Air Sports Ctr., Inc. v. FAA, 887 F.2d 966, 969 (9th Cir. 1989)). The Manual explains "that a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required in [section 553]."  United States Department of Justice, Attorney General's Manual on the Administrative Procedure Act 30-31 (1947).  For example, the Manual provides that "contrary to the public interest" indicates a situation where advance notice, or delay, would harm the public.  Id. at 31. Thus, when, as here, prior notice of a rule would delay benefits to the public, notice and comment are contrary to the public interest.  See National Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States, 59 F.3d 1219, 1223-24 (Fed. Cir. 1995).  The good cause exception thus excuses notice and comment when real harm could result from delayed implementation. See, e.g., National Federation of Federal Emp. v. Devine, 671 F.2d 607, 611-12 (D.C. Cir. 1982) (exception applies where delay "could result in serious damage to important interests").

Regulations enacted to prevent future harm to health, medical benefits, or natural resources consistently have been held to fall within the good cause exception, because requiring notice and comment would be impracticable and contrary to the public interest. See Northern Arapahoe Tribe v. Hodel, 808 F.2d 741, 751 (10th Cir. 1987) (Bureau of Indian Affairs properly enacted game code for reservation without notice and comment where necessary to prevent irreparable harm to wildlife from the ongoing hunting season); Nat'l Fed'n, 671 F.2d 607, 610-11 (finding good cause for regulation postponing "open season," during which federal employees

may enroll in or switch health plans, when a timely open season "might have posed a serious threat to the financial stability of the benefit program"); Washington State Farm Bureau v. Marshall, 625 F.2d 296, 307 (9th Cir. 1980) (promulgation of rules, without notice and comment, prohibiting certain pesticides on crops harvested by children, was valid protection measure when crop season was already underway).

In this case, per the APA, CMS "for good cause f[ound] (and incorporate[d] the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, [and/]or contrary to the public interest[.]" See 5 U.S.C. § 553(b)(B). The "brief statement of reasons" required by the APA is published at 70 Fed. Reg. 50943, and explains that, because "fraudulent billing practices for PMDs have been a substantial problem, evidenced by an approximate 350 percent increase in billing for these devices in 1999 to 2003, . . . it would be contrary to the public interest to delay a regulation intended to stem the abusive billing practices of certain DME suppliers" that threaten the integrity of the Medicare program. Cf. Nat'l Fed'n, 671 F.2d 607, 610-11 (good cause to avoid situation that "might have posed a serious threat to the financial stability of the benefit program"); Warren Decl. ¶ 30 (discussing CMS goal to address "rampant fraud in the PMD arena"). "[C]onsistent with these changes," 70 Fed. Reg. 50943, the PMD rule also provides appropriate compensation for the physicians or other treating practitioners who will prepare the medical record documentation for PMD claims that will, in turn, help assure the program's integrity. Id.

Plaintiff appears little concerned by "the fraud justification," Pl. Br. 16, and claims that there can hardly be any urgency attendant to protecting the Medicare PMD program from "rampant fraud" (see Warren Decl. ¶ 30), because, Plaintiff alleges, the agency has been

concerned about the problem for too long.  Cf. United Steelworkers of Am. v. Rubber Mfrs.

Ass'n, 783 F.2d 1117, 1120 (D.C. Cir. 1986) (in the contrary context of an action for

unreasonable delay in rulemaking, courts should not "punish" agency "for past delay").  Plaintiff

goes so far as to claim that "the Secretary decided to proceed without notice and comment

precisely so that he would not have to address" comments received on another rulemaking

docket.  Pl. Br. 17.  In fact, the other, proposed rule to which Plaintiff refers was *not* a PMD rule,

but a much broader, more general rule covering payment for all types of DME.  69 Fed. Reg.

66236, 66336 (November 15, 2004).  While CMS has yet to promulgate a rule conforming other

types of DME to pertinent requirements of the MMA, id., it was perfectly appropriate for CMS to

prioritize a rule as to PMD over other types of DME.  Indeed, it was mandated by Congress: the

MMA states that "the Secretary shall first establish standards for those covered [DME] items for

which the Secretary determines there has been a proliferation of use, consistent findings of

charges for covered items that are not delivered, or consistent findings of falsification of

documentation to provide for payment of such covered items under this part."  42 U.S.C.

§ 1395m(a)(1)(E)(iii).[26]

    The Secretary has adequately explained why there is good cause to promulgate the

documentation requirements of the PMD payment rule without further delay in order to protect

the integrity of Medicare coverage of PMD for beneficiaries, and appropriately issued the rule as

an interim final rule with comment period and 60 days' notice before it became effective to give

---

    [26]    Plaintiff's argument that the "lack of a congressional deadline," Pl. Br. 16 (in
parenthetical), undercuts the agency's good cause argument is, therefore, unfounded: Congress
instructed the Secretary to prioritize payment rules for products such as PMD where he found
significant fraud and abuse.  42 U.S.C. § 1395m(a)(1)(E)(iii).

the regulated community time to prepare.  Plaintiff, accordingly, has failed to establish that it will likely succeed on its claim that the PMD payment rule documentation requirements were promulgated in breach of the APA.

## V.    The Balance of Interests Supports Denial of Emergency Relief

As discussed supra, Plaintiff has failed to establish any compelling interest in support of their motion.  Plaintiff's argument that Medicare beneficiaries will be denied appropriate access to PMDs are entirely dependent on their unsubstantiated claims of irreparable harm to PMD suppliers and, therefore, those arguments are also unpersuasive.  Conversely, the public has a strong interest in the fiscal and moral integrity of the Medicare program, and in eliminating rampant fraud and abuse in the PMD claims arena.  In addition, as the Secretary found, "Medicare beneficiaries will benefit from the increased ability to obtain POVs," rather than power wheelchairs, since they are "less cumbersome" devices, and are subject to lower copayments.  70 Fed. Reg. 50945; see also generally id. (discussing public benefits of PMD payment rule).  Accordingly, the balance of interests and harms favors the Secretary.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for a preliminary injunction.

Date:   October 21, 2005                              Respectfully submitted,

                                                      PETER D. KEISLER
                                                      Assistant Attorney General
                                                      KENNETH L. WAINSTEIN
                                                      U.S. Attorney for the District of Columbia
                                                      SHEILA M. LIEBER
                                                      Deputy Director, Federal Programs Branch

                                                      _____/s/_____
                                                      STEVEN Y. BRESSLER D.C. Bar No. 482492
                                                      Trial Attorney, Federal Programs Branch
                                                      Civil Division, U.S. Department of Justice
                                                      P.O. Box 883
                                                      Washington, D.C. 20044
                                                      (202) 514-4781 (telephone)
                                                      (202) 318-7609 (fax)
                                                      Steven.Bressler@USDOJ.gov

                                                      Counsel for Defendants