IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| POWER MOBILITY COALITION, )<br>)<br>Plaintiff, )<br>)<br>)<br>v. )<br>)<br>MICHAEL O. LEAVITT, Secretary, United States )<br>Department of Health and Human Services, and )<br>MARK B. McCLELLAN, Administrator, Centers )<br>for Medicare and Medicaid Services, )<br>)<br>Defendants. )<br>_____) | Case No. 1:05CV02027 (RBW) |

## DECLARATION OF JOHN F. WARREN

I, John F. Warren, declare as follows:

1. I am the Director of the Division of Medical Review and Education, Program Integrity Group, Office of Financial Management at the Centers for Medicare & Medicaid Services (CMS). I am responsible for managing the day-to-day operations of the Division of Medical Review & Education including direct supervision of a staff of analysts. The Division of Medical Review & Education is responsible for developing instructions to Medicare contractors on ways to implement and maintain medical review activities including their development of local coverage determinations, and the development of performance criteria for Medicare contractors. The statements made in this declaration are based on personal knowledge, information contained in agency files, and information furnished in the course of my duties.

2.	The primary purpose of our Medicare contractors' medical review activities is to protect the Medicare Trust Fund from fraud, waste, and abuse. CMS currently contracts with private entities, either Program Safeguard Contractors or Durable Medical Equipment Regional Carriers (henceforth, I will refer to both these entities collectively as "contractors") who each perform medical review activities for a given region of the country. The contractors follow the instructions and definitions set forth in the CMS Program Integrity Manual (PIM) and other CMS instructions (i.e. Budget and Performance Requirements, Program Memorandums, etc). The PIM, Chapter 3, Verifying Potential Errors and Taking Corrective Actions sets out for the contractors the protocols, called Progressive Corrective Action (PCA), that they follow in performing their medical review activities.

3.	PCA requires that contractors, in the absence of a complaint against a specific supplier, base their medical review activities on the results of data analysis. Data analysis is used to identify potential claim payment errors. Data analysis compares claim information and other related data to identify potential errors and/or potential fraud, waste, or abuse by claim characteristics (e.g., diagnoses, procedures, providers, or beneficiaries) individually or in the aggregate. Data analysis is an integrated, on-going component of the contractors' medical review activities.

4.	Vulnerabilities in the Medicare program are identified by making claims data comparisons among similarly situated suppliers to identify suspect patterns. Suspect patterns can include an unexplainable increase in billing, patterns of similar equipment provided to all beneficiaries, questionable diagnosis codes, or other such statistical outliers.

5.	The contractors are instructed to employ education as the primary tool in correcting aberrant billing behavior.

6. Data analysis may identify one or a few suppliers whose billing patterns are statistically anomalous. The contractor may then subject that supplier's or those suppliers' claims to pre- or post-payment review.

7. Post-payment review is performed on a sample of the suppliers' claims after those claims have been paid by the Medicare program.

8. Pre-payment review is performed on a percentage of the claims submitted by a supplier for Medicare reimbursement prior to payment. Up to 100 percent of a supplier's claims can be subjected to pre-payment review.

9. Under both types of review, claims are reviewed to determine whether the service or item 1) falls within a benefit category defined by Title XVIII of the Social Security Act (the Act), a national coverage determination, a coverage provision in an interpretive manual, or a local medical review policy/local coverage policy, 2) is not statutorily excluded, 3) is reasonable and necessary within the meaning of 1862(a)(1)(A) of the Act, and 4) is billed in compliance with national and local coding requirements.

10. As part of a pre- or post-payment review, the contractor will request from the subject supplier documentation beyond any documentation the supplier submitted with the claim. The contractor will make an additional documentation request (ADR) to the supplier in writing which will request the specific documentation needed (and only those pieces needed) to make a coverage or coding decision.

11. CMS has engaged in medical review activities since the inception of the Medicare program. For just as long, CMS has performed these activities through a review of documentation from a beneficiary's medical record and, in the context of medical review, has long required suppliers to provide such documentation to demonstrate the medical necessity of

an item or service.

12. Since 1994 CMS has required suppliers of certain items of durable medical equipment to include a completed and physician signed Certificate of Medical Necessity (CMN) with their claim for reimbursement under Medicare Part B. The CMN itself is a limited, standard document which, when the supplier distributes it to physicians, may contain only 1) identifying information about the supplier and the beneficiary, 2) a description of the DME supplied, and 3) other administrative information "other than information relating to the beneficiary's medical condition." 42 U.S.C. § 1395m(j)(2)(A). It was designed to allow for the efficient processing of Medicare claims which, given the sheer volume of claims involved and constraints on the government, could not be timely processed if CMS was required to review detailed records in each case before making an initial determination on a claim. The CMN was never intended to replace the medical documentation in the beneficiary's medical record as a necessary part of the documentation required from a supplier as part of medical review. Indeed, our experience has been that the CMN has not been shown to be useful as a medical necessity document for the purposes of medical review of PMD claims, or even as a claims processing tool. This is why we recently announced in an Interim Final Rule, Conditions for Payment of Power Mobility Devices, Including Power Wheelchairs and Power-Operated Vehicles, 70 Fed. Reg. 50, 940 (Aug. 26, 2005), that CMS would be discontinuing the use of the CMN for certain mobility devices.

