**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| POWER MOBILITY COALITION, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHAEL O. LEAVITT, Secretary, United States )<br>Department of Health and Human Services, and )<br>MARK B. McCLELLAN, Administrator, Centers )<br>for Medicare and Medicaid Services, )<br>)<br>Defendants. )<br>_____ ) | Case No.: 1:05cv02027 (RBW) |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS**
**MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

The Power Mobility Coalition justifies a preliminary injunction by citing specific evidence and authority to demonstrate that the challenged Interim Final Rule represents a major change to the Medicare program; that the Rule is both procedurally defective and substantively unlawful; and that the Rule will immediately and irreparably harm suppliers of power wheelchairs and medical scooters and Medicare patients who need those devices. The Coalition's version of the facts is clear, consistent, and supported by four sworn declarations – only one of which the Secretary makes any real effort to attack.

As demonstrated by the Coalition's Motion and its supporting exhibits, the standardized Certificate of Medical Necessity is the congressionally ratified mechanism for bringing clarity and consistency to Medicare reimbursement for power mobility devices. It provides doctors a concise and convenient way to record their determination whether a PMD is medically reasonable and necessary for a particular patient, in a form

that is accessible to the PMD supplier and tailored to address Medicare requirements. The Rule does away with the CMN and substitutes a set of vague and onerous documentation requirements with which power mobility device suppliers must comply. Suppliers cannot operate their businesses without reasonable certainty of Medicare reimbursement. Accordingly, the Rule will impose irrecoverable economic losses upon suppliers and threaten Medicare beneficiaries' access to needed medical equipment.

The Secretary's response is internally inconsistent, obviously incomplete, and irreconcilable with HHS's actions over the last decade. On the one hand, the Secretary posits that the Rule merely codifies existing statutory requirements and agency practices without making significant changes. On the other hand, he claims that implementing the Rule is so urgent to safeguarding the Medicare fisc that the public would suffer greatly if the Rule were first subjected to examination through public comment. Both arguments cannot be correct. Nor can the Secretary's claim of urgency be squared with his assessment that "this regulation will have minimal net impact on the Medicare program." Interim Final Rule, *Conditions for Payment of Power Mobility Devices, Including Power Wheelchairs and Power-Operated Vehicles*, 70 Fed. Reg. 50,940, 50,945 (Aug. 26, 2005). Furthermore, the Secretary's decision to eliminate the CMN is inconsistent with the significant role that Congress – and HHS itself – have assigned that document.

What is inescapable from the Secretary's conflicting arguments is that the instant Rule is not ready for prime time. Indeed, Medicare carriers will not even be equipped to implement the Rule until April 2006. This is a classic case where enforcement of a highly dubious administrative rule should be enjoined to prevent irreparable injury to

2

regulated entities and significant harm to the public, while its legality is finally determined.

I.    **THE COALITION HAS SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS**

A.    **This Court Has Jurisdiction To Grant the Coalition Relief**

The Secretary wrongly contends (Opp. 20-26) that he is likely to prevail on a jurisdictional challenge to the Coalition's lawsuit.  That is incorrect for several reasons, including the Secretary's misreading of case law concerning the Court's federal-question jurisdiction, and his misunderstanding of the Court's mandamus jurisdiction.

1.    *The Court Has Jurisdiction under 28 U.S.C. § 1331 Because Delaying Judicial Review at this Time Would Deny Judicial Review*

In *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1 (2000), the Supreme Court held that, when a plaintiff brings a claim relating to Medicare under the general federal-question jurisdictional statute, 28 U.S.C. § 1331,[1] that claim must first proceed through the administrative process unless doing so "would not simply channel review through the agency, but would mean no review at all."  529 U.S. at 19 (interpreting *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667 (1986)).  The test is whether the plaintiff would "as a practical matter be able to obtain meaningful judicial review" of agency regulations if he is required to exhaust the administrative process in the first instance.  *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991) (also interpreting *Bowen*).

The Coalition and its members have sought relief from the Rule through informal administrative channels (*see* Mot. 2 n.1) but, because the Rule is not yet in effect, CMS

---

[1] For the Court's convenience, we have reproduced in Exhibit 1 to this Reply the relevant statutes that have not already been provided to the Court.

has not rendered any claim-denials under the Rule that would trigger the five-layer administrative review process. That process entails three different reviews by a Medicare carrier that is under contract with CMS (*see id.* at 5), and then a hearing before an administrative law judge ("ALJ"), before the claimant may even take an appeal to HHS's Departmental Appeals Board. *See* 42 C.F.R § 405.801(a) (Exh. 2 hereto). The process of appealing a carrier's disallowance of a PMD claim commonly takes two to three years. *See* Zipp Decl. ¶ 14. Furthermore, if claimants obtain relief at one level of the process, the agency can limit the precedential value of that relief by failing to take an appeal. *See DeWall Enters. v. Thompson*, 206 F. Supp. 2d 992, 998 (D. Neb. 2002) (describing "endless loop" of administrative review over 11 years).