13. Generally, the contractors must complete their pre- or post-payment review within 60 days from the day they requested the additional medical records.

14. Claims may be denied in whole or in part for failure to satisfy any one of the requirements listed in paragraph 9 of this declaration.

15. If a supplier fails to provide any documentation or if the documentation provided is not sufficient to demonstrate that a service or item was medically necessary and reasonable, or demonstrates affirmatively that a service or item was not medically necessary and reasonable, then, in accordance with 1862(a)(1)(A) of the Act, the contractor denies the claims for lack of medical necessity and reasonableness. For example, in the case of a claim for a power wheelchair, if the beneficiary's medical record indicates that she has been successfully using a walker or manual wheelchair, and that her condition has not changed such that the walker no longer meets her needs, then a power wheelchair would not be indicated and the claim would be denied.

16. If claims are denied as part of a post-payment review, the contractor will calculate the amount Medicare erroneously paid to the supplier and assess an overpayment against the supplier.

17. If a contractor determines, through pre-payment review, that claims are not payable, the claims will be denied and payment will not be made.

18. A supplier dissatisfied with a contractor's determination on either pre- or post-payment review may appeal that determination.

19. So far, in 2005 and based on the contractors' interim expenditure reports, the DMERCs collectively subjected 114,066 claims to complex medical review as described above. These claims are distributed among all types of durable medical equipment. Historically, the DMERCs have subjected, on average, just over 191,000 claims to complex medical review each year; based on 2003 data, 0.3% of all DME claims (including PMDs) are subject to complex medical review. By comparison, the Medicare program processes over 1 billion individual claims each year, over 70 million of which are for DME. I have no reason to believe that the

implementation of the Interim Final Rule will significantly change the number or percentage of claims reviewed.  Meanwhile, expenditures by the Medicare Trust Fund and its beneficiaries on power wheelchair claims rose approximately 350 percent from $289 million 1999 to $1.2 billion in 2003; in 2004 the cost fell to $822 million following increased anti-fraud efforts. Based on the claims received to date this year, I estimate 2005 expenditures will climb again to reach approximately $900 million.

20. I have reviewed the pages 9-9 to 9-10 of the DMERC A Supplier Manual, pages 9-10 of the Region B DMERC Supplier Manual, Chapter 26 of the Palmetto GBA's Supplier Manual, Motorized/Power Wheelchair Bases Policy Article and pages 1 and 4 of DMERC Region D Supplier Manual and attest that they accurately describe the current documentation requirements of these CMS contractors.  True and correct copies of those documents are attached hereto as Exhibit A.

21. On August 26, CMS published an Interim Final Rule, Conditions for Payment of Power Mobility Devices, Including Power Wheelchairs and Power-Operated Vehicles, 70 Fed. Reg. 50, 940 (Aug. 26, 2005).  Among other things, this interim regulation requires that a power mobility device (PMD) supplier have a written prescription from the beneficiary's physician or treating practitioner prior to dispensing the PMD, and the supplier must receive from the physician or treating practitioner the pertinent parts of the medical record supporting the PMD prescription.

22. The portion of the medical record provided to the supplier should provide enough information to confirm or rebut the claim of medical necessity of the PMD.

23. The supplier is not required to submit this documentation to the contractor with the claim, but, as has been the case since the inception of the Medicare program, the supplier

and/or physician is expected to produce such documentation if requested by the contractor as part of an audit (i.e. medical review).

24. On pages 50,942 to 50,943 of the published Interim Final Rule, CMS provided examples of what may be contained in the pertinent parts of the beneficiary's medical record.

25. The length of these examples was not intended to require physicians or treating practitioners to prepare similar narratives of the beneficiary's medical condition. Nor do these examples impose a minimum or maximum word limit on such narratives if a physician or treating practitioner chooses to provide a similar narrative. The length of these examples is due to the need to explain the physician's or treating practitioner's actions to the lay audience who will be reading this regulation's preamble. In practice, most physicians make heavy use of abbreviations, acronyms, and incomplete sentences. Such a narrative would have been inappropriate to include in the Interim Final Rule since the lay public would likely find it difficult to read. Claims will not be denied because of the length, or lack thereof, of a progress note unless the progress note does not adequately describe the patient's need for a PMD.

26. In CMS' examples of the pertinent parts of a beneficiary's medical record, reference to the term "subjective" portion of the physician's notes comes from the well-known (among physicians) S.O.A.P. acronym (subjective, objective, assessment, plan).1 "Subjective" refers to the information provided by the patient, i.e. the patient's presenting complaint, history, etc. "Objective" refers to the physician's findings, such as the blood pressure, heart murmur, etc. The "Assessment" is the physician's interpretation/evaluation of the subjective and objective

---

1  See DEGOWIN'S DIAGNOSTIC EXAMINATION (8th ed. 2004) ("Each note has four subheads. Use the mnemonic SOAP to remember them: Subjective data (symptoms and changes in symptoms, their appearance and disappearance, and their response to therapy); Objective data (changes in or new physical signs and laboratory findings and response to therapy); Assessments (updates to your problem list and hypotheses); and Plans (diagnostic tests, therapeutic interventions and

sections, in light of his clinical expertise. The "Plan" describes the tests to be ordered or prescriptions to be written.