Forcing Coalition members to that administrative process would deny them access to meaningful judicial review. First, HHS's administrative processes cannot provide any review of the Coalition's claim that the Rule has been promulgated in violation of the APA's notice-and-comment requirements. No subordinate Medicare contractor, ALJ, or administrative body could require the Secretary to undertake a notice-and-comment proceeding. By the time a challenge to CMS's denial of a claim for reimbursement cleared the futile administrative process and could be reviewed in court, the Secretary would have issued a permanent rule to replace or modify the challenged interim rule. *See* 70 Fed. Reg. at 50,940 (initiating notice-and-comment rulemaking). At that point, the Secretary would doubtless take the position that a claim challenging his failure to comply with notice-and-comment requirements in issuing the superseded interim rule (*i.e.*, the Rule at issue in this case) had become moot. *See*, *e.g.*, *Natural Res. Defense Council, Inc. v. United States Nuclear Regulatory Comm'n,* 680 F.2d 810, 813-15 (D.C. Cir. 1982)

(re-promulgation of rule moots notice-and-comment challenge to earlier version). Pre-enforcement judicial review is therefore the *only* way in which the Coalition (or any other plaintiff) can vindicate the public's right to participate in this agency rulemaking.

Future judicial review also is foreclosed due to the economic impact of the Rule, and associated agency enforcement actions, on PMD suppliers. In support of a preliminary injunction, the Coalition has submitted declarations establishing that the Rule is likely to drive PMD suppliers out of business in short order: If suppliers furnished seemingly eligible Medicare beneficiaries with expensive power wheelchairs and medical scooters under the Rule, they would lack reasonable assurance of ever being paid. *See* DiLernia Decl. ¶¶ 7-9 (Mot. Exh. 9); Sidak & Singer Decl. ¶¶ 23, 27 (Mot. Exh. 8); Zipp Decl. ¶¶ 20, 24-27 (Mot. Exh. 7). That is true for suppliers of all sizes and business plans, including The Scooter Store (which is a large supplier of PMDs with approximately 1100 employees in 40 states, *see* Zipp Decl. ¶ 8) and Mr. Mobility (which is a much smaller New Jersey supplier with 11 employees, *see* DiLernia Decl. ¶ 2).

The Secretary insists at length (Opp. 15-19) that the Coalition's sworn and unrebutted testimony should be dismissed as "rank speculation" (*id*. at 2). But the Secretary never even acknowledges key testimony such as that of Mr. Mobility's founder and President, who states that if (but only if) the Rule takes effect, he expects his company to "wind-down its operations and stop doing business as a supplier of mobility equipment in early 2006." DiLernia Decl. ¶ 18. It is hard to imagine how any businessman could be more concrete about the imminent effect of a regulatory action on his company.

The Secretary's criticisms of the economic analysis showing that The Scooter Store would be in similar peril under the new Rule devolves into a post hoc attempt (Opp. 16-18) to rewrite the preamble to the Rule. The Secretary's real point (*id*. at 17-18) seems to be that it is implausible for the economists to conclude that The Scooter Store must plan for disallowance of at least 25% of its claims under the new Rule – which is a higher disallowance rate than the company could endure.[2] *See* Sidak & Singer Decl. ¶ 27. But that is an entirely reasonable conclusion in light of three irrebuttable facts: (1) the disallowance rate for power wheelchairs is 17% *under the current rules* (*see* Warren Decl. ¶ 31); (2) the Secretary states (Opp. 2, 42) that the purposes of the new Rule include "limit[ing] Medicare payments" and safeguarding the "fiscal . . . integrity" of Medicare, which strongly suggests that the disallowance rate will increase under the new Rule; and (3) a similar claims-review process under the Social Security Disability program results in a claims-denial rate of 25%-40%, *see* Sidak & Singer Decl. ¶ 27 n.20. *See also* Zipp Decl. ¶ 24 (explaining why The Scooter Store "must expect that the rate of denial of Medicare reimbursement claims will be much higher than the historical rate of denials").[3]

Any supplier who could remain in business under the Rule would face other obstacles to obtaining eventual judicial review. In addition to being denied payment on the PMDs it sells, *see* Zipp. Decl. ¶ 13; Sidak & Singer Decl. ¶ 19, a supplier who refused to comply with the Rule would face the possibility of an additional penalty of up to

---

[2] The Secretary is simply wrong in stating (Opp. 17) that Sidak and Singer assume ultimate denial of "*between 50 and 100 percent* of suppliers' claims."

[3] The Secretary misleadingly invokes (Opp. 25) a calculation that only 0.3% of claims actually undergo "complex" review. As the Secretary well knows, CMS extrapolates from the claims for reimbursement that are subjected to "complex" review to demand repayment from a supplier on other claims that have not been reviewed. *See* Mot. 28 n.5.

$2000 on each claim filed. *See* 42 C.F.R. § 402.105(a). The supplier could also lose its

Medicare billing privileges. 42 C.F.R. § 424(c)(1) (requiring supplier to certify that it

will "[o]perate[] its business and furnish[] . . . Medicare-covered items in compliance

with all applicable Federal and State licensure and regulatory requirements"); *id.* § 424(d)

("CMS *will* revoke a supplier's billing privileges if it is found not to meet the standards in

paragraphs (b) and (c) of this section.") (emphasis added). Zipp explains that suppliers

are acutely aware of their exposure to "civil monetary penalties and exclusion from future

participation in Medicare" for submitting claims later determined not to be medically

reasonable and necessary. Zipp Decl. ¶ 27. Suppliers also face the further specter of

treble-damages liability under the False Claims Act, 31 U.S.C. § 3729, and criminal

punishment under 18 U.S.C. § 287. *See* Zipp Decl. ¶ 27.