27. The Interim Final Rule also conforms CMS regulations to section 302(a)(2)(E)(iv) of the Medicare Modernization Act of 2003 (MMA) (Pub. L. 108-173).

28. Section 302(a)(2)(E)(iv) of MMA provides 1) that a face-to-face examination of the individual be conducted by a physician, a physician assistant, a nurse practitioner or a clinical nurse specialist and 2) that payment may not be made for a power wheelchair unless the physician or treating practitioner has written a prescription for the item. By permitting treating practitioners to conduct the face-to-face examination, MMA effectively removed CMS' regulatory requirement that a beneficiary must be seen by a specialist in physical medicine, orthopedic surgery, neurology, or rheumatology in order to receive a power-operated vehicle, also known as a scooter. Through the Interim Final Rule CMS removed its previous specialist requirement to conform CMS regulations with the dictates of the MMA.

29. This Interim Final Rule commits to regulation CMS' longstanding requirement that, as part of a medical review, a supplier is required to produce documentation from the beneficiary's medical record that demonstrates the medical necessity of an item or service.

30. Through this regulation and other actions CMS has taken in the past months, it was our goal to 1) address the rampant fraud in the PMD arena, 2) provide greater certainty to physicians, suppliers, and beneficiaries on CMS' coverage requirements, and 3) help physicians, suppliers, and beneficiaries to better understand the documentation requirements.

31. It has not been CMS' goal to prevent the provision of PMDs to beneficiaries who have a demonstrable medical need for these devices. In fact, in 2004, a total of 207,150 claims

---

instructions to the patient and nursing staff).").

for K0011 (a standard weight power wheelchair with programmable controls), the code used for the vast majority of power wheelchair claims, were submitted and CMS approved 170,871 of these claims, representing a denial rate of only 17%. Those 17% of claims include denial based on complex medical review, as well as other denials such as, <u>e.g.</u>, denials of duplicate claims. As some of those 17% complete the Medicare appeals process, the denial rate may decline.

32.     Indeed, with the information that physicians are required to provide to suppliers under the Interim Final Rule, we anticipate that supplier denial rates will decline. For years, PMD suppliers have complained to CMS that physicians do not provide suppliers with the sections of the medical records that support coverage.2 The Interim Final Rule requires treating practitioners to supply this information to PMD suppliers. Suppliers may then review this documentation to determine whether the supplier wishes to a) supply the prescribed equipment and submit the claim to the Medicare program for payment, b) inform the beneficiary that she will have to complete an Advanced Beneficiary Notice (ABN)3 because Medicare coverage is unlikely, or c) decline to bill Medicare for the item. With this additional information, suppliers will be able to make a more informed decision about whether to seek payment from the Medicare program, thus reducing the prospect that their claim will be denied. Whether under the new rule or past practice, suppliers should not submit claims in any instance in which the

---

2  Section 1842(p)(4) of the Act requires that when an item or service is ordered by a physician or practitioner, but furnished by another entity, if the Secretary requires the entity furnishing the item or service to provide diagnostic or other medical information in order for payment to be made to the entity, the physician or practitioner shall provide that information to the entity at the time that the item or service is ordered by the physician.
3  An ABN is a CMS form (Form CMS-R-131-G) that a supplier can use when the supplier expects that Medicare will not pay for the item or service at issue. The ABN gives the Medicare beneficiary the option of paying for the item or service himself, while having the supplier submit the claim to Medicare. If Medicare does pay then the supplier refunds the money to the beneficiary. If Medicare denies payment, then the beneficiary is responsible for payment.

physician refuses to make documentation available.

33. Some of our efforts to explain CMS' coverage and documentation policy have not been received as intended by the supplier community. In March of 2004, the four DMERCs issued guidance meant to assist physicians and suppliers in better understanding CMS' longstanding coverage requirements for power wheelchairs and scooters. The industry, however, misinterpreted the policy in such a way as to render any educational benefit nearly impossible. The document was withdrawn but the underlying policy remained the same. The DMERCs continued to apply the policy in their adjudication and review of power wheelchair and scooter claims.

34. The coverage criteria at issue March 2004 guidance has since been changed. In May 2005, CMS issued a new national coverage determination (NCD) that altered how mobility assistive equipment (which includes power wheelchairs and scooters) are covered under the Medicare program.

I, John Warren, declare under penalty of perjury that the foregoing is true and correct.

Executed this 21ST of October, 2005.

_____
John Warren
Director of the Division of Medical Review & Education
Program Integrity Group
Centers for Medicare & Medicaid Services
Baltimore, Maryland