This case is therefore very different from *Illinois Council*, in which the Supreme

Court determined that "a nursing home . . . can test the lawfulness of [CMS's] regulations

simply by refusing to [comply] and incurring a minor penalty." 529 U.S. at 22. This

case fits, instead, within a line of cases in which courts have found jurisdiction to hear

claims arising under Medicare, without prior administrative review.

In *American Lithotripsy Society v. Thompson*, 215 F. Supp. 2d 23 (D.D.C. 2002),

for example, the Court determined that, if providers of a kidney stone treatment did not

comply with new Medicare reimbursement rules, they could be required to disgorge

payments and face potential statutory penalties of up to $15,000 per bill submitted to

Medicare, possible exclusion from the Medicare program, and possible criminal penalties

under 18 U.S.C. § 287. *Id.* at 29. Those potential sanctions for non-compliance with the

reimbursement rule were sufficient to allow immediate judicial review under *Illinois*

7

*Council*, because the providers faced "financial ruin" if required to live under the challenged rule.  *Id.  Accord National Athletic Trainers Ass'n v. HHS*, No. 3:05-CV-1098, 2005 WL 2648402 (N.D. Tex. July 21, 2005) ("Severe penalties and sanctions have been held to remove any incentive a party may have to seek administrative review of a denial of claims in violation of the Medicare regulation.").

The Secretary's only argument for distinguishing *American Lithotripsy* is that, in that case, "the Secretary did not contest plaintiffs' allegations of 'financial ruin' and lack of access to the administrative process."  Opp. 26.  Yet the Secretary does not contest *in this case* that suppliers who are found to have violated the new Rule could face loss of revenue of approximately $5000 per claim (*i.e.*, the cost of a power wheelchair), plus an additional penalty of up to $2000 per claim, plus loss of Medicare billing privileges, plus False Claims Act liability, plus the same criminal penalties at issue in *American Lithotripsy*.  This case is materially indistinguishable from *American Lithotripsy*.

Similarly, in *National Association of Psychiatric Health Systems v. Shalala*, 120 F. Supp. 2d 33 (D.D.C. 2000), the Court found that it had jurisdiction because the plaintiff hospitals faced termination from Medicare.  *Id.* at 38.  The Court explained that, "[u]nlike the nursing homes in *Illinois Council*," Medicare providers facing possible termination from the program "do not have the option of incurring a minor penalty and receiving an administrative hearing before proceeding to federal court."  *Id.* at 39.  The same is true here, where PMD suppliers "fac[e] 'economic suicide,'" if they continue in the program without reasonable assurance of reimbursement.  *Id.* at 38 n.4.

Decisions of other courts also directly support a finding of jurisdiction in this case.  *See Frontier Health, Inc. v. Shalala*, 113 F. Supp. 2d 1192, 1192 (E.D. Tenn. 2000)

(granting a preliminary injunction to preserve the status quo because the plaintiff hospital could otherwise have been forced to close before obtaining judicial review); *Pathfinder Healthcare, Inc. v. Thompson*, 177 F. Supp. 2d 895, 896-97 (E.D. Ark. 2001) (following *Frontier Health*).

The Secretary contends (Opp. 24-25) that resort to the administrative process is required unless administrative review is formally unavailable, such that a claim literally could not be presented to the agency. The Secretary's extreme reading of *Illinois Council* implies that each of the above-cited cases was wrongly decided. But the Secretary's argument is itself incorrect. *Illinois Council* expressly did not foreclose the possibility that "a general agency practice that forced nursing homes to abandon legitimate challenges to agency regulations could amount to the 'practical equivalent of a total denial of judicial review.'" 529 U.S. at 22 (quoting *Haitian Refugee Center,* 498 U.S. at 497). Courts in this and other Circuits addressed that situation in *American Lithotripsy*, *Psychiatric Health System*, and the other cases cited above, and this Court should follow those decisions.

The Secretary's final argument (Opp. 25 & n.17) is that, although civil and criminal penalties beyond denial of reimbursement are "theoretically possible," the Court should "accept the Secretary's representations on this matter." That is a bizarre assertion, because *the Secretary makes no representations about what penalties he would attempt to impose for alleged non-compliance with the Rule.* To the contrary, as if to highlight the aggressive enforcement posture the Secretary is taking against PMD suppliers, the Secretary's lawyers virtually boast (*id.* at 18 & n.12, 36 n.24) that they might possibly force The Scooter Store out of business through a pending lawsuit that involves the False

Claims Act (although not any issues of medical necessity under Medicare). *See DeWall Enters.*, 206 F. Supp. 2d at 998 n.5 (recognizing the reasonableness of a Medicare supplier's "reluctance" to file disputable reimbursement claims because of "the possibility of inviting prosecution for Medicare fraud"). Under the circumstances, PMD suppliers cannot take any comfort from the Secretary's *non*-assurances in this case.

    2.      *The Court Has Jurisdiction To Preserve the Status Quo Under 28 U.S.C. § 1331*

Even if this Court were to determine that *Illinois Council* requires resort to the administrative process in the first instance, the Court still would have jurisdiction to issue a preliminary injunction against enforcement of the Rule, to preserve the pre-Rule status quo while Coalition members pursue an (inevitably futile) administrative challenge. *See Pathfinder Healthcare*, 177 F. Supp. 2d at 895; *Frontier Health*, 113 F. Supp. 2d at 1192; *see also International Long-Term Health Care, Inc. v. Shalala*, 947 F. Supp. 15, 20 (D.D.C. 1996) (pre-*Illinois Council* decision granting an injunction to "maintain the status quo and permit [an] ALJ . . . to rule on the merits of whether termination [of plaintiff nursing home's funding] is appropriate before the issue becomes academic as a practical matter"); 5 U.S.C. § 705 (authorizing, on showing of irreparable injury, judicial "process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings").

Although this Court has jurisdiction to reach the merits of this case without delay, and doing so would vindicate the public's participatory rights under the APA and better protect PMD suppliers and Medicare beneficiaries from hardship, an injunction to preserve the status quo would nevertheless minimize irreparable harm to the Coalition's members.

10

3.    *The Court Has Mandamus Jurisdiction To Enjoin Enforcement of the Rule Pending a Final Determination on the Merits*

Finally, *Illinois Council* and the underlying statute it applies, 42 U.S.C. § 405(h), do not limit the Court's jurisdiction to issue a writ of mandamus under 28 U.S.C. § 1361. The D.C. Circuit has held that "§ 1361 jurisdiction is not barred" by section 405(h). *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 813 (D.C. Cir. 2001).

In this case, the high standard for mandamus relief is met.  *See id.* ("[T]o maintain an action under § 1361, a plaintiff must both exhaust available remedies and show a clear non-discretionary duty.").  For the reasons discussed in the Coalition's Motion (at 12-19), and further explained in the next section of this Reply, the Secretary had a clear, non-discretionary duty to give the public an opportunity to comment on the Rule *before* it became effective, and to consider those comments before promulgating any rule, whether labeled "Interim Final" or "Final."  The Coalition cannot enforce that duty through any administrative process because no available administrative body has authority to overturn the Rule, the Coalition's procedural claims may be lost when a permanent rule is issued, and members of the Coalition could not survive the lengthy administrative process.  *See, e.g.*, *Garner v. United States Dep't of Labor*, 221 F.3d 822, 825 (5th Cir. 2000) (on petition for a writ of mandamus, exhaustion of administrative remedies not required because exhaustion would be futile).

**B.     The Rule Is Clearly Unlawful Due to the Secretary's Failure To Solicit Public Comment**

The Secretary devotes only a few pages of his lengthy opposition to defending his failure to follow notice and comment procedures; those pages add nothing to the inadequate justification in the preamble to the Rule. *See* Opp. 36-42. Indeed, the Secretary is unable to offer any plausible justification for short-circuiting notice and comment.

1.     *The Secretary's "Interpretive Rule" Rationale Does Not Apply to the Critical Portions of the Rule*

The Secretary first argues (Opp. 36-38) that "portions" of the Rule (specifically, the written-prescription and face-to-face-examination requirements) are exempt from the APA's notice-and-comment mandate as "interpretive rules." 5 U.S.C. § 553(b)(A). That argument is wrong even on its own terms. *See* Mot. 14-15 (discussing Secretary's departure from the Medicare Modernization Act ("MMA") in defining "prescription," and relevant case law). But much more important, it cannot support the *other* portions of the Rule that are central to the Coalition's request for an injunction.

2.     *The Secretary's Fraud Rationale Does Not Withstand Examination*

With respect to the critical features of the Rule – its elimination of the CMN and the Documentation Requirements – the Secretary argues (Opp. 38-42) that notice and comment were unnecessary under the "good-cause" exception of 5 U.S.C. § 553(b)(B). According to the Secretary, failing to let the public participate in developing the Rule was justified "because 'fraudulent billing practices for PMDs have been a substantial problem, evidenced by an approximate 350 percent increase in billing for these devices in 1999 and 2003.'" Opp. 40 (quoting 70 Fed. Reg. at 50,943). The Coalition's Motion (at

16-19, 21-23) disproves that argument several times over, and the Secretary's Opposition confirms our analysis.

To invoke lawfully the good-cause exception, an agency must show that:  (1) there was insufficient time to undertake notice and comment; (2) delay would entirely frustrate the purposes of the rule; or (3) "delay could result in serious harm."  *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004); *see Utility Solid Waste Activities Group v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001).  The Secretary cannot satisfy any of those tests.[4]

As for the first possible justification, insufficient time, the Secretary relies only on data covering 2003 and before.  There plainly has been time for an anti-fraud rulemaking since the period covered by his data.  Indeed, the Secretary contemplated changing the reimbursement rules as early as September 2003 and actually initiated a notice-and-comment rulemaking on that issue (and others) in August 2004, *see* Mot. 6-8 & n.2, but he never followed through with a rule.  Agency delay disproves, rather than supports, a claim of insufficient time for public notice and comment.  *See World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61, 65 (D.D.C. 2000).

The Secretary makes no argument that allowing public participation in consideration of the Rule would have entirely frustrated the purposes of the Rule, and, indeed, public comment might have enabled the Secretary to discern reasonable alternatives that would have strengthened anti-fraud measures without creating

---

[4] The Secretary's citation (Opp. 38) to the interim-rule provisions of the Medicare Act, 42 U.S.C. § 1395hh(a) (Supp. 2004), adds nothing to his argument.  Under § 1395hh(b), notice and public comment are required unless the rule comes within an exception in 5 U.S.C. § 553(b)(B).

destabilizing uncertainty in the industry. The second potential justification for skipping notice and comment therefore is inapplicable as well.

In advancing his fraud rationale, the Secretary attempts to make a case under the third possible justification – that delay would have caused serious harm to the public. Yet the supposed urgency of adopting this Rule as part of a fraud-reduction effort is entirely undercut by the fact that the Secretary has been considering revisions to the PMD program's documentation requirements since at least September 2003. The Secretary affirmatively decided to take no action on the reimbursement-documentation issue in the 2004 rulemaking, even though he did act on many other aspects of the rules proposed in that proceeding. *See* Mot. 8. Then the Secretary waited until August 2005 to release the instant Rule.[5]

The Secretary's intentional two-year delay strongly suggests there is no genuine emergency. *See World Duty Free Americas*, 94 F. Supp. 2d at 65. Even if there were an emergency, moreover, it could have been addressed, without any additional delay, to the extent the public record generated in 2004 supported reasonable changes to the existing rules. There was no need to bypass APA procedures.[6]

The Secretary's assertion of a fraud emergency is further discredited by the fact that both Congress and the Secretary have elsewhere addressed that problem. *See* Mot. 6 (discussing MMA); *id.* at 18 n.3, 21-22 (discussing National Coverage Decision (NCD)

---

[5] The Secretary points out (Opp. 41) that the rule proposed in 2004 "cover[ed] payment for all types of DME." But the Secretary's initial proposal for broader regulatory change did not prevent him from addressing PMDs either alone or as part of a broader rule.

[6] The Secretary's reliance (Opp. 40-41) on *United Steelworkers of America v. Rubber Manufacturers Association*, 783 F.2d 1117 (D.C. Cir. 1986), is hard to understand. In that case, the court rejected a request to "punish" an agency for its prior delay by ordering the agency to accelerate a rulemaking. 783 F.2d at 1120. Here, the Coalition emphasizes the Secretary's delay, not to punish the agency, but to disprove the Secretary's bald assertion that an emergency justified disregard for APA procedures.

released in May 2005); CMS, *Decision Memo for Mobility Assistive Equipment* (CAG-00274N), at 4 (May 5, 2005) (Exh. 3 hereto) (noting that NCD was intended to address "allegations of wheelchair fraud and abuse").  The Secretary himself makes this point. Using Medicare parlance, he states that "[o]ngoing efforts by [the Secretary] to target fraud and abuse" – outside the context of the new Rule – have "improve[d] the profile of PMD claims."  Opp. 11.  More concretely, the Secretary's witness states that Medicare expenditures on power wheelchair claims fell from $1.2 billion in 2003 to $822 million in 2004 (a 31% decrease) "following increased anti-fraud efforts."  Warren Decl. ¶ 19; *accord* Zipp Decl. ¶ 9.  Of course, that decrease occurred under a regime in which providers relied on CMNs for reimbursement, so the Secretary can make no credible claim that eliminating the CMN will produce anti-fraud benefits.[7]  Finally, in the preamble to the Rule, the Secretary represented that the new Rule would make only a "minimal" contribution to reducing PMD reimbursement expenditures.  70 Fed. Reg. at 50,945.

The Secretary also undercuts his exigency arguments by asserting (Opp. 15) that the Rule merely "continues [CMS's] longstanding policy" concerning medical records. That assertion is untrue, and could not explain the Secretary's elimination of the CMN, which historically has been the primary tool for ensuring consistency, clarity, and accuracy in Medicare reimbursement for PMDs.  *See* Mot. 25-27; pp. 17-18, *infra*.  The important point with respect to the Secretary's assertion of good cause for bypassing notice and comment, however, is that, if the Secretary were correct that "the PMD payment rule documentation requirements are fully consistent with prior CMS policy"

_____

[7] Indeed, the treating physician must certify, subject to civil and criminal penalties, that the information contained on the CMN is true, accurate, and complete. *See* Mot. Exh. 4.  Eliminating the CMN therefore removes a reliable means of deterring fraudulent prescriptions of PMDs.

(Opp. 36), then there is absolutely no urgency to issuing the Rule. A desire to codify "longstanding requirements" would not constitute an "emergency situation[]" under the APA's good-cause exception. *Utility Solid Waste Activities Group*, 236 F.3d at 754.

At bottom, the Secretary's argument for bypassing notice and comment is literally nothing more than that he believes there will be a benefit to adopting the Rule. As the Coalition noted in its Motion (at 18), accepting that argument would allow the good-cause exception to swallow the notice-and-comment protections of the APA. Such an outcome would be entirely inconsistent with Congress's view that public notice and comment strikes the correct balance between agency efficiency and agency accountability. *See New Jersey Dep't of Envtl. Prot. v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980).[8]

### C.    The Coalition Is Likely To Prevail on Its Substantive Claims

To grant the requested injunction, this Court need only conclude that the Coalition is likely to prevail on the foregoing procedural arguments. Nevertheless, consideration of the Coalition's substantive claims makes the case for preliminary relief even stronger.

---

[8] The cases cited by the Secretary (Opp. 39-40) confirm that the good-cause exception is reserved for rare circumstances in which a true emergency demands urgent action. *Northern Arapahoe v. Hodel*, 808 F.2d 741 (10th Cir. 1987), for example, upheld an emergency regulation governing the upcoming hunting season based on evidence that, in the absence of regulation for that season, "wildlife could be reduced to a point where normal propagation and recovery will not occur." *Id.* at 746, 750 (internal quotation marks and emphasis omitted). *National Federation of Federal Employees v. Devine*, 671 F.2d 607 (D.C. Cir. 1982), involved an emergency postponement of the "open season" for federal employees' health plan enrollment because of "unforeseen emergency circumstances, including last-minute benefit reductions and pending litigation," which made accurate information about the terms of health care plans unavailable. 671 F.2d at 608. The remaining cases mentioned by the Secretary are no more helpful to him. *See National Customs Brokers & Fowarders Ass'n of Am., Inc. v. United States*, 59 F.3d 1219, 1221, 1223 (Fed. Cir. 1995) (interim rule did not affect existing rights and obligations); *Washington State Farm Bur. v. Marshall*, 625 F.2d 296, 307 (9th Cir. 1980) (EPA permissibly invoked good-cause exception to act promptly after being presented with new information showing risk to children from pesticides, because the "strawberry harvest season was already at hand").

1.    *The Secretary Failed To Consider Obvious Alternatives*

In response to the Coalition's explanation that the Secretary unlawfully failed to consider obvious and facially reasonable alternatives to the radical approach taken in the Rule (Mot. 24), the Secretary offers the non-response that he did not have to consider "every alternative device and thought conceivable by the mind of man" (Opp. 35) (internal quotation marks omitted).  Aside from that rhetorical flight of fancy, the Secretary offers no reason for failing to consider the concrete alternatives discussed in comments submitted on the August 2004 proposed rule – which is what the Secretary promised to do when he deferred action on the relevant portions of the proposed rule in November 2004.  *See* Mot. 8.  Likewise, the Secretary does not explain why he rejected the known option of revising the CMN form to include additional information that would facilitate review by Medicare carriers.  *See* Zipp. Decl. ¶ 23.  Those options were not "uncommon or unknown," and the Secretary therefore had "an obligation to consider" them.  *Chamber of Commerce v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005).

2.    *The Rule Violates Substantive Requirements of the Medicare Act*

The Motion further points out (at 23) that both eliminating the CMN and adding the Documentation Requirements conflict with the Medicare Act.  The Secretary responds, first, that the statute does not prevent abolition of the CMN.  Opp. 27-35.  That is incorrect.  The Medicare Act, 42 U.S.C. § 1395m(j), provides that "a supplier of medical equipment and supplies *may distribute to physicians*, or to individuals entitled to benefits under this part, a certificate of medical necessity for commercial purposes."  *Id.* § 1395m(j)(2)(A)(i) (emphasis added).  The Act then provides that a CMN is "a form or other document containing information required by the carrier to be submitted to show

that an item is *reasonable and necessary*." 42 U.S.C. § 1395m(j)(2)(B). The Rule

nullifies those statutory provisions – and eliminates suppliers' statutory right – by

eliminating the CMN. In addition, HHS has long expressed the view that the CMN –

which was developed in consultation with the American Medical Association, the

Practicing Physicians Advisory Council, and other medical experts – is "indispensable"

to the administration of the Medicare program. Mot. 5 (quoting HCFA's November 1996

Paperwork Reduction Act submission to OMB), *see id.* at 23, 25-27 (discussing the role

of the CMN). Elimination of the CMN is therefore arbitrary, as well as contrary to law.

*See* 5 U.S.C. § 706.

The Secretary further argues (Opp. 27-30) that he has essentially limitless

discretion to require documentation in lieu of the CMN. That, too, is incorrect. Section

1395m(j) gives a supplier a statutory right – exercised at the *supplier's* discretion – to use

a CMN to aid in the reimbursement process. The only court to consider the matter has

rejected the Secretary's claim of boundless discretion. *Maximum Comfort, Inc. v.

Thompson*, 323 F. Supp. 2d 1060, 1068-69 (E.D. Col. 2004).

The Secretary points out (Opp. 27) that the Act makes "reasonableness and

necessity . . . the touchstone of reimbursement." But Congress identified the CMN as a

primary vehicle by which determinations of reasonableness and necessity should be

made. *Compare* 42 U.S.C. § 1395m(j)(2)(B) (CMN defined as containing information

needed "to show that an item is reasonable and necessary") *with id.* § 1395y(a)(1)(A)

("no payment may be made . . . for items or service . . . which . . . are not reasonable and

necessary"). The Secretary's rush to eliminate the CMN and to replace it with vague and

essentially boundless documentation requirements flouts the will of Congress as expressed in the Medicare Act.

## II. ABSENT A PRELIMINARY INJUNCTION, COALITION MEMBERS WILL SUFFER IRREPARABLE HARM

The Secretary concedes (Opp. 14) that "economic loss that threatens the survival of a movant's business constitutes irreparable harm." Citing *Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985), however, the Secretary contends (Opp. 14-15) that going out of business is the *only* form of economic loss that can constitute irreparable harm, and even that is not enough unless the loss of a business is "certain to occur in the near future."

The Secretary grossly misreads *Wisconsin Gas*. First, the Court of Appeals stated in *Wisconsin Gas* that "*[r]ecoverable* monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." 758 F.2d at 674 (emphasis added). In substance, the threatened loss of a business converts otherwise recoverable economic loss into unrecoverable loss. When substantial monetary loss is unrecoverable for some other reason, a threat to the existence of the business is not necessary. *See* Mot. 29-30 (discussing cases).

Second, the burden on the party seeking an injunction is to "substantiate the claim that irreparable injury is '*likely*' to occur." *Wisconsin Gas*, 758 F.2d at 674 (emphasis added) (quoting *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n.3. (1977)). A concrete showing of likelihood – not absolute certainty – is what the Court of Appeals required in saying that the harm must be sufficiently certain. As the Court of Appeals explained, "[i]njunctive relief will not be

granted against something merely feared as liable to occur at some indefinite time." *Id.* (internal quotation marks omitted).

In this case, Coalition members are very likely to suffer irreparable harm if implementation of the Rule is not enjoined at this time. *See* pp. 5-7, *supra* (discussing the Coalition's evidence and the inadequacy of the Secretary's criticisms of that evidence). Testimony such as Mr. DiLernia's statement that he expects to shut his business within several months, and the economic demonstration that The Scooter Store could not operate profitably if its claims were denied at a rate modestly higher than the current 17% denial rate for power wheelchair claims, is not "strident speculation," as the Secretary asserts. Opp. 15. The DiLernia Declaration records a practical business judgment: Because Mr. DiLernia's long experience with the PMD program tells him he is unlikely to be able to make a profit under the Rule, he plans to wind-down his business rather than operate at a loss. *See* DiLernia Decl. ¶¶ 1, 5-18. Similarly, Sidak and Singer make a very reasonable assumption that when the Secretary has promulgated a rule to reduce PMD reimbursement costs through new procedures, without changing the substantive eligibility criteria, the Secretary intends to deny more claims under the new procedures. *See* Sidak & Singer Decl. ¶¶ 25-27.

The Secretary offers (Opp. 18) a CMS employee's statement that "we anticipate that supplier denial rates will decline" under the Rule. Warren Decl. ¶ 32. Mr. Warren's prediction, however, does not contradict the Coalition's evidence. Because suppliers incur thousands of dollars of loss on every denied claim, they will refuse to provide power wheelchairs and scooters to some Medicare beneficiaries under the new Rule in order to minimize the likelihood of claims-denials, even though the beneficiaries'

underlying medical records may strongly (but not certainly) substantiate medical reasonableness and necessity. Reduced utilization of PMDs by eligible Medicare beneficiaries might reduce the claims-denial rate for PMDs in the long run, even though PMD suppliers must assume that the Secretary intends to deny a higher percentage of claims in the near term. The prospect of eventually selling fewer PMDs than today will not be enough to keep suppliers in business, when they cannot operate with an expectation of profitability due to uncertainty over the standards for reimbursement.

Because he fails to recognize that non-recoverable economic loss, short of going out of business, can be irreparable injury, the Secretary has no substantive answer to the Coalition's additional showing (Mot. 28-29) of irreparable injury from foregone sales of PMDs and denied reimbursement claims. Furthermore, Coalition members will incur new out-of-pocket costs if required to live under the Rule, such as increased record-gathering and record-keeping costs. *See* Mot. 24, 28. Because Medicare caps suppliers' recovery on reimbursable PMDs, *see* 42 C.F.R. § 410.152(d), there is little chance that those costs ever could be recouped. This also is irreparable injury under *Wisconsin Gas*, 758 F.2d at 674.[9]

Finally, the Secretary does not respond to the Coalition's point that its members are suffering irreparable *non-economic* harm from being deprived of their opportunity to participate in the notice-and-comment process on the Rule. *See* Mot. 30 (citing *Community Nutrition Inst. v. Butz*, 420 F. Supp. 751, 757 (D.D.C. 1976)). That harm – which already is being suffered – is alone sufficient to support a preliminary injunction.

---

[9] The Secretary claims (Opp. 36 n.24) that the Rule does not substantially change record-keeping obligations. But his witness states only that as a part of pre- or post-payment review, a Medicare carrier could request additional documentation from the supplier. Warren Decl. ¶¶ 10-11. The new Rule, by contrast, requires for *every claim* that the physician must provide and the supplier must keep "pertinent parts of the beneficiary's medical record." 70 Fed. Reg. at 50,946 (new 42 C.F.R. § 410.38(c)(2)(iii)).

## III.    A PRELIMINARY INJUNCTION WOULD NOT CAUSE THE SECRETARY SERIOUS HARDSHIP

The Coalition showed that the Secretary will suffer minimal hardship if implementation of the Rule is enjoined.  *See* Mot. 30-32.  The Secretary's only response (Opp. 42) is a general invocation of fraud concerns.  The Secretary's reliance on the Rule as a supposedly essential fraud-reduction tool suffers from all the same inadequacies as his invocation of fraud concerns to explain bypassing notice-and-comment procedures. *See pp.* 15-16, *supra*.

The Secretary's claim is also undermined by his failure to dispute that Medicare carriers do not have the systems necessary to process reimbursement claims under the new Rule, and they will not have such systems in place before April 2006.  *See* Mot. 10-11.  For the next five months, therefore, the Rule would not even have the full benefit the Secretary claims.  *Id.* at 31-32.

In that regard, because the Coalition seeks an injunction to *preserve* the status quo in the PMD program, the balance of hardships further tips in favor of granting the requested relief.  The Secretary's unexplained invocation of the rule that injunctions are disfavored when they change the status quo (Opp. 13-14 n.7) has no place in this case. *See* 43A C.J.S. Injunctions § 21 (June 2005) (available on Westlaw) ("The status quo which will be preserved by a preliminary injunction is the last, actual, peaceable, noncontested status which preceded the pending controversy.").

IV.    **THE PUBLIC INTEREST LIES IN ISSUING A PRELIMINARY INJUNCTION**

The public interest weighs heavily in favor of injunctive relief. An injunction would make it unnecessary for physicians and equipment suppliers to withdraw from the PMD program in order to avoid hardship from the Rule. An injunction would thus safeguard Medicare recipients' access to mobility equipment that enables them to live safer and more independent lives. *See* Mot. 33; Race Decl. ¶¶ 2-5, 13. In addition, an injunction would serve the public interest by enforcing the participatory rights safeguarded by the APA. Mot. 34.

The Secretary responds (Opp. 42) primarily by reciting his fraud rationale, which (once again) overlooks that: program expenditures already have plummeted; measures outside the Rule are addressing fraud; abolishing the sworn CMN is not a reasonable way to deter fraud; and there are better ways to address any inadequacies in the current CMN process.

Relatedly, the Secretary invokes (*id.* at 42) "the fiscal . . . integrity of the Medicare program." That rhetoric is out of place here, given the Secretary's assertion in the Federal Register that the Rule will have "minimal" impact on Medicare reimbursements for PMDs. 70 Fed. Reg. 50,945. The Secretary is also silent about research, discussed in the Motion (at 33-34), that the provision of PMDs under Medicare *saves* program funds by reducing expenditures on home healthcare and inpatient care. Furthermore, the fundamental purpose of Medicare is ensuring that eligible beneficiaries have access to medically reasonable and necessary technologies. *See International Long Term Care, Inc. v. Shalala*, 947 F. Supp. 15, 20 (D.D.C. 1996). The Rule contravenes that purpose by threatening beneficiaries' access to PMDs, because it will force

physicians and suppliers out of the Medicare program.  *See* DiLernia Decl. ¶¶ 17-18; Sidak & Singer Decl.; Race Decl. ¶¶ 12-13.[10]

The Secretary's suggestion that immediately implementing the Rule is necessary to avert a crisis is even more outlandish when it is considered in the overall context of the Medicare and Medicaid programs that CMS administers.  Combined Medicare and Medicaid expenditures were approximately $600 billion in 2004.  *2005 the Secretary Statistics* at Table 26, U.S. Department of Health and Human Services, *available at* http://www.cms. hhs.gov/researchers/pubs/CMSstatistics/2005CMSstat.pdf.  Total PMD reimbursement expenditures make up less than 0.2% of overall program spending.  *See* Warren Decl. ¶ 19.  The Secretary's suggestion that notice and comment on his new Rule would have threatened "the financial stability of the benefit program" cannot be taken seriously.  Opp. 40 (quoting *National Fed'n of Fed. Emp. v. Devine*, 671 F.2d 607, 610-11 (D.C. Cir. 1982)).

Finally, the Secretary asserts (Opp. 42) that beneficiaries would suffer from an injunction because the Rule implements a statutory change that made it easier for eligible Medicare recipients to obtain medical scooters.  *See* Mot. 6 (discussing statutory change). That is a frivolous argument.  Although the Secretary has expressed concern about the stability of medical scooters and continues to recommend that a specialist should evaluate the beneficiary's capacity to operate one safely, *see* 70 Fed. Reg. at 50,941, he undoubtedly has legal authority to take non-discretionary action, outside the context of the current Rule, that allows non-specialist physicians and certain other medical

---

[10] The Secretary argues (Opp. 17) that the Rule will not adversely affect physician participation in the PMD program because physicians will be paid a small extra amount.  The Secretary, however, never addresses Dr. Race's testimony that "the additional administrative costs imposed on [medical] practice[s] as a result of the new rule's documentation requirements will not be fully reimbursed by Medicare."  Race Decl. ¶ 12.

professionals to prescribe scooters. The Secretary's decision to use the Rule as a device to implement a statutory change that Congress made two years ago is not a basis for denying the injunctive relief requested by the Coalition, particularly when the Secretary has tied his implementing action to other changes that will sow confusion and uncertainty in the industry.

## CONCLUSION

For the reasons stated in the Coalition's Motion and this Reply, this Court should enter a preliminary injunction enjoining defendants from enforcing the challenged Rule (new 42 C.F.R. § 410.38(c)).

Respectfully submitted,

/s/ K. Chris Todd
K. Chris Todd
  D.C. Bar No.: 284455
David C. Frederick
  D.C. Bar No.: 431864
Austin C. Schlick
  D.C. Bar No.: 450042
Gregory G. Rapawy
  D.C. Bar No.: 493973
Kellogg, Huber, Hansen, Todd
  Evans & Figel, P.L.L.C.
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
(202) 326-7900

Eric W. Sokol
  D.C. Bar No.: 434592
Power Mobility Coalition
919 18th Street, N.W.
Suite 550
Washington, D.C. 20006
(202) 296-3501

Stephen M. Azia
  D.C. Bar No.: 426575
Eastwood & Azia, P.L.L.C.
919 18th Street, N.W.
Suite 550
Washington, D.C. 20036
(202) 296-4100

*Counsel for the Power Mobility Coalition*

Dated:  October 24, 2